## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | ) | |
| IN RE G-FEES ANTITRUST LITIGATION | ) | Civil Action No. 05-114 (RWR) |
| | ) | |
| This Document Relates to: | ) | |
| All Actions | ) | |
| | ) | |

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs, by their counsel, submit this Consolidated Class Action Complaint against Defendants Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac"), upon knowledge as to themselves and their own acts, and upon information and belief as to all other matters, and allege as follows:

## NATURE OF THE ACTION

1.     These class actions are brought under federal and state antitrust laws, and other state laws, on behalf of all persons or entities who have obtained a residential real estate loan in the United States (including the District of Columbia), during the period from January 1, 2001 through the present (the "Class Period"), which contains guarantee fees, or "G-Fees", set by Fannie Mae or Freddie Mac  and incorporated into loans by mortgage lenders (the "Class").

2.     Fannie Mae and Freddie Mac set G-Fees that are included in certain residential mortgage loans throughout the United States.  G-Fees are the price that Defendants charge for a credit risk guarantee which assures timely payment of principal and interest of the underlying loan.  A G-Fee may include delivery fees and fees associated with cash-out re-financings, which are added guarantee costs for purportedly riskier mortgage loans. The G-Fees guarantee that the residential real estate loan, which has been pooled and sold to investors as part of a mortgage-

backed security, will be paid to the investor in a timely manner, whether or not there is a loan default. Not including delivery fees and fees associated with cash-out re-financings, G-Fees average about two-tenths of a percent (0.2%) of a loan amount and are included as a component of the monthly mortgage rate charged by lenders and paid by millions of borrowers. This means, for example, that on a typical $250,000 home loan, the G-Fees constitute about $500 of the annual mortgage payments at the beginning of the loan's term and total about $11,350 over the full 30-year term of the loan.

3.      If Defendants were competing with one another with regard to the amounts of G-Fees charged to borrowers, G-Fees would be expected to fluctuate with Fannie Mae's or Freddie Mac's actual losses from mortgage defaults. Despite a significant decrease in mortgage defaults, however, G-Fees have been collusively maintained at artificially inflated levels, allowing Fannie Mae and Freddie Mac to garner approximately $4 billion attributable to G-Fees last year. In 2003, Fannie Mae and Freddie Mac collected G-Fees amounting to thirty-three (33) times credit losses, which constitutes a dramatic increase from 4.4 times credit losses in 1995. Fannie Mae's G-Fee income rose twenty-four percent (24%) in the latest quarter of 2004 to $759 million, despite a continuing decline in mortgage activity and minimal credit losses.

4.      As alleged herein, Fannie Mae and Freddie Mac entered into a contract, combination or conspiracy to fix, raise, maintain or stabilize G-Fees paid in connection with residential real estate loans. In or about 2001, Freddie Mac established a G-Fee floor, which Fannie Mae has followed in "lock-step." As reported in the *Wall Street Journal*, the Office of Federal Housing Enterprise Oversight ("OFHEO"), the regulator that oversees Fannie Mae and Freddie Mac, has recently concluded that they have been maintaining artificially high G-Fees,

2

yielding excessive profits at the expense of millions of homeowners. *See* John R. Wilke, House Money: Hidden Fees in Most Mortgages Bring Scrutiny to Fannie and Freddie, - - Regulator Calls Some Charges To Homeowners Too High - - Hundreds of Dollars a Year - - Everyone Has To Dance Along, *Wall Street Journal*, Jan. 14, 2005, p. 1.  Fannie Mae and Freddie Mac paid top executives millions of dollars in bonuses for meeting aggressive earnings targets, which were fueled in part by excessive G-Fee income.

5.      As a direct and proximate result of Defendants' unlawful behavior, Plaintiffs and members of the Class have paid, and continue to pay, artificially high G-Fees, causing them to sustain injury to their business or property.

## JURISDICTION AND VENUE

6.      Plaintiffs bring this class action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and injunctive relief as well as reasonable attorneys' fees and costs with respect to injuries arising from violations by Defendants of the federal antitrust laws, including Section 1 of the Sherman Act. 15 U.S.C. § 1.  Plaintiffs also bring this class action under Section 16 of the Clayton Act, 15 U.S.C. § 26, for injunctive relief as well as reasonable attorneys' fees and costs with respect to injuries arising from violations by Defendants of federal and state antitrust statutes and other state laws.

7.      The Court has federal question subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§1331, 1337(a), Sections 4 and/or 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

8.     Jurisdiction and venue are proper in this District pursuant to 15 U.S.C. §§ 1, 7, 15, 22 and 26, and 28 U.S.C. §1391(b)(2), because a part of the events or omissions giving rise to the claims occurred in this District.  Jurisdiction is also proper in this District because Defendants were federally chartered in this District.

9.     No other forum would be more convenient for the parties and witnesses to litigate this case.

## PARTIES

*Plaintiffs*

10.     The Plaintiffs identified below all obtained residential real estate loans from commercial lenders and make monthly mortgage payments that include G-Fees at artificially inflated levels set by the Defendants:

(a)     Paul Ardelean ("Ardelean") is a resident of Linwood, New Jersey. Ardelean obtained residential real estate loans from Irwin Mortgage Co. (now Gateway Mortgage Co.).

(b)     Raphael Allison ("Allison") is a resident of Hudson, New York.  Allison obtained a residential real estate loan from Key Bank.

(c)     Apryll Boggs ("Boggs") is a resident of Elkview, West Virginia.  Boggs obtained a residential real estate loan from Citigroup.

(d)     William V. Dalessandro and Tracie M. Dalessandro ("the Dalessandros") are residents of Briarcliff Manor, New York.  The Dalessandros obtained a residential real estate loan from M&T Mortgage Corporation, an affiliate of M&T Bank, both of Buffalo, New York.

(e)     Jan and Sari Dulman ("the Dulmans") are residents of West Orange, New Jersey.  The Dulmans obtained a residential real estate loan from HSBC.

4

(f)     Dennis T. Gorchov and Seena Gorchov ("the Gorchovs") are residents of Lafayette Hill, Pennsylvania. The Gorchovs obtained a residential real estate loan from Hamilton National Mortgage Co.

(g)     Ian R. George and Devon L. George ("the Georges") are residents of Pittsburgh, Pennsylvania. The Georges obtained a residential real estate loan from Countrywide Homeloans, Inc.

(h)     Jason Guttman ("Guttman") is a resident of Norwalk, Connecticut. Guttman obtained a residential real estate loan from America's Wholesale Lender.

(i)     Donna Jacobsen ("Jacobsen") is a resident of Boise, Idaho. Jacobsen obtained a residential real estate loan from Interfirst Mortgage.

(j)     Barclay Curran Kling ("Kling") is a resident of Palm Beach, Florida. Kling obtained a residential real estate loan from Stuart Mortgage Corporation.

(k)     Sean M. Lesnjak and Colleen M. Lesnjak ("the Lesnjaks") are residents of Milwaukee, Wisconsin. The Lesnjaks obtained a VA residential real estate loan from US Bank.

(l)     Corey and Pamela McSweeney ("the McSweeneys") are residents of Burnsville, Minnesota. The McSweeneys obtained a residential real estate loan from Countrywide Homeloans, Inc.

(m)     Kathleen Miller ("Miller") is a resident of Scottsdale, Arizona. Miller obtained residential real estate loans from National City Mortgage.

(n)     Mark N. Moon and Elaine P. Moon ("the Moons") are residents of Plano, Texas. The Moons obtained a residential real estate loan from Provident Home Loans.

(o)     Ralph Nudi ("Nudi") is a resident of Kenosha, Wisconsin.  Nudi obtained
a residential real estate loan from Countrywide Homeloans Inc.

(p)     Stuart Rosenthal ("Rosenthal") is a resident of Plantation, Florida.
Rosenthal obtained a residential real estate loan from General Motors Acceptance Corporation.

(q)     Lee F. Sullivan and Diane M. Sullivan ("the Sullivans") are residents of
Denver, Colorado.  The Sullivans obtained residential real estate loans from Washington Mutual
(for their primary residence) and Ohio Savings Bank (for other property they own in Goodyear,
Arizona).

### Defendants

11.     Fannie Mae is a federally chartered corporation with its headquarters in the
District of Columbia.  *See* 12 U.S.C. §§ 1716, *et seq.*  Fannie Mae maintains its principal place of
business at 3900 Wisconsin Avenue, NW, Washington, D.C.  Fannie Mae is shareholder-owned
and its stock trades on the New York Stock Exchange.

12.     Freddie Mac is a government-sponsored enterprise created by Congress in 1970
pursuant to a charter act, 12 U.S.C. §§ 1451 *et seq.*  Freddie Mac maintains its principal place of
business at 8200 Jones Branch Drive, McLean, Virginia.  It is a shareholder-owned company and
its stock trades on the New York Stock Exchange.  While Freddie Mac initially benefited from
statutory immunity from the antitrust and other competition and consumer protection laws,
Congress repealed this immunity in 1989.  *See* 12 U.S.C. § 1456.

13.     Fannie Mae and Freddie Mac are a special form of organization known as a
government-sponsored enterprise (or "GSE").  *See* 2 U.S.C. § 622 (8).

## AGENTS

14.     As more fully described in sections below, lenders with whom Defendants

frequently meet serve as agents of the Defendants with respect to the violations alleged herein.

Defendants acted as undisclosed principals to these agents.  Defendants allow these agents no

discretion as to price or terms under which the G-Fees are to be charged to the Plaintiffs or other

members of the Class.  The agents' role is simply to obtain the price at which the G-Fees are to

be charged to Plaintiffs and other members of the Class.  *See* paragraphs 41-43, *infra*.

## CLASS ACTION ALLEGATIONS

15.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil

Procedure on behalf of the following class:

> All persons or entities who have obtained a residential real estate loan in the
> United States (including the District of Columbia) during the period from January
> 1, 2001 to present (the "Class Period") which contains a guarantee fee ("G-Fee")
> set by Defendant Federal National Mortgage Association ("Fannie Mae"), or
> Federal Home Loan Mortgage Corporation ("Freddie Mac")(the "Class").

Excluded from the Class are the Defendants and any parent, subsidiary, corporate affiliate,

officer, director or employee of a Defendant and any judge or magistrate judge assigned to

entertain any portion of this case.

16.     The members of the Class are so numerous and geographically dispersed that

joinder of all members is impracticable.  The exact number and identity of Class members is

unknown to Plaintiffs, but can readily be ascertained from books and records maintained by

Defendants or their agents.  Upon information and belief, there are millions of persons or entities

in the United States who obtained residential real estate loans containing G-Fees set by Fannie

Mae or Freddie Mac during the Class Period.

17.     There are questions of law or fact common to Class members, which predominate over any individual questions, and include but are not limited to:

(a)     Whether Defendants entered into a contract, combination or conspiracy to fix, raise, maintain or stabilize G-Fees;

(b)     Whether Defendants engaged in a contract, combination or conspiracy not to compete with one another in connection with G-Fees;

(c)     The duration and extent of the contract, combination or conspiracy and monopoly maintenance alleged herein;

(d)     Whether the Defendants were participants in the contract, combination or conspiracy alleged herein;

(e)     Whether the alleged conduct violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

(f)     Whether the alleged conduct violated the state laws alleged herein;

(g)     The effect of Defendants' conduct upon interstate commerce;

(h)     Whether the alleged conduct caused injury and damage to Plaintiffs and members of the Class and the appropriate measure of damages; and,

(i)     Whether Plaintiffs and members of the Class are entitled to injunctive and other equitable relief.

18.     Plaintiffs' claims are typical of the claims of each member of the Class. Plaintiffs and the Class obtained residential real estate loans containing G-Fees from Fannie Mae or Freddie Mac.

19.     Plaintiffs will fairly and adequately protect the interests of the Class.  There is no conflict of interest between Plaintiffs and the other members of the Class.  Plaintiffs are represented by experienced counsel who have successfully prosecuted complex antitrust class actions.

20.     Defendants have acted in an unlawful manner on grounds generally applicable to all members of the Class.

21.     The questions of law or of fact common to the claims of the Class predominate over any questions affecting only individual class members, so that the certification of this case as a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

22.     For these reasons, the proposed Class should be certified under Fed. R. Civ. P. 23.

## INTERSTATE TRADE AND COMMERCE

23.     At times relevant herein, Defendants and/or their wholly-owned subsidiaries or affiliates engaged in the business of purchasing pools of mortgages to package into guaranteed mortgage-backed securities.  The alleged conspiracy involved significant United States commerce.

24.     Defendants engaged in unlawful conduct within the United States, including regularly and frequently receiving payments via the mail and the wires throughout the United States.  The marketing, sale and purchasing pools of mortgages to package into guaranteed mortgage backed securities and the establishment of G-Fees in connection therewith regularly occurs in and substantially affects interstate trade and commerce.

9

## FACTUAL ALLEGATIONS

25.     Plaintiffs, as borrowers and mortgagors, have financed the purchase of their homes with conventional, conforming mortgages (hereinafter, "conforming mortgages") provided by lenders.  Conforming mortgages are loans that conform to the guidelines of Fannie Mae and Freddie Mac (hereinafter the "GSE guidelines").  The GSE guidelines establish uniform features for the loan, such as the maximum loan amount,[1] the down payment amount, the minimum credit worthiness for the borrower, the borrower's income requirements, and suitable properties.  Lenders that make mortgage loans to borrowers conforming to the GSE guidelines may sell those loans to Defendants.  If a loan does not conform to the GSE guidelines, the Defendants are unlikely to purchase the loan except in unusual circumstances.  One of Defendants' requirements is that lenders collect G-Fees from borrowers.

### *Fannie Mae's and Freddie Mac's Business and Market Power*

26.     Defendants Fannie Mae and Freddie Mac, also known as "government sponsored entities" or "GSEs," are privately owned, federally chartered companies, created by Congress to help aid the flow of credit to the residential housing market.  *See* 2 U.S.C. § 622 (8).  Congress's objective in creating Fannie Mae and Freddie Mac was to ensure that mortgage money is available for U.S. homebuyers.  In 1989, Freddie Mac stock was sold to the public.  Since 1992, both Freddie Mac and Fannie Mae have been supervised by a single-purpose regulator housed in the Department of Housing and Urban Development, the Office of Federal Housing Enterprise

---

[1]     In 2004, the conforming loan limit for a one-family home was $333,700.  The maximum conforming loan amounts for mortgages in Alaska, Hawaii and the U.S. Virgin Islands are generally 50% higher than in the rest of the country.

Oversight ("OFHEO").  The advantages of GSE status have enabled the GSEs to grow rapidly and gain an increasing share of the capital markets.

27.     Fannie Mae and Freddie Mac are the biggest issuers of mortgage-backed securities and corporate securities and the largest buyers and hedgers of securities in the world. Fannie Mae and Freddie Mac dominate the fixed-rate mortgage market in the United States, using their borrowing power to buy mortgages from lenders at more advantageous prices (*i.e.*, generally with better interest rates) than those available from their potential competitors.  In 2003, Fannie Mae and Freddie Mac held seventy percent (70%) of the $2.7 trillion business of pooling and selling mortgages as mortgage-backed securities.  Fannie Mae and Freddie Mac are the source of liquidity for more than 75% of conforming home mortgages originated in the United States.

28.     The Defendants are expressly prohibited by their charters from lending directly to consumers.  They operate exclusively in what is known as the secondary mortgage market purchasing mortgages from primary mortgage market institutions.  Primary mortgage market institutions, such as commercial banks, savings and loan associations, and mortgage companies (hereinafter "lenders" or "approved seller/servicers"), lend directly to consumers.  The GSEs are the dominant institutions in the secondary mortgage market.  Fannie Mae and Freddie Mac either own or guarantee most of the currently outstanding conforming mortgages.

### *Securitization and the Secondary Mortgage Market*

29.     Fannie Mae and Freddie Mac operate two distinct lines of business — mortgage-backed securitization (off-balance sheet guarantees) and retained mortgage portfolios (*i.e.*, the mortgages and mortgage-related securities that they hold on their books).  In mortgage-backed

securitization, Fannie Mae and Freddie Mac purchase and pool mortgage loans and sell the cash

flows from the pools as mortgage-backed securities to capital market investors.  This

securitization transforms the illiquid financial assets—mortgage loans—into marketable

securities, called mortgage-backed securities.  Freddie Mac and Fannie Mae securitize

conforming mortgages by bundling them into pools and selling claims on the pools, guaranteeing

the continued creditworthiness of the resulting mortgage-backed securities.  The mortgage-

backed securities are traded in the secondary mortgage market.

30.    For guaranteeing these mortgage-backed securities against the risk of default,

Fannie Mae and Freddie Mac charge G-Fees.  All payment streams from the mortgages that form

the mortgage-backed securities flow to the investors in the mortgage-backed securities.  Fannie

Mae and Freddie Mac have guaranteed that if the underlying mortgages that form the mortgage-

backed securities default, they will step in and cover the absent cash flow.

31.    In their retained mortgage (investment) portfolios, Fannie Mae and Freddie Mac

directly purchase mortgages and various mortgage-related securities, including the repurchase of

their own mortgage-backed securities from capital markets.

32.    The profit structures for the two lines of business differ substantially.  Profits on

investor-held mortgage-backed securities derive primarily from G-Fees.  Profits on the retained

mortgage portfolios, in contrast, are based both on the assumption of credit risk of the mortgages

and on the spread between the interest return on the mortgage assets and the GSEs' cost of funds.

Because of the implied federal guarantee, discussed below, that cost of funds is very low.

33.    While both lines of business have been growing, the guarantee business has

increased significantly.  Total mortgage-backed securities guaranteed — both those held by other

investors and those held by the GSEs in their portfolios —more than doubled from $731 billion in 1991 to over $1.76 trillion in 2000.  Mortgage defaults rates, however, have declined more than 80% over the same period.  Despite this drop, as alleged below, Fannie Mae's and Freddie Mac's G-Fees have been maintained at or near the same levels, generating enormous profits — an estimated $4 billion in 2004 alone — that have no relationship to the potential losses the G-Fees are represented to cover.

### *The Implied Federal Guaranty*

34.     The GSEs derive their market power from a so-called implied federal guarantee, which is a perception in the secondary mortgage market that if the GSEs run into financial trouble, investors in their obligations and mortgage-backed securities will nevertheless be protected by the U.S. government.

35.     Although the prospectuses for all of Fannie Mae's and Freddie Mac's debt offerings clearly state that the U.S. government does not back the company's obligations or mortgage-backed securities, the GSEs' role in the capital markets is aided by the numerous benefits derived from their federal charters and the perception, fostered by Defendants, that these benefits imply a larger commitment by the federal government to sustain the GSEs.  GSE status provides the following benefits that are not available to other financial institutions:

    i.  The GSE debt and mortgage-backed securities are exempt from registration with the Securities and Exchange Commission and from many associated fees;

    ii.  The GSEs are exempt from state and local corporate income taxes;

    iii.  The GSEs have a line of credit from the U.S. Treasury Department that authorizes the department to purchase up to $2.25 billion of Fannie Mae and Freddie Mac

obligations;

iv.     Banks and thrifts are permitted to make unlimited investments in GSEs' debt securities, whereas there are limits placed on their investments in other companies' debt securities;

v.     The GSE securities are eligible as collateral for public deposits and for loans from Federal Reserve Banks and Federal Home Loan Banks;

vi.     The GSE securities are lawful investments for federal fiduciary and public funds;

vii.     The GSEs are authorized to use Federal Reserve Banks as their fiscal agents, including issuing and transferring their securities through the book-entry system maintained by the Federal Reserve;

viii.     The President of the United States appoints a minority number of members to each GSE's board of directors; and

ix.     Any insolvency of the two companies must be resolved by Congress.

36.     Taken together with a perception in the market that the GSEs are quasi-governmental, these statutory benefits provide the GSEs with important advantages: lower funding costs; the ability to operate with less capital; lower direct costs; and the ability to obtain a higher price for mortgage-backed securities than similarly rated non-GSE securities.  The two companies enjoy virtually unlimited access to the capital markets at funding costs that are below those available to other market participants.  As the Congressional Budget Office has noted, "Fannie Mae and Freddie Mac are able to sustain a duopoly [in the secondary mortgage market] because GSE benefits are provided exclusively to them."

14

37.     Because of the implied federal guarantee, the market applies a lower risk premium to Defendants' securitizations than it would to securitizations provided by a non-GSE securitization by even the most creditworthy private company.  Purchasers of mortgage-backed securities issued by Defendants seem to believe that the GSE guarantee means that the payment stream of the security is backed by the U.S. government.  This perception has been fostered by Defendants because it lowers their funding costs.  Any purely private sector offering will carry a higher premium for risk of default than a security that is deemed to have the backing of the U.S. government.  This inherent advantage means that the securitizations for conforming mortgages offered by Defendants will fetch a higher price in the secondary market for mortgage backed securities.  It is this higher price, which translates into a lower interest rate, for their mortgage-backed securities that has allowed the Defendants successfully to conspire and charge supra-competitive prices in the market for conforming mortgage fees.

38.     The market power conferred by the implied federal guarantee allows Defendants to control the market for the purchase and securitization of conforming mortgages.  Any originator of mortgages must abide by the GSE guidelines, if they want to sell their conforming mortgages to Defendants and continue to participate in the market.  Indeed, the GSEs have the power to destroy a lender's ability to compete by, for example, denying that lender access to their services, and thereby forcing that lender to seek higher-cost funding than is available through the GSEs.

*GSEs' Relationship With the Primary Mortgage Market*

39.     The GSEs purchase conforming mortgages from mortgage lending institutions, including both depositary institutions and mortgage bankers. The willingness of a GSE to purchase a mortgage is a critical factor in a financial institution's decision to originate that mortgage. The GSEs purchase conforming mortgages only from lenders known as "approved seller/servicers." A lender must negotiate with Fannie Mae and Freddie Mac in order to become an approved seller/servicer. Among other things, an approved seller/servicer is required to remit to Fannie Mae and Freddie Mac all G-Fees associated with conforming mortgages. With respect to G-Fees, approved seller/servicers act as conduits between Defendants and mortgagors. Mortgagors pay these G-Fees in the form of higher monthly payments (*i.e.*, higher interest rates). Approved seller/servicers are required, with few exceptions, to sell mortgages that conform to the GSE guidelines.

40.     Fannie Mae and Freddie Mac use contractual agreements with approved seller/servicers, backed by the GSEs' market power, to assure that lenders originate and sell to the two GSEs only those mortgages that comply with the GSEs' requirements. The GSEs also apply their market power when negotiating the pricing of those mortgages. Among the controls applied by the GSEs are requirements that (1) approved seller/servicers meet prescribed standards, (2) approved seller/servicers meet specified "mandatory delivery commitments" that obligate them to sell mortgage loans of specified characteristics at a specified price and within a specified time period, (3) approved seller/servicers commit through representations and warranties, to repurchase loans that turn out not to perform as originally promised by the lender at the time of sale, and (4) if approved seller/servicers service loans, they will do so in

16

compliance with guidelines prescribed by the GSEs. Fannie Mae and Freddie Mac set the rates at which they will pay the approved seller/servicer for the work involved in servicing the conforming mortgage. Servicing a mortgage involves, among other things, the collection of payments and the institution of foreclosure proceedings against the underlying property in the event of default.

41. The GSEs also offer to lenders, for a fee, the use of comprehensive software technology, known as an automated underwriting system (AUS) to qualify the mortgages as eligible for purchase by Fannie Mae and Freddie Mac. Some approved seller/servicers are permitted to use another AUS that Fannie Mae or Freddie Mac deem acceptable. In such cases, the GSEs monitor the mortgages sold through these alternative AUSs and screen them with their own AUS. That technology, and the rigid and detailed criteria governing mortgages that the software applies, effectively preclude the approved seller/servicers from exercising independent discretion concerning the vast majority of mortgage terms. In these and other ways, Fannie Mae and Freddie Mac exercise such detailed and broad control over the activities of lenders relating to mortgages sold to a GSE that there is functional economic unity between the lenders and Fannie Mae or Freddie Mac. When mortgages are newly originated for sale to a GSE, the origination and sale of a mortgage loan by the lender and its purchase from the lender by Fannie Mae or Freddie Mac effectively constitute only one mortgage and loan transaction.

42. Where G-Fees and conforming loans are concerned, the only role that the approved seller/servicers play is to secure offers for G-fees and conforming loan terms from borrowers. G-fee rates and nearly all loan terms are effectively set in advance by Fannie Mae or Freddie Mac. Unless they obtain permission in advance, approved seller/servicers have no

17

discretion to deviate from requirements set by Fannie Mae or Freddie Mac as to virtually any of the economically significant terms and conditions of the loans, or as to the amount of the G-fee that must be collected from the borrower for the benefit of Fannie Mae and Freddie Mac. Thus, as to G-fees that are ultimately paid by the borrower, approved seller/servicers effectively act under the control of Fannie Mae or Freddie Mac and act effectively for their account, and in this respect the approved seller/servicers do not genuinely function as distinct economic entities in a chain of purchase or sale or as a distinct entrepreneurial link in a chain of distribution.

43.     Borrowers are largely unaware that Freddie Mac and Fannie Mae charge G-Fees or that approved seller/servicers are acting as agents. The amount of the G-Fee that must be paid by each borrower to Fannie Mae or Freddie Mac on a monthly basis throughout the life of the loan is "baked into" the loan transaction at the outset, and continues throughout the life of the loan on an unchanged basis, with approved seller/servicers and others acting effectively as mere conduits for the collection of G-Fees from borrowers for the benefit of Fannie Mae and Freddie Mac. Thus, with regard to the G-Fees in particular, Fannie Mae and Freddie Mac exercise such control over the approved seller/servicers that there is functional economic unity between them, and the G-Fees set at the time of the loans by approved seller/servicers and at all times thereafter throughout the life of the mortgage loans effectively constitute only one G-fee transaction.

### *Anticompetitive Pricing of G-Fees*

44.     G-Fees are a component of the mortgage payment that millions of consumers pay each month. In 2001, the average G-Fee, not including delivery fees and cash-out refinancing fees, was 19 basis points (*i.e.*, 0.19 percentage points) of the outstanding balance of their respective outstanding mortgage-backed securities. For example, on a loan amount of $250,000,

the G-fee typically averages $500 a year at the start of a mortgage and, over a 30-year mortgage, the total averages $11,350.

45.     Fannie Mae and Freddie Mac justify the G-Fees they charge the approved seller/servicers in terms of the credit risk that they take in the securitization of pools of conforming mortgages.  In exchange for the G-Fees, the GSEs guarantee that principal and interest from the conforming mortgages will be paid to the investors on a timely basis regardless of the mortgagor's performance under the terms of the mortgage.  This guarantee against default is a standard term in Defendants' mortgage-backed securities.

46.     Since 2001, Fannie Mae and Freddie Mac have secretly met with lenders (approved seller/servicers) to discuss the terms, conditions and costs under which they will buy the lender's loans.  Fannie Mae and Freddie Mac require lenders to sign statements that they will keep the terms confidential and they are forbidden to reveal the negotiated G-Fee rates.  Mortgage borrowers are not even aware of the G-Fees, which quickly disappear into the pricing of the mortgage loan after the secret negotiations with the GSEs have been concluded.  Upon information and belief, Fannie Mae and Freddie Mac have unlawfully agreed with one another to require such confidentiality agreements from lenders.

47.     G-Fees are generally paid on a monthly basis from a portion of the interest payments received on the underlying mortgage loans.  G-Fees are calculated at the loan level as a percent of the unpaid principal balance remaining on a loan.  For their mortgage-backed security pools, Fannie Mae and Freddie Mac purportedly use either a weighted average G-Fee based upon the characteristics of the loan in the trust and assign that fee to each loan in the trust or assign each loan in the trust a G-Fee based on risk characteristics.  Thus, in the absence of a conspiracy,

if the Defendants were competing, G-Fees would be expected to rise and fall with the companies' actual losses due to mortgage defaults. Instead of competing, however, both Defendants have set such fees at artificially high rates despite a continuing decline in their credit losses.

48.     If Defendants' G-Fees were competitively priced, then they would fluctuate with Fannie Mae's or Freddie Mac's realistically forecasted losses due to mortgage defaults. Despite a significant decrease in mortgage defaults over time, however, G-Fees have been maintained at artificially inflated levels. In 2003, Fannie Mae and Freddie Mac collected guarantee fees amounting to thirty-three (33) times losses, in contrast to 4.4 times credit losses in 1995.

### *Escalating G-Fees Vital to Increased Earnings*

49.     Until 1989, three federal officials who constituted the Federal Home Loan Bank Board governed Freddie Mac. Members of the bank board tended to have close ties to the thrift industry which, until the late 1980s, also owned (directly or indirectly) all stock in Freddie Mac. In 1989, Freddie Mac converted to investor ownership and a shareholder-controlled board of directors with fiduciary responsibility to investor shareholders of Freddie Mac. Until 1989, Freddie Mac was a cooperative owned (directly or indirectly) by thrifts, who were originators of loans in the primary mortgage market. When its stock was sold to the public in that year, the GSE's management was no longer bound to serve the interests of these lenders. Investor ownership meant that Freddie Mac was under pressure to increase earnings, even if this involved increased risk. One consequence of this new emphasis on profits was that Freddie Mac increased the volume of mortgages it held in portfolio, and thereby also exposed itself to greater interest rate risk.

50.   In the 1990s, both Fannie Mae and Freddie Mac adopted executive pay schemes that awarded cash bonuses based on earnings per share.

51.   Fannie Mae and Freddie Mac had exceptionally high returns on equity throughout the 1990s, fueled in part by rising G-Fees. In 1990, Freddie Mac's income from fees increased by 14 percent, even though the total volume of mortgage-backed securities issued was relatively flat. In 1990, Fannie Mae's average G-Fee was 21.1 basis points while Freddie Mac's was 22 basis points.

52.   At the Mortgage Bankers Association of America secondary market conference in the spring of 1991, Freddie Mac Chairman and chief executive officer Leland Brendsel unabashedly announced that Freddie Mae was raising its G-Fees. Brendsel added that he hoped Fannie Mae would follow suit.

53.   According to the OFHEO, Fannie Mae's and Freddie Mac's G-Fees remained stable from 1994 through 2003 despite a dramatic decrease in the rate of credit losses.

54.   In 2001, Freddie Mac dictated a G-Fee floor which Fannie Mae has followed in "lock-step." Upon information and belief, Freddie Mac secretly met with Fannie Mae periodically to set fees and discuss the terms, conditions and costs under which they will buy lender's loans.

55.   G-Fees should rise and fall with Fannie Mae's and Freddie Mac's losses due to mortgage defaults. In 2003, however, G-Fees collected amounted to thirty-three (33) times those losses - a dramatic increase from 4.4 times credit losses in 1995. In other words, despite falling losses due to defaults, G-Fee rates remain "artificially" high. The G-Fees and other charges imposed by Defendants on the massive volume of mortgages they handle each year provide a

steady source of profit and about a third of their annual earnings.  At Fannie Mae, G-Fee income

rose twenty-four percent (24%) in the fourth quarter of 2004 to $759 million, despite a decline in

mortgage activity and minimal credit losses.  Fannie Mae and Freddie Mac have defended the

level of the G-Fees by maintaining that the fees are based on future losses, not on current

minimal loss rates.   The fact that Fannie Mae and Freddie Mac can target a high return on

equity, and achieve that return though their G-Fee pricing, certainly suggests that they are not

actually competing.

### *Fannie Mae's and Freddie Mac's Coordinated Behavior*

56.     Defendants also have engaged in other behavior that is consistent with

coordinated activity between them.  For example, in 2002, Fannie Mae and Freddie Mac added a

fee in "lock-step" on popular "cash-out" refinancings in which consumers tap into equity in their

homes by taking out a larger loan than they currently hold.

57.     Officers and agents of the Defendants regularly communicate with one another

concerning many aspects of their respective businesses.  Thus, there is ample opportunity for

Defendants to conspire with regard to G-Fee levels and maintenance of their monopoly.

58.     The structure of the pertinent mortgage market is such as to make a conspiracy

feasible, in that the two Defendants, taken together, dominate the market for mortgage-backed

securities.  Elaborate communications thus would not have been necessary in order to enable

Defendants to conspire with one another with regard to the setting of G-fees.  A successful

conspiracy between the Defendants to fix G-Fees would not require such frequent

communications as to make prompt detection likely.

59.    Fannie Mae and Freddie Mac also use their market power and advantages as

GSEs to strong-arm commercial lenders into participating in the scheme and to protect their

monopolistic position.  According to Peter J. Wallison of the American Enterprise Institute,

> Discussions with mortgage lenders revealed that they were afraid
> to speak publicly about G-fee issue, or how fees were set, because
> Fannie and Freddie had the power to retaliate against them by
> raising the fees of any lender who publicly complained.  The *Wall
> Street Journal* article [Jan. 14, 2005] suggests why this is such a
> worrisome matter for mortgage lenders: the fees charged by Fannie
> and Freddie differ from lender to lender, are heavily negotiated and
> are not disclosed.  Lenders thus have no way of knowing whether
> their fees are higher or lower than those of their competitors, and a
> public complaint could bring an increase in the lender's G-fee,
> directly affecting its ability to compete and its profit level.

As Sayid  Naqvi, retired CEO of PNC Mortgage Corp., now part of Washington Mutual, recently

stated, "They [Fannie Mae and Freddie Mac] have enormous power, and can dictate what lenders

can and can't do.  No one wants to cross them."

60.    The two GSEs have such substantial power that they are able to threaten and

implement retaliation against mortgage firms and other market participants that seek, on policy

grounds, to persuade the Congress to enact legislation that could curtail the GSEs' market power.

As Representative Jim Leach (R-IA), later the Committee's Chairman, noted in his statement in

the committee report:

> [I]t is not surprising that Fannie and Freddie are beginning to
> exhibit that arrogance characteristic of a duopoly, controlling 90%
> of the market.  Such market dominance allows for heavy-handed
> approaches to competitors, to financial intermediaries, and to
> consumers.  Competitors such as community based savings and
> loan associations and commercial banks are also users of GSE
> services.  They are understandably apprehensive about expressing
> reservations about their practices in fear of retaliation.  Likewise,
> would-be competitors such as securities firms run well known
> market risks if they object or attempt to compete with Fannie and

> Freddie. The two GSEs distribute billions of dollars of business on
> Wall Street and have a reputation of not cottoning to challengers of
> the status quo.

(Committee on Banking, Finance and Urban Affairs, U.S. House of Representatives, 1991, page

115.)

61.     The GSEs have continued their practice of retaliating against those in the industry

who seek to persuade the Congress to contain the market power of the GSEs. The Wall Street

Journal reported on March 8, 2001:

> Several major banks and financial-services firms said they have
> been threatened by Fannie Mae and Freddie Mac for criticizing the
> market power and expansion efforts of the two government-
> sponsored mortgage-finance giants. The chief executives of Wells
> Fargo & Co. and American International Group Inc. said in
> interviews this week that they have faced threats of retaliation in
> their business relationships with Fannie Mae and Freddie Mac for
> participating in FM Watch, a group here that has been a vocal
> critic of the companies. The chief executive of J.P. Morgan Chase
> & Co. recently made a similar comment to a group of fellow Wall
> Street executives, according to participants in the meeting.

62.     On March 9, 2004, the Wall Street Journal reported further that, "GE Capital CEO

Denis Nayden on Thursday became the third chief executive of a major company to allege

publicly that at least one of the two government-sponsored companies has threatened retaliation

against its critics."

63.     If one of the Defendants had broken ranks and reduced its G-Fees, the other

would have discovered that fact immediately. The likely immediacy of such discovery makes a

conspiracy to fix G-Fees more feasible, more readily enforceable, and more probable. In this

respect as well, the structure of the market was conducive to an agreement among the Defendants

to fix G-Fees.

24

64.     Fannie Mae and Freddie Mac have used their market power over the approved

seller/servicers to maintain their monopoly position.  Upon information and belief, when

negotiating with approved seller/servicers, Defendants have threatened to increase or have

increased the amounts of conforming mortgage fees charged to individual approved

seller/servicers (thereby making them less competitive in the market for the origination of

mortgages) if the approved seller/servicer attempted to compete or interfere in any other way

with Defendants in the market for the securitization of conforming mortgages.  Defendants

disciplined approved seller/servicers with discriminatory treatment if they participated in

political conduct that threatened the monopoly of defendants.  Defendants also controlled the

behavior of approved seller/servicers by threatening to reset the price of their servicing fees.

### *Regulators Conclude That Fannie Mae's and Freddie Mac's G-Fees Are Artificially High, Yielding Excessive Profits At The Expense of U.S. Homeowners*

65.     In a previously undisclosed report provided to Congress in early 2005, OFHEO,

Fannie Mae's and Freddie Mac's regulator, concluded that Fannie Mae and Freddie Mac use

their market power and government privileges to keep G-Fees high.  Regulators also concluded

that Fannie Mae and Freddie Mac move their G-Fees in lock-step.  According to *Business Week*,

"the housing giants' current regulator is probing whether Fannie and Freddie colluded in setting

mortgage fees."  Amy Borrus, "Did Fannie and Freddie Outsmart Themselves," *Business Week*,

Feb. 28, 2005.

66.     It appears that regulators believe that G-Fees have remained high as a result of a

contract, combination or conspiracy between Fannie Mae and Freddie Mac or conduct that

otherwise raises antitrust concerns.  Regulators have concluded that current G-Fees exceed the

cost of providing the service and yield supracompetitive profits.  Lenders in the mortgage

industry appear to agree, suggesting that consumers should be paying hundreds of millions of dollars less in G-Fees and other charges. Indeed, lenders continue to contend that Defendants have kept fees too high given the sharp drop in losses due to defaults.

### The Steady and Increasing Stream of Income from G-Fees, Together with Questionable Accounting Methods, Helped Fannie Mae and Freddie Mac Reach Earnings Targets That Triggered Excessive Executive Compensation.

67.    Fannie Mae's and Freddie Mac's scheme to keep G-Fees artificially inflated is part of an overall corporate culture of financial misrepresentation designed to inflate earnings in order to meet targets that trigger excessive executive compensation. Although the purpose of G-Fees is to ensure against defaults by borrowers, the steady and increasing stream of profits from G-Fees as defaults decreased was critical (in addition to creative accounting) in reaching these earnings targets.

68.    In 2003 and 2004, Fannie Mae and Freddie Mac were rocked by multibillion dollar accounting scandals that required restatements of earnings and resulted in the ouster of top management. In a study distributed in March 2005, Lucian A. Bebchuk of Harvard Law School and Jesse M. Fried of the University of California at Berkeley School of Law criticized Fannie Mae's executive pay policy. According to Bebchuk and Fried, this policy provided incentives for senior managers to manipulate accounting in Fannie Mae's huge portfolio of mortgage investments to reach earnings targets. Fannie Mae has since eliminated all executive bonus programs based on earnings-per-share growth.

69.    In June 2003, Freddie Mac chief executive officer Leland Brendsel, chief operating officer David Glenn and chief financial officer Vaughn Clarke, were forced out when Freddie Mac was required to restate $5 billion in earnings for the period 2000 to 2002. In

26

December 2003, OFHEO assessed Freddie Mac a penalty of $125 million for false earnings reports.

70.     In a September 2004 report, OFHEO concluded that Fannie Mae: (1) applied accounting methods that do not comply with generally accepted accounting principles ("GAAP") in accounting for its derivative transactions and hedging activities; (2) employed an improper "cookie jar" reserve in accounting for amortization of deferred price adjustments under GAAP; (3) tolerated related internal control deficiencies; (4) in at least one instance deferred expenses apparently to achieve bonus compensation targets; and (5) maintained a corporate culture that emphasized stable earning at the expense of accurate financial disclosures.  On December 15, 2004, the Securities and Exchange Commission issued its conclusion that Fannie Mae had not materially complied with GAAP, and it ordered Fannie Mae to restate $9 billion in earnings for the period from 2001 through mid-2004.  Fannie Mae chief executive officer Franklin D. Raines and chief financial officer J. Timothy Howard were ousted by its board in December 2004.

71.     Fannie Mae paid $65.1 million in bonuses to 749 members of management in 2003.  These bonuses were pegged to annual earnings targets set by the company's board. According to Rep. Richard H. Baker (R-La.), chairman of the House Financial Services Committee's capital markets subcommittee, the bonuses are "extremely relevant to the question of fixing a corporate culture so focused on short-term success that it appears to have created the wrong type of incentives that may have played a part in the manipulation of earnings."

72.     In the midst of the accounting scandal and under increased scrutiny from Congress and OFHEO, Freddie Mac modified its G-Fee "floor" in 2004.  According to OFHEO's 2005 Report to Congress, June 15, 2005, Freddie Mac's average G-Fee in 2004 fell

5.8 basis points, to 17.5 basis points and G-Fee income declined 16.4% to $1.4 billion. Fannie

Mae's average G-Fees for 2004 were not yet available to the government.

### *Effects of Defendants' Conspiracy*

73.     Defendants' anticompetitive agreements, as detailed herein, had the effect of

inflating G-Fee rates charged by lenders to members of the Class beyond the level that would

have prevailed in a competitive market. Defendants implemented the unlawful pricing policies

so that the prices charged by lenders in market and received by Defendants were inflated. As the

direct consequence of the monopolistic behavior and the unlawful contract, combination or

conspiracy, such prices were artificially inflated in the United States.

74.     Defendants derive substantial revenue in the United States from setting and

receiving G-Fees. Defendants intended and expected, at the time they devised, implemented and

maintained the scheme alleged herein, that their scheme would affect residential real estate

borrowers in the United States.

75.     Absent their anticompetitive agreements, Defendants could not have maintained

their artificially high prices without risking the loss of business to one another.

76.     Plaintiffs and the Class have been injured by Defendants' anticompetitive

conspiracy in that they have paid higher costs for G-Fees than they would have absent

Defendants' anticompetitive agreement, combination and/or conspiracy.

### RELEVANT MARKET

77.     The relevant product market for this case is the market for conforming mortgages

(the "conforming mortgage market"). As discussed above, defendants have monopoly power in

the conforming securitization market. It is because of this monopoly power, illegally maintained

and unchecked by competition, that Defendants have been able to conspire to set prices for G-Fees at supra-competitive levels.

78.     The relevant geographic market for these cases is the United States.

## FRAUDULENT CONCEALMENT

79.     The running of any statute of limitations has been tolled by reason of Defendants' fraudulent concealment.  Defendants, through various devious devices and techniques of secrecy and public misrepresentation, affirmatively concealed the existence of their unlawful combination and conspiracy.  Defendants' methods of concealment included, but were not limited to, holding conspiratorial meetings between themselves in private, and affirmatively representing that the Defendants' unlawfully established prices and business practices had been arrived at independently.  Defendants also held meetings with lenders and required them to sign confidentiality agreements, thereby concealing the true nature of the conspiracy.  Plaintiffs could not have discovered the collusion between Defendants through the exercise of due diligence, as a consequence of Defendants' willful concealment of the G-Fees that they charged, as alleged herein.

## COUNT I
### (Violation of Sherman Act § 1 - 15 U.S.C. §1)

80.     Plaintiffs repeat and reallege paragraphs 1 through 79 as though set forth herein.

81.     Defendants have engaged in a horizontal contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

82.     From January 1, 2001, and continuing to the present, the exact dates being unknown to Plaintiffs, Defendants engaged in a contract, combination or conspiracy to fix, raise,

maintain or stabilize the price of G-Fees in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

83.     During the same period, Defendants conspired and agreed (in writing) to conceal the amount of their G-Fees, and thereby keep them secret from the mortgage borrowers who pay the G-Fees and from other mortgage lenders, in order to fix, raise, maintain or stabilize the price of G-Fees in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

84.     The contract, combination or conspiracy between Defendants has had and will continue to have the following effects:

a.     competition in the G-Fee market has been unlawfully restrained, suppressed or eliminated;

b.     Plaintiffs and members of the Class have been denied the benefits of free, open and unrestricted competition in the G-Fee market; and

c.     the price of G-Fees has been maintained or stabilized at artificially high and non-competitive levels.

85.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have suffered injury to their business or property and have paid artificially high G-Fees.

**COUNT II**
**(Declaratory and Injunctive Relief Under Section 16 of the**
**Clayton Act for Violations of Section 1 of the Sherman Act)**

86.     Plaintiffs repeat and reallege paragraphs 1 through 85 as though set forth herein.

87.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have suffered injury to their business or property and have paid artificially high G-Fees.

88.    Plaintiffs have no adequate remedy at law.  If not permanently enjoined, the unlawful contract, combination or conspiracy will continue and cause irreparable harm to Plaintiffs and members of the Class.

### COUNT III
### (Damages And Injunctive Relief Under
### District Of Columbia Antitrust Law)

89.    Plaintiffs repeat and reallege paragraphs 1 through 88 as though set forth herein.

90.    Defendants have engaged in a horizontal contract, combination or conspiracy in unreasonable restraint of trade in violation of D.C. Code Ann. §§ 28-4501, *et seq.*

91.    From January 1, 2001, and continuing to the present, the exact dates being unknown to Plaintiffs, Defendants engaged in a contract, combination or conspiracy to fix, raise, maintain or stabilize the price of G-Fees in violation D.C. Code §§ 28-4501, *et seq.*

92.    Through such conspiratorial conduct, which was based principally in the District of Columbia, Defendants restrained competition and the free exercise of activities in the conduct of business, trade and commerce and in furnishing of products nationwide.

93.    Defendants' restraints of business, trade and commerce have substantially affected business, trade and commerce in the District of Columbia and across the country.

94.    If not permanently enjoined, Defendants' unlawful contract, combination or conspiracy will continue and cause irreparable harm to Plaintiffs and members of the Class, who have no adequate remedy at law.

95.     By reason of the foregoing, Plaintiffs and other members of the Class have sustained an injury to their business or property.

## COUNT IV
### (In the Alternative, for Damages and Injunctive Relief under "Repealer State" Laws)

96.     Plaintiffs repeat and reallege paragraphs 1 through 95 as though set forth herein.

97.     Defendants have entered into agreements in restraint of trade in violation of numerous other state laws identified below.  To the extent these other state laws apply to Plaintiffs' claims, Plaintiffs seek injunctive relief and, where available, compensatory and multiple damages under the following state laws as to claims of class members who obtained loans in these states:

a.     *Arizona.* Az. Rev. Stat. §§ 44-1401, *et seq.*

b.     *California.* Cal. Bus. & Prof. Code §§ 16700, *et seq.*, and Cal. Bus. & Prof. Code §§ 17200, *et seq.*

c.     *District of Columbia.* D.C. Code Ann. §§ 28-4501, *et seq.*

d.     *Florida.* Fla. Stat. §§ 501. 201, *et seq.*

e.     *Iowa.* Iowa Code §§ 553.1, *et seq.*

f.     *Kansas.* Kan. Stat. Ann. §§ 50-101, *et seq.*

g.     *Louisiana.* La. Rev. Stat. §§ 51:137, *et seq.*

h.     *Maine.* Me. Rev. Stat. Ann. 10, § 1101, *et seq.*

i.     *Massachusetts.* Mass. Ann. Laws ch. 92§§1, *et seq.*

j.     *Michigan.* Mich. Comp. Laws Ann. §§ 445.773, *et seq.*

k.     *Minnesota.* Minn. Stat. §§ 325D.52, *et seq.*

32

l.     *Mississippi.* Miss. Code Ann. §§ 75-21-1, *et seq.*

m.    *Nebraska.* Neb. Rev. Stat. §§ 59-801, *et seq.*

n.     *Nevada.* Nev. Rev. Stat. Ann. §§ 598A., *et seq.*

o.     *New Jersey.* N.J. Stat. Ann. §§ 56:9-1 *et seq.*

p.     *New Mexico.* N.M. Stat. Ann. §§ 57-1-1 *et seq.*

q.     *New York.* New York Gen. Bus. Law §§ 340 and 349.

r.     *North Carolina.* N.C. Gen. Stat. §§ 75-1, *et seq.*

s.     *North Dakota.* N.D. Cent. Code § 51-08.1-01, *et seq.*

t.     *South Dakota.* S.D. Codified Laws Ann. § 37-1, *et seq.*

u.     *Tennessee.* Tenn. Code Ann. §§ 47-25-101, *et seq.*

v.     *Vermont.* Vt. Stat. Ann. 9, § 2453, *et seq.*

w.    *West Virginia.* W.Va. Code §§ 47-18-1, *et seq.*

x.     *Wisconsin.* Wis. Stats. § 133.01, *et seq.*

98.     By reason of Defendants' violations of these state laws, Plaintiffs and other members of the Class have sustained injury to their business or property.

**COUNT V**
**(Damages And Injunctive Relief Against Fannie Mae Under**
**District Of Columbia Consumer Protection Law)**

99.     Plaintiffs repeat and reallege paragraphs 1 through 98 as though set forth herein.

100.    Fannie Mae's unlawful conduct as alleged above constitutes a violation of D.C. Code §§ 28-3901, *et seq.* Through its own unlawful conduct, which was based principally in the District of Columbia, Fannie Mae engaged in deceptive and misleading acts in furnishing products and services nationwide.

33

101.   D.C. Code §§ 28-3904 provides that it is unlawful to "fail to state a material fact if such failure tends to mislead," among other deceptive acts.

102.   In their contracts with lenders, Defendants deceptively required that the lenders keep secret and confidential the existence and amount of the G-Fees that were being "baked into" loans to borrowers, thereby misleading borrowers into believing that there were no such hidden charges. Had such deceptive confidentiality obligations not been imposed upon lenders, borrowers would not have been misled, but would instead have exerted competitive pressures on lenders to compete with one another in reducing the amounts of G-Fees. Lenders would have responded to such pressures by requiring Defendants to compete with one another and with others to reduce the amounts of G-Fees that are charged to borrowers. The effect of such competitive pressures, which borrowers were deceptively prevented from exerting as a consequence of secrecy and confidentiality agreements insisted on by Defendants, would have been systematically to reduce the amount of G-Fees charged to all Class members.

103.   Fannie Mae's own unlawful trade practices as alleged herein, which were based principally in the District of Columbia, have substantially affected business, trade and commerce in the District of Columbia and throughout the United States.

104.   If not permanently enjoined, Fannie Mae's deceptive practice of requiring lenders to keep G-Fee secret and confidential will continue and will cause irreparable harm to Plaintiffs and members of the Class, who have no adequate remedy at law.

105.   By reason of the foregoing, Plaintiffs and other members of the Class who obtained loans containing G-Fees set by Fannie Mae have sustained injury to their business or property.

## COUNT VI
### (Damages and Injunctive Relief Against Freddie Mac
### Under Virginia Consumer Protection Law)

106.    Plaintiffs repeat and reallege paragraphs 1 through 105 as though set forth herein.

107.    Freddie Mac's unlawful conduct as alleged above constitutes a violation of Va.
Code Ann. Sec. 59.1-200, *et seq*. Through its own unlawful conduct, which was based
principally in Virginia, Freddie Mac engaged in deceptive and misleading acts in furnishing
products and services nationwide.

108.    Va. Code Ann. Sec. 59.1-200 provides that it is unlawful to use any "deception,
false pretense, false promise, or misrepresentation in connection with a consumer transaction."

109.    In their contracts with lenders, Defendants deceptively required that the lenders
keep secret and confidential the existence and amount of the G-Fees that were being "baked into"
loans to borrowers, thereby misleading borrowers into believing that there were no such hidden
charges. Had such deceptive confidentiality obligations not been imposed upon lenders,
borrowers would not have been misled, but would instead have exerted competitive pressures on
lenders to compete with one another in reducing the amounts of G-Fees. Lenders would have
responded to such pressures by requiring Defendants to compete with one another and with
others to reduce the amounts of G-Fees that are charged to borrowers. The effect of such
competitive pressures, which borrowers were deceptively prevented from exerting as a
consequence of secrecy and confidentiality agreements insisted on by Defendants, would have
been systematically to reduce the amount of G-Fees charged to all Class members.

110.    Freddie Mac's own unlawful trade practices as alleged herein, which were based principally in Virginia, have substantially affected business, trade and commerce in the District of Columbia and throughout the United States.

111.    If not permanently enjoined, Freddie Mac's deceptive practice of requiring lenders to keep G-Fees secret and confidential will continue and will cause irreparable harm to Plaintiffs and members of the Class, who have no adequate remedy at law.

112.    By reason of the foregoing, Plaintiffs and other members of the Class who obtained loans containing G-Fees set by Freddie Mac have sustained injury to their business or property.

## COUNT VII
### (Restitution, Disgorgement and Constructive Trust for Unjust Enrichment)

113.    Plaintiffs repeat and reallege paragraphs 1 through 112 as though set forth herein.

114.    Defendants benefited from their unlawful acts through the receipt of overpayments by Plaintiffs and other Class members.  It would be inequitable for Defendants to be permitted to retain the benefit of these overpayments, which were conferred by Plaintiffs and retained by Defendants.

115.    Plaintiffs and members of the Class are entitled to the establishment of a constructive trust consisting of the benefit to Defendants of such overpayments, from which Plaintiffs and the other Class members may make claims on a pro-rata basis for restitution.

116.    Plaintiffs and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray that the Court enter judgment in their favor as follows:

A.   Declaring this action to be a proper class action and certifying Plaintiffs as the representatives of the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.   Declaring that Defendants violated and are in violation of the Sherman Act §1, and the various state laws alleged herein;

C.   Awarding threefold the damages sustained by Plaintiffs and members of the Class as a result of Defendants' violations;

D.   Awarding punitive damages where applicable to Plaintiffs and the Class as a result of Defendants' violations;

E.   Ordering injunctive relief preventing and restraining Defendants and all persons acting on their behalf from engaging in the unlawful acts alleged herein, including but not limited to colluding with one another with regard to G-Fees and requiring of lenders that G-Fees be kept secret and confidential;

F.   Awarding Plaintiffs and the Class the costs, interest, expenses, and reasonable attorneys' fees and experts' fees for bringing and prosecuting this action; and

G.   Awarding Plaintiffs and the Class such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a jury trial on all issues so triable.

Dated: August 5, 2005

MILBERG WEISS BERSHAD
& SCHULMAN LLP

By: _____

Reuben A. Guttman (D.C. Bar #414781)
1920 L Street NW Suite 400
Washington, D.C. 20036
Tel: 202-783-6091
Fax: 202-350-5908

Marvin A. Miller
Patrick E. Cafferty
Jennifer W. Sprengel
MILLER FAUCHER and CAFFERTY LLP
30 North LaSalle Street, Suite 3200
Chicago, Illinois 60602
Tel: 312/782-4880
Fax: 312/782-4485

J. Douglas Richards
Michael M. Buchman
MILBERG WEISS BERSHAD&
SCHULMAN LLP
One Pennsylvania Plaza
New York, NY 10119-0165
Tel: 212-594-5300
Fax: 212-868-1229

*Interim Co-Lead Counsel for Plaintiffs*

38

*Additional Plaintiffs' Counsel*

Kurt B. Olsen
KLAFTER & OLSEN LLP
D.C. Bar Identification No. 445279
2121 K Street, N.W.
Suite 800
Washington, D.C. 20037
Tel:  202-261-3553
Fax: 202-261-3533

Jeffrey A. Klafter
KLAFTER & OLSEN LLP
1311 Mamaroneck Ave.
Suite 220
White Plains, NY 10605
Tel: 914-997-5656
Fax: 914-997-2444

Ann D. White
Jayne A. Goldstein
Bruce D. Parke
MAGER WHITE & GOLDSTEIN LLP
One Pitcairn Place, Suite 2400
165 Township Line Road
Jenkintown, PA 10046
Tel: 215-481-0273
Fax: 215-481-0271

Mark R. Rosen (D.C. Bar No. 336065)
Leonard Barrack
Daniel E. Bacine
Jeffrey B. Gittleman
BARRACK, RODOS & BACINE
Two Commerce Square
2001 Market Street
Suite 3300
Philadelphia, PA 19103
Tel: 215-963-0600
Fax: 215-963-0838

William F. Savarino (D.C. Bar No. 386706)
Russell J. Gaspar (D.C. Bar No. 229781)
COHEN MOHR LLP
1055 Thomas Jefferson Street NW
Suite 504
Washington D.C. 20007
Tel: 202-342-2550
Fax: 202-342-6147

W. Joseph Bruckner
Richard A. Lockridge
Heidi M. Silton
LOCKRIDGE GRINDAL NAUEN P.L.L.P
100 Washington Ave. South
Minneapolis, MN 55401
Tel: 612-339-6900
Fax: 612-339-0981

Rhett A. McSweeney
MCSWEENEY & FAY P.L.L.P.
800 Washington Ave. North
Suite 506
Minneapolis, MN 55401
Tel: 612-333-6900
Fax: 612-333-0355

Klari Neuwelt
LAW OFFICE OF KLARI NEUWELT
110 East 59th Street, 29th Floor
New York, NY 10022
Tel: 212-593-8800
Fax: 212-593-9131

Keith T. Vernon (D.C. Bar No. 484246)
CLIMACO, LEFKOWITZ, PECA,
WILCOX & GAROFOLI CO., L.P.A.
818 Connecticut Ave., NW Suite 857
Washington, D.C. 20006
Tel: 202-887-4777
Fax: 202-887-4778

John R. Climaco
CLIMACO, LEFKOWITZ, PECA,
WILCOX & GAROFOLI CO., L.P.A.
1228 Euclid Ave., Suite 900
Cleveland, Ohio 44115
Tel: 216-621-8484
Fax: 216-771-1632

Marc H. Edelson
EDELSON & ASSOC., LLC
45 West Court Street
Doylestown, PA 18901
Tel: 215-230-8043
Fax: 215-230-8735

Michael J. Boni
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Tel: 215-238-1700
Fax: 215-238-1968

Jack C. Sando
4922A St. Elmo Ave.
Bethesda, Maryland 20814
Tel: 301/986-0818
Fax: 301-907-0965
D.C. Bar No. 11320

Guri Ademi
Shpetim Ademi
Robert K. O'Reilly
ADEMI & O'REILLY, LLP
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel: 414/482-8000
Fax: 414/482-8001

John Drury (D.C. Bar No. 924407)
1900 L Street, N.W., Ste. 303
Washington, D.C. 20036
Tel: 202-463-6131
Fax: 202-463-6695

Andrew S. Friedman
BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
2901 N. Central Ave.
Phoenx, AZ 85012
Tel: 602-274-1100
Fax: 612-274-1199

Joe R. Whatley, Jr.
G. Douglas Jones
WHATLEY DRAKE, LLC
2323 Second Ave. North
Birmingham, AL 35203
Tel: 205-328-9576
Fax: 205-328-9669

Jonathan P. Whitcomb
DISERIO MARTIN O'CONNOR &
CASTIGLIONI LLP
One Atlantic Street
Stamford, CT 06901
Tel: 203-358-0800
Fax: 203-348-2321

Richard T. Seymour
LIEFF, CABRASER, HEIMANN &
BERNSTEIN LLP
1100 New York Avenue, NW
Suite 1080 - West Tower
Washington, D.C. 20005
Tel: (202) 582-1000
Fax: (202) 582-1500
D.C. Bar No. 28100

Daniel Hume
David Kovel
James Carroll
KIRBY McINERNEY & SQUIRE, LLP
830 Third Avenue
New York, NY 10022
Tel: (212) 371-6600
Fax: (212) 751-2540

David S. Stellings
LIEFF, CABRASER, HEIMANN &
BERNSTEIN LLP
780 Third Avenue, 48th Floor
New York, NY 10017
Tel: (212) 355-9500
Fax: (212) 355-9592

Michael D. Donovan
DONOVAN SEARLES, LLC
1845 Walnut Street
Philadelphia, PA 19103
Tel: (215) 732-6067
Fax: (215) 732-8060

Jonathan Shub
SHELLER, LUDWIG & BADET, P.C.
1528 Walnut Street Third Floor
Philadelphia, PA 19102
Tel: (215) 790-7300
Fax: (215) 546-0942

John Coale
COALE, COOLEY, LIETZ, P.C.
818 Connecticut Ave. NW. Suite 857
Washington D.C. 20006
Tel: (202) 887-4770
Fax: (202) 887-4778