# UNITED STATES DISTRICT COURT
## DISTRICT OF THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN RE: | ) | |
| G-FEES ANTITRUST LITIGATION | ) | Civil Action No. 05-114 (RWR) |
| This Document Relates To: | ) | Oral Hearing Requested |
| All Actions | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS
## PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT

Henry C. Thumann (D.C. Bar # 474499)
Richard G. Parker (D.C. Bar # 418605)
Rebecca H. Farrington (D.C. Bar # 460592)
O'MELVENY & MYERS
1625 Eye Street, N.W.
Washington, DC 20006

*Attorneys for the Federal National Mortgage
Association*

Of Counsel
Jodie L Kelley (D.C. Bar # 447477)
Jonathan Griffith (D.C. Bar # 456080)
FEDERAL NATIONAL MORTGAGE
CORPORATION
3900 Wisconsin Avenue, N.W.
Washington, DC 20016

James R. Atwood (D.C. Bar # 079996)
John E. Hall (D.C. Bar # 415364)
Jonathan J. Gimblett (D.C. Bar # 489257)
COVINGTON & BURLING
1201 Pennsylvania Avenue, N.W.
Washington, DC 20004

Graciela M. Rodriquez (D.C. Bar # 438955)
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, DC 20006

Jeffrey Q. Smith
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036

*Attorneys for Federal Home Loan Mortgage
Corporation*

Of Counsel
Hyacinth G. Kucik (D.C. Bar # 398736)
Lance Wolf (D.C. Bar # 476388)
FEDERAL HOME LOAN MORTGAGE
CORPORATION
8200 Jones Branch Drive
McLean, VA 22102

October 11, 2005

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 2

ARGUMENT .................................................................................................................. 5

Summary of Argument .................................................................................................. 5

Standard of Review for a Motion to Dismiss................................................................ 7

I.   PLAINTIFFS' SHERMAN ACT DAMAGES CLAIM IS BARRED AS
     A MATTER OF LAW BY THE RULE OF *ILLINOIS BRICK* (COUNT I)........................ 7

     A.   Under *Illinois Brick*, Only Direct Purchasers May Sue for Antitrust
          Damages Under Federal Law.................................................................................7

     B.   Plaintiffs Are Not Direct Purchasers of Defendants' Securitization and
          Guarantee Services.................................................................................................9

     C.   Under *Illinois Brick*, It Is Immaterial that Plaintiffs' Loan Payments
          Formed Part of the Cash Flow From Which G-Fees Were Collected ...................9

     D.   Plaintiffs' Conclusory and Unsupported Allegations That Lenders
          Constitute An "Economic Unit" With Or Serve As "Agents" Of Defendants
          Do Not Save Their Claim ...................................................................................11

II.  PLAINTIFFS LACK STANDING TO PURSUE THEIR CLAIMS UNDER STATE
     REPEALER LAWS (COUNTS III & IV)........................................................................... 18

     A.   Because Plaintiffs Are Not "Purchasers" of the Allegedly Price-Fixed
          Services, They Lack Standing To Assert a Claim Under the D.C.
          Antitrust Act and Several Other State Laws.........................................................19

     B.   As to All of the State Law Claims, Plaintiffs' Remote and Attenuated
          Theory of Harm Is Legally Insufficient To Satisfy Basic Requirements for
          Antitrust Standing ...............................................................................................22

     C.   Additional Independent Grounds Mandate the Dismissal of the Majority
          of the Count IV Claims........................................................................................29

III. PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE D.C. AND VIRGINIA
     CONSUMER PROTECTION LAWS (COUNTS V & VI) ................................................. 33

     A.   Plaintiffs Fail To State a Claim Because None Purchased Any
          Consumer Good or Service from Freddie Mac or Fannie Mae ............................34

B.      The DCCPP and VCPA Do Not Apply to Transactions Occurring Outside
of Their Jurisdictions ............................................................................................36

IV.    PLAINTIFFS LACK STANDING TO SEEK INJUNCTIVE RELIEF BECAUSE
THE CONDUCT THEY SEEK TO ENJOIN DOES NOT THREATEN THEM
(COUNT II) ........................................................................................................ 37

V.     PLAINTIFFS' UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED
BECAUSE IT IS BASED ON THE SAME DEFECTIVE ANTITRUST CLAIMS
(COUNT VII)...................................................................................................... 39

CONCLUSION...................................................................................................... 40

EXHIBIT A ― Summary Chart of Grounds for Dismissal of State Antitrust Claims................ 41

# TABLE OF AUTHORITIES

*Alexis v. District of Columbia*, 44 F. Supp. 2d 331 (D.D.C. 1999) ...........................................7

*American Jewish Congress v. Vance*, 575 F.2d 939 (D.C. Cir. 1978)....................................32

\* *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519 (1983) ..................................... 6, 23-29

*Avery v. State Farm*, No. 91494, 2005 Ill. LEXIS 959 (Ill. Aug. 18, 2005)...........................37

*Banks v. District of Columbia*, 377 F. Supp. 2d 85 (D.D.C. 2005) ...........................................7

*Beaudreau v. Larry Hill Pontiac/Oldsmobile/GMC, Inc.*, 160 S.W.3d 874 (Tenn. Ct. App. 2004)....................................................................................31

*Beckler v. Visa U.S.A.*, No. 09-04-C-00030, 2004 WL. 2475100 (N.D. Dist. Ct. Sept. 21, 2004)...........................................................................................22, 25

*Bennett v. Visa U.S.A., Inc.*, No. Civ. A. 35126, 2004 WL. 2115353 (Tenn. Ch. Aug. 27, 2004)........................................................................26, 31

*In re Brand Name Prescription Drugs Antitrust Litigation*, 123 F.3d 599 (7th Cir. 1997) ...................................................................................................12

*California v. ARC America Corp.*, 490 U.S. 93 (1989) .........................................................7

\* *Campos v. Ticketmaster Corp.*, 140 F.3d 1166 (8th Cir. 1998).............................................10

*Ciardi v. F. Hoffmann La-Roche, Ltd.*, 762 N.E.2d 303 (Mass. 2002)...................................30

*Consiglio -Tseffos v. Visa U.S.A.*, Inc., No. CV 2003-020170, 2004 WL 3030043 (Ariz. Super. Ct. Dec. 8, 2004)...........................................................22, 26

*Cornelison v. Visa U.S.A., Inc.*, No. CIV03-1350 (S.D. Cir. Ct. Oct. 22, 2004) (motion hearing) ...................................................................25

*Cox v. Microsoft Corp.*, 290 A.D.2d 206 (N.Y. App. Div. 2002) ...........................................31

*Credit/Debit Card Tying Cases*, No. J.C.C.P. No. 4335, 2004 WL 2475287 (Cal. Super. Ct. Oct. 14, 2004) ...............................................................................................25

\* *Crouch v. Crompton Corp.*, No. 02 CVS 4375, 2004 WL. 2414027 (N.C. Super. Ct. Oct. 28, 2004) .......................................................................24, 25, 26

*Dial A Car, Inc. v. Transport, Inc.*, 884 F. Supp. 584 (D.D.C. 1995) ...................................20

*F.T.C. v. Mylan Laboratories, Inc.*, 62 F. Supp. 2d 25 (D.D.C. 1999)....................................8

*Fischer v. Wattles*, 639 F. Supp. 7 (M.D. Pa. 1985) ...............................................13

*Free v. Abbott Laboratories*, 176 F.3d 298 (5th Cir. 1999)....................................30

*Fucile v. Visa U.S.A., Inc.*, No. S1560-03 CNC, 2004 WL 3030037
(Vt. Super. Ct. Dec. 27, 2004) ..........................................................................25

*Genetic Systems Corp. v. Abbott Laboratories*, 691 F. Supp. 407
(D.D.C. 1988) ................................................................................................7

*Gray v. Marshall County Board of Education*, 367 S.E.2d 751
(W. Va. 1988) ................................................................................................30

*Greene v. Ellis (In re Ellis)*, 152 B.R. 211 (Bankr. E.D. Tenn. 1993)........................16, 17, 21

*Griffin v. Dugger*, 823 F.2d 1476 (11th Cir. 1987) ...........................................32, 33

\* *Gutzwiller v. Visa U.S.A., Inc.*, No. C4-04-58, 2004 WL 2114991
(Minn. Dist. Ct. Sept. 15, 2004)........................................................................25, 26

*Ho v. Visa U.S.A., Inc.*, No. 112316/00, 2004 WL 1118534
(N.Y. Sup. Ct. Apr. 21, 2004)............................................................................25, 26

\* *Howard Hess Dental Laboratories, Inc. v. Dentsply International, Inc.*,
Nos. 04-1979 & 04-1980, 2005 WL 2291967 (3d Cir. Sept. 21, 2005) ...................... 12, 14-15

*Howard v. Minnesota Timberwolves Basketball Ltd. Partnership*,
636 N.W.2d 551 (Minn. App. Ct. 2001) ...........................................................24

\* *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1978).............................2, 5-6, 7-19, 23, 30

\* *Jewish Hospital Association of Louisville, Ky., Inc. v.
Stewart Mechanical Enterprises, Inc.*, 628 F.2d 971 (6th Cir. 1980)...............................12, 13

*Kanne v. Visa, U.S.A., Inc.*, No. 1033, 469, 2005 WL 1403764
(Neb. Dist. Ct. Feb. 4, 2005)............................................................................25

*Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199 (1990).........................................7, 11, 12

*Knowles v. Visa U.S.A.*, Inc., No. Civ.A. CV-03-707, 2004 WL 2475284
(Me. Super. Ct. Oct. 20, 2004)..........................................................................25

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (2003) .................................31

*Kowal v. MCI Communications Corp.*, 16 F.3d 1271 (D.C. Cir. 1994) .............................7, 16

*Leider v. Ralfe*, No. 01 Civ.3137 HB FM, 2005 WL 152025
(S.D.N.Y. Jan. 25, 2005)....................................................................................31

*Lerma v. Univision Communications, Inc.*, 52 F. Supp. 2d 1011
(E.D. Wis. 1999) ...............................................................................................24

*Lewis v. Casey*, 518 U.S. 343 (1996) .................................................................32

*In re Lorazepam & Clorazepate Antitrust Litigation*, 289 F.3d 98
(D.C. Cir. 2002) ...........................................................................................7, 11

*Lucas v. Bechtel Corp.*, 800 F.2d 839 (9th Cir. 1986)..........................................38

*Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100
(Fla. Dist. Ct. App. 1996) .................................................................................22

*Matthews v. Automated Business Systems & Services, Inc.*,
558 A.2d 1175 (D.C. 1989) ...............................................................................36

*McCarthy v. Recordex Service, Inc.*, 80 F.3d 842 (3d Cir.)....................................10

*McConnell v. FEC*, 540 U.S. 93 (2003)..............................................................37

*Mendrala v. Crown Mortgage Co.*, 955 F.2d 1132 (7th Cir. 1992) ........................17

\*  *In re Microsoft Antitrust Litigation*, 127 F. Supp. 2d 702 (D. Md. 2001) ........14, 18

*In re Microsoft Antitrust Litigation*, 168 F. Supp. 2d 541 (D. Md. 2001) ...............11

*In re Microsoft Corp. Antitrust Litigation*, 241 F. Supp. 2d 563
(D. Md. 2003) ..................................................................................................39

*Moore v. Visa U.S.A., Inc.*, No. 03 CV 4086, 2004 WL 3030032
(Kan. Dist. Ct. Nov. 15, 2004)...........................................................................26

*Murray v. Dryvit Systems, Inc.*, No. 01-04-7383, 2002 WL 32072493
(Va. Cir. Ct. July 15, 2002)...............................................................................35

*Nelson v. Nationwide Mortgage Corp.*, 659 F. Supp. 611 (D.D.C. 1987)...............37

*In re New Motor Vehicles Canadian Export Antitrust Litigation*,
350 F. Supp. 2d 160 (D. Me. 2004) ....................................................................39

*In re Nifedipine Antitrust Litigation*, 335 F. Supp. 2d 6 (D.D.C. 2004) ................................38

*O'Shea v. Littleton*, 414 U.S. 488 (1974) .................................................................32

*Papasan v. Allain*, 487 U.S. 265 (1986) .................................................................16

\* *Peterson v. Visa U.S.A., Inc.*, No. Civ. A. 03-8080, 2005 WL 1403761
(D.C. Super. Ct. Apr. 22, 2005) .........................................................20-22, 25, 38

*In Re Public Offering Antitrust Litigation*, No. 98 Civ. 7890 (LMM),
2004 WL. 350696 (S.D.N.Y. Feb. 25, 2004) ....................................................10-11

*In re Relafen Antitrust Litigation*, 225 F.R.D. 14 (D. Mass. 2004) ........................................39

*Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323
(9th Cir. 1980) ......................................................................12

*Sadowski v. Bush*, 293 F. Supp. 2d 15 (D.D.C. 2003) ............................................7

*Senior Resources v. Martinez*, No. Civ. A. 01-0983, 2003 WL 24147442
(D.D.C. Oct. 20, 2003) .............................................................16

*Sickles v. Cabot Corp.*, 877 A.2d 267 (N.J. Super. Ct. App. Div. 2005) .............................30

\* *Siradas v. Chase Lincoln First Bank, N.A.*, No. 98 Civ. 4028,
1999 U.S. Dist. LEXIS 15593 (S.D.N.Y. Sept. 30, 1999) ....................................34-36

*Smith v. U.S. Credit Corp.*, 626 F. Supp. 102 (E.D. Va. 1985) .............................................35

*Southard v. Visa U.S.A., Inc.*, *No. LACV 031729, 94491*,
2004 WL 3030028 (Iowa Dist. Ct. Nov. 17, 2004) ................................................25

*Sperry v. Crompton Corp.*, Index No. 17872/02
(N.Y. Sup. Ct. Nov. 20, 2003) ........................................................31, 35

*Stark v. U.S.A.*, No. 03-055030-CZ, 2004 WL 1879003
(Mich. Cir. Ct. July 23, 2004) .......................................................22, 25

*Strang v. Visa U.S.A., Inc.*, No. 03 CV 011323, 2005 WL 1403769
(Wis. Cir. Ct. Feb. 8, 2005) .........................................................25

*Stutman v. Chemical Bank*, 731 N.E.2d 608 (N.Y. 2000) ......................................................31

*In re Sugar Industry Antitrust Litigation*, 579 F.2d 13 (3d Cir. 1978) ....................................12

*Tackitt v. Visa U.S.A.*, No. CI03-740, 2004 WL 2475281
(Neb. Dist. Ct. Oct. 19, 2004) ....................................................................................22, 25

*In re Terazosin Hydrochloride Antitrust Litigation*, 160 F. Supp. 2d 1365
(S.D. Fla. 2001) ...........................................................................................................32, 39

*Wesley v. Howard University*, 3 F. Supp. 2d 1 (D.D.C. 1998) ...............................20

*Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100 (1969) ...........................38

## STATUTES

12 U.S.C. § 1451 (2000), *et seq.* ............................................................................2

12 U.S.C. 1716 (2000), *et seq.* .................................................................................2

15 U.S.C. § 12 (2000), *et seq.* ...............................................................................20

15 U.S.C. § 1601 (2000), *et seq* .............................................................................35

Ariz. Rev. Stat. 44-1401 (2004), *et seq.*............................................................24, 38

California Business & Professions Code § 17200 (2005) ......................................31

D.C. Code § 28-3901 (2005), *et seq.* ................................................................ 6, 33-37

D.C. Code § 28-4501 (2005), *et seq.* ................................................. 19-22, 24, 25, 38

Iowa Code § 553.2 (2004) ......................................................................................24

Mass. Ann. Laws ch. 92 § 1 (2005), *et seq.*........................................................24

Mass. Ann. Laws ch. 93 § 1 (2005), *et seq.*....................................................24, 31

Mich. Comp. Laws Ann. § 445.784 (2005) ...........................................................24

N.J. Stat. Ann. § 56:9-18 (2005)............................................................................24

N.M. Stat. Ann. § 57-1-15 (2005)..........................................................................24

N.Y. C.P.L.R. § 901(b) (2005) ..............................................................................31

N.Y. Gen. Bus. Law § 340 (2005) .........................................................................31

N.Y. Gen. Bus. Law § 349 (2005).....................................................................31, 38

Neb. Rev. Stat. § 59-829 (2005) ...............................................................................24

Nev. Rev. Stat. Ann. § 598A.050 (2004)..................................................................24

S.D. Codified Laws § 37-1-22 (2005) ......................................................................24

Va. Code Ann. § 59.1-196 (2005), *et seq.* ..................................................... 6, 33-37

W. Va. Code § 47-18-1 (2005), *et seq.* ...............................................................24, 38

## TREATISES

73 Am. Jur. 2d Statutes § 250 ...................................................................................36

\*    Indicates case chiefly relied upon per LCvR 7.1(a).

Defendants Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac") respectfully submit this memorandum in support of Defendants' Joint Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint for failure to state a claim upon which relief may be granted.

## INTRODUCTION

The named plaintiffs in this putative nationwide class action are borrowers who contend that they obtained home loans from various lenders in the primary mortgage market. Defendants are two government-sponsored enterprises ("GSEs"), Fannie Mae and Freddie Mac, that operate in a different market — the secondary mortgage market — where they buy mortgage loans from lenders and convert them into mortgage-backed securities, which can be sold to investors in the capital markets. The holder of a mortgage-backed security receives income from the cash flow generated by the principal and interest payments on the pool of mortgages underlying that security. In addition to securitizing the mortgages, each defendant guarantees to the holders of the resulting securities that it will cover any shortfall in the payment of principal and interest due on the underlying mortgages. For these securitization and guarantee services, the GSE charges the lender a fee, known as a "guarantee fee" or "g-fee."

Plaintiffs allege that Fannie Mae and Freddie Mac conspired to fix the price of g-fees. They seek to recover as damages the alleged overcharge that they contend was "baked" into the rates the lenders charged them on their loans. The purported conspiracy is described in a hodge podge of often contradictory allegations, many based on nothing more than "information and belief," strung together with a selection of press and third-party quotes of little or no relevance to the antitrust claims asserted. Nevertheless, to dispose of this Complaint, it is unnecessary to consider the sufficiency of such pleading because plaintiffs' claims fail for an even more

fundamental reason, and one eminently well-suited to a motion to dismiss:  plaintiffs lack standing.

The fatal flaw in plaintiffs' case is that they are not purchasers, either direct or indirect, of the securitization and guarantee services provided by defendants to mortgage lenders.   As a result, plaintiffs' federal antitrust claims are barred by the direct purchaser rule of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1978).  Moreover, because plaintiffs are not purchasers of the services at issue, their claims of injuries are necessarily derivative and remote.  Accordingly, under generally applicable antitrust standing principles, they cannot recover antitrust damages under *any* of the state antitrust laws invoked in the Complaint, even those that have repealed *Illinois Brick* as to indirect purchasers.  Finally, as we show below, the auxiliary consumer protection, unjust enrichment, and injunctive claims incorporated in the Complaint also fail for a variety of standing-related and other reasons.

## STATEMENT OF FACTS

Congress established Fannie Mae and Freddie Mac to provide stability in and ongoing assistance to the "secondary market for residential mortgages" by increasing the liquidity of mortgage investments and offering mortgage lenders greater access to private capital.  *See* 12 U.S.C. § 1716 (2000); 12 U.S.C. § 1451 (2000).  (*See also* Consolidated Class Action Complaint ("Compl.") ¶ 26.)  To fulfill these goals, Fannie Mae and Freddie Mac are both authorized to purchase, service and sell residential mortgages.  12 U.S.C. § 1717 (2000) (Fannie Mae); 12 U.S.C. § 1454(a)(1) (2000) (Freddie Mac).  As the Complaint recognizes, both Fannie Mae and Freddie Mac "are expressly prohibited by their charters from lending directly to consumers." (Compl. ¶ 28.)  Instead, "[t]hey operate exclusively in what is known as the secondary mortgage market purchasing mortgages from primary mortgage market institutions."  (*Id.*)

- 2 -

Plaintiffs are twenty-five homeowners in twelve states[1] who "all obtained residential real estate loans from commercial lenders . . . ." (*Id.* ¶ 10.)[2] Their loans were procured in the consumer or primary market for mortgage loans — not the secondary mortgage market — and were used to finance the purchase of their homes. (*Id.* ¶¶ 10, 25-28.) Plaintiffs allege that after their mortgages were originated, they were pooled with other mortgages and eventually purchased by one of the defendants. (*Id.* ¶¶ 2, 10, 23.) The mortgage pools were then securitized by defendants to create mortgage-backed securities. (*Id.* ¶¶ 23, 29.)

A mortgage-backed security ("MBS") is a liquid instrument that trades in the capital markets. *Id.* ¶ 29, 30. Fannie Mae and Freddie Mac create MBSs by taking pools of mortgages and issuing certificates representing an equity or debt participation in the pool; the payment streams emanating from the pooled mortgages underlying a specific MBS flow through to the holder of that MBS and constitute its core value. *Id.* As part of this securitization service, Fannie Mae and Freddie Mac guarantee the timely payment of principal and interest to the certificate holders. *Id.* ¶¶ 2, 30. Defendant's guarantee, however, is completely separate from, and in no way affects, the obligation of the borrowers of the underlying loans to make full monthly payments of principal and interest under the mortgages; plaintiffs do not allege otherwise. Indeed, plaintiffs concede that "[b]orrowers are largely unaware that Freddie Mac and Fannie Mae charge g-fees." *Id.* ¶ 43.

---

[1]     These twelve state are Arizona, Colorado, Connecticut, Florida, Idaho, Minnesota, New Jersey, New York, Pennsylvania, Texas, West Virginia, and Wisconsin.

[2]     Those lenders are Irwin Mortgage Co., Key Bank, Citigroup, M&T Bank, HSBC, Hamilton National Mortgage Col, Countrywide Home Loans, Inc., America's Wholesale Lender, Interfirst Mortgage, Stuart Mortgage Corporation, US Bank, National City Mortgage, Provident Home Loans, General Motors Acceptance Corporation, and Ohio Savings Bank. Compl. ¶ 10.

Lenders who utilize securitization and guarantee services benefit by reducing their credit risk and transforming an illiquid mortgage pool into a liquid security that they can sell in the capital markets at any time.  *Id.* ¶¶ 29, 30.  As consideration for these benefits, the contracts under which lenders agree to sell mortgages to defendants provide that defendants will be compensated for their services by payment of a g-fee, deducted from the income flow due to the MBS holder, whether that be the lender itself or a subsequent purchaser of the security.  *Id.* ¶¶ 30, 40.  That fee is paid to the defendant out of the payment that the lender is entitled to receive under the terms of the loans constituting the pool prior to its sale to that defendant.  *Id.* at ¶ 2.  G-fees are typically expressed as a percentage of the outstanding loan balance.  *See id.*  Rather than paying the entire fee upfront, however, the lender agrees to its collection over the life of the loan through the defendant's withholding a portion of the monthly cash flow generated by the pool before its remittance of the remainder to the holder of the MBS.  *See id.* ¶¶ 30, 43, 45.

Plaintiffs acknowledge the highly individualized nature of g-fee pricing.  The Complaint alleges that the amount of the g-fee charged by each defendant to each lender (a) is heavily negotiated, (b) differs from lender to lender, and (c) is not disclosed.  (*Id.* at ¶ 59.)  Nevertheless, plaintiffs maintain that defendants managed somehow to collude to artificially fix their respective g-fees at supra-competitive levels in violation of the Sherman Act and the laws of certain states and the District of Columbia.  (*See id.* ¶¶ 80-85, 89-98.)

Although plaintiffs do not allege that they engaged in any transaction with defendants, or even participated in the secondary mortgage market, they contend that the allegedly inflated g-fees were passed through to them without their knowledge "as a component of the monthly mortgage rate charged by lenders" for their primary market home loans.  (*Id.* ¶ 2, 79; *see also* ¶¶ 39, 43.)  They seek treble-recovery of the alleged overcharge on behalf of both themselves and a

- 4 -

national class of purportedly similarly situated residential mortgagors.  (*Id.* ¶ 15, Prayer for

Relief (C)).  In addition to their antitrust damages claims, plaintiffs also assert violations of

certain state consumer protection statutes on the ground that the terms of the securitization

agreements between defendants and their lenders were maintained as confidential and thus

wrongly obscured from plaintiffs, (*id.*, ¶¶ 99-112), as well as claims for injunctive relief and

unjust enrichment (*id.*, ¶¶ 86-88, 113-16).

## ARGUMENT
### Summary of Argument

It is clear from the face of the Complaint that plaintiffs are neither direct nor indirect

purchasers of the defendants' securitization and guarantee services.  Plaintiffs, therefore, lack

standing to recover damages under any of the federal or state antitrust damage claims asserted in

the Complaint.

First, plaintiffs fail to allege that they ever dealt directly with defendants, let alone

purchased from them the securitization and guarantee services subject to the alleged price-fixing.

The federal antitrust claim in Count I is therefore barred by the rule of *Illinois Brick*, which

permits only direct purchasers to sue for an overcharge.  In a desperate attempt to avoid this rule,

plaintiffs make the far-fetched claim that lenders (which include such powerful entities as

Citigroup and General Motors Acceptance Corporation) constitute a single economic unit with or

serve as *de facto* agents of defendants in making their mortgage loans. This entirely conclusory

allegation cannot bring plaintiffs' claim within the narrow *Illinois Brick* exception designed for

indirect purchasers who buy from an entity "controlled" by the alleged violator, such as a wholly

owned subsidiary.  Plaintiffs are not indirect purchasers and the lenders are not subsidiaries or

entities otherwise subject to the structural control of defendants.

Second, plaintiffs' fallback attempt to assert claims in Counts III and IV under the laws of twenty-four states that allegedly have repealed the direct purchaser limitation of *Illinois Brick* also fails.   Whether or not a state has repealed *Illinois Brick*'s per se rule limiting recovery to direct purchasers, a plaintiff must still satisfy the basic antitrust standing requirements that are reflected in the five-factor test established by the Supreme Court in *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519 (1983) (*"AGC"*).  Plaintiffs fall short on every one of *AGC*'s five factors.  Therefore, the Court should dismiss these claims in their entirety.

The few remaining claims also fail for lack of standing and because of other defects.  In Counts V and VI, plaintiffs do not state a claim under either the D.C. or Virginia Consumer Protection Act because the guarantee and securitization services offered by defendants are commercial rather than consumer services, and therefore outside the scope of both statutes. Plaintiffs' Count VII claim for unjust enrichment, based on the same allegations as the antitrust damages claims, is nothing more than an attempt to make an "end run" around the antitrust standing requirements and should accordingly be dismissed.  Finally, plaintiffs lack standing to seek injunctive relief because they do not allege conduct that poses any risk of future harm to them.

### Standard of Review for a Motion to Dismiss

Defendants move to dismiss the complaint under Fed. R. Civ. P. 12(b)(6) because plaintiffs fail to state a claim upon which relief can be granted. Questions of antitrust standing are properly raised in a Rule 12(b)(6) motion. *See In re Lorazepam & Clorazepate Antitrust Litig.*, 289 F.3d 98, 107 (D.C. Cir. 2002); *Genetic Sys. Corp. v. Abbott Labs.*, 691 F. Supp. 407, 419-22 (D.D.C. 1988). In deciding a motion to dismiss under Rule 12(b)(6), the Court considers all well-pleaded facts as true, and draws all reasonable inferences in favor of the non-movant. *Banks v. District of Columbia*, 377 F. Supp. 2d 85, 88 (D.D.C. 2005). The Court need not, however, accept as true the plaintiffs' legal conclusions. *Alexis v. District of Columbia*, 44 F. Supp. 2d 331, 336-37 (D.D.C. 1999). Similarly, the Court need not accept inferences or conclusory allegations that are unsupported. *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994); *Sadowski v. Bush*, 293 F. Supp. 2d 15, 18 (D.D.C. 2003).

### I.   PLAINTIFFS' SHERMAN ACT DAMAGES CLAIM IS BARRED AS A MATTER OF LAW BY THE RULE OF *ILLINOIS BRICK* (COUNT I)

#### A.   Under *Illinois Brick*, Only Direct Purchasers May Sue for Antitrust Damages Under Federal Law

In *Illinois Brick Co. v. Illinois*, 431 U.S. 720, the U.S. Supreme Court established the rule that only direct purchasers may state claims for overcharge damages under the federal antitrust laws. A direct purchaser is one who buys the allegedly price-fixed product or service directly from the defendant and not from parties further down the distribution chain such as intermediate wholesalers, distributors, or retailers. *See Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 207 (1990); *California v. ARC Am. Corp.*, 490 U.S. 93, 97 (1989).

In *Illinois Brick*, the State of Illinois sued manufacturers of concrete blocks used in the construction of government buildings for allegedly fixing the price of the blocks. The State did

not purchase the blocks from the manufacturers, but rather received and paid for them through intermediary contractors.  The contractors used them in constructing the State's buildings and allegedly passed on the manufacturers' overcharge in their bid prices to the State.  The Supreme Court held, as a matter of law, that only immediate purchasers of the price-fixed product may seek overcharge damages under federal antitrust law.  431 U.S. at 728-29.

In articulating its rationale, the Court explained that permitting recovery for an alleged overcharge at subsequent levels in the chain of distribution would "transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge from direct purchasers to middlemen to ultimate consumers. . . ., add[ing] whole new dimensions of complexity to the treble damages suits and seriously undermin[ing] their effectiveness."  *Id.* at 737.  Moreover, the Court reasoned, allowing every party in the chain of distribution independently to sue antitrust defendants for damages arising out of the same injury would lead to "inconsistent adjudications and therefore [ ] unwarranted multiple liability."  *Id.* at 730.  The Court also observed that the uncertainty attending both the assessment and apportionment of an alleged overcharge among various levels of plaintiffs would reduce the incidence and effectiveness of civil actions, an "important weapon of antitrust enforcement."  *Id.* at 745.  The Court concluded, in sum, that the twin perils of complex apportionment and duplicative recovery are avoided, and the antitrust laws more effectively enforced, by permitting only direct purchasers to sue for overcharge damages.

In the more than twenty-five years since the Supreme Court's decision, the "*Illinois Brick* Rule" has become a settled and well-known part of federal antitrust jurisprudence.  The rule has been applied regularly, including by courts of this Circuit, to bar claims by indirect purchasers. *See, e.g.*, *F.T.C. v. Mylan Labs., Inc.*, 62 F. Supp. 2d 25 (D.D.C. 1999).

**B.      Plaintiffs Are Not Direct Purchasers of Defendants' Securitization and Guarantee Services**

The Complaint makes clear on its face that plaintiffs are not direct purchasers of defendants' securitization and guarantee services, the subjects of the alleged price-fixing. Plaintiffs allege that these services were rendered in the course of defendants' respective secondary-market purchases of mortgage loan pools from lenders, and their transformation of those pools into MBSs saleable in the capital markets.  (*See* Compl. ¶ 29.)  Plaintiffs are not parties to that transaction.  Rather, plaintiffs are borrowers in a loan transaction with a mortgage lender that occurs in the separate primary mortgage market.  (*See id.* ¶¶ 25, 28.)  Plaintiffs acknowledge that defendants are expressly prohibited by their federal charters from participating in that market.  (*Id.* ¶ 28.)  All plaintiffs claim is that defendants' purported over-pricing of the securitization and credit guarantee services provided to their lenders resulted in inflated lender costs, and that the lenders passed those costs through to plaintiffs as a "baked-in" overcharge in their pricing of plaintiffs' individual mortgage loans.  Thus, based upon their own allegations, plaintiffs are not direct purchasers as defined by federal antitrust laws.  Accordingly, they are barred by the rule of *Illinois Brick* from suing defendants for the antitrust damages alleged.

**C.      Under *Illinois Brick*, It Is Immaterial that Plaintiffs' Loan Payments Formed Part of the Cash Flow From Which G-Fees Were Collected**

*Illinois Brick* makes clear that plaintiffs may only recover for an overcharge if they bought the price-fixed product or service directly from the defendant.  Plaintiffs' allegation that their individual monthly mortgage payments constitute a part of the MBS cash flow from which guarantee fee payments are withdrawn does not make them direct purchasers of the services for which defendants charge those fees, and therefore is immaterial to the *Illinois Brick* analysis.

This outcome is clear from the holdings of other cases in which antitrust plaintiffs have

unsuccessfully attempted to avoid the *Illinois Brick* rule by arguing that the manner in which the
overcharge was billed and collected shows that the plaintiffs were direct purchasers.  For
example, in *Campos v. Ticketmaster Corp.*, 140 F.3d 1166 (8th Cir. 1998), concert ticket
purchasers sued Ticketmaster seeking as damages the alleged monopoly overcharge in
Ticketmaster's distribution fee.  Ticketmaster negotiated the fee with concert promoters, who
were logically the direct purchasers of Ticketmaster's ticket distribution services.  Each ticket
sold by Ticketmaster to a concertgoer, however, included a separate service charge representing
the amount of the distribution fee owed by the promoter to Ticketmaster.  The plaintiffs argued
that the fact that a portion of the ticket price was set aside to pay Ticketmaster its fee made
concertgoers the direct purchasers of Ticketmaster's distribution services.  The court rejected the
argument.  Citing  *McCarthy v. Recordex Service, Inc.*, 80 F.3d 842, 853 n.8 (3d Cir.), *cert.
denied*, 519 U.S. 825 (1996), in which the court noted that "even if a separate charge for gasoline
were assessed [to a taxi passenger], the taxi passenger still could not be considered a direct
purchaser [of gasoline] in any sense," the court in *Campos* ruled that "billing practices [are not]
determinative of indirect purchaser status."  140 F.3d at 1171.

As the *Campos* court held, what matters is not how the alleged overcharge is billed and
paid, but whether the plaintiff is actually a purchaser of the allegedly price-fixed good or service.
*Id.* at 1171-72.  In *Campos*, the plaintiffs purchased concert *tickets,* not the *ticket distribution
service* to which the fee pertained.  Accordingly, the court dismissed the complaint on *Illinois
Brick* grounds.  *See also In Re Public Offering Antitrust Litig.*, No. 98 Civ. 7890 (LMM), 2004
WL 350696 (S.D.N.Y. Feb. 25, 2004) (holding that investors in initial public offering stock were
barred by *Illinois Brick* from seeking to recover alleged overcharge on underwriting fees,
notwithstanding the fact that such fees had been deducted from the share price plaintiffs paid

directly to the underwriters; court focused on the reality of the transaction rather than the billing structure to determine that it was the issuers of the securities, and not plaintiffs, who purchased the underwriting services).

The same result is even more warranted here because plaintiffs are not purchasers of defendants' securitization and guarantee services, are not engaged in any transaction of any type with defendants, and do not operate in the same market as defendants. The present Complaint therefore presents an *a fortiori* case for the application of the *Illinois Brick* bar.

**D.     Plaintiffs' Conclusory and Unsupported Allegations That Lenders Constitute An "Economic Unit" With Or Serve As "Agents" Of Defendants Do Not Save Their Claim**

Presumably recognizing that their federal antitrust damage claim is barred by *Illinois Brick*, plaintiffs attempt to fabricate an *Illinois Brick* exception by alleging that mortgage lenders are a single economic unit with or *de facto* agents of defendants. (*See* Comp. ¶¶ 14, 41.) This effort fails both on the pleaded facts and as a matter of law.

**1.     The Control Exception is Narrowly Applied, Requiring Structural Control, Such as a Parent-Subsidiary Relationship**

The Supreme Court has made clear that "the *Illinois Brick* rule is intended to have broad force and effect." *In re Microsoft Antitrust Litig.*, 168 F. Supp. 2d 541, 546 (D. Md. 2001) (citing *Kansas v. UtiliCorp United, Inc.*, 497 U.S. at 216-17). Its exceptions are "narrow," *In re Lorazepam*, 289 F.3d at 101, and the Supreme Court has warned that loosening them would be "an unwarranted and counterproductive exercise." *UtiliCorp*, 497 U.S. at 217.

The agency, or more accurately, "control" exception that plaintiffs seek to invoke is derived from a footnote in *Illinois Brick*. The Supreme Court there observed that in the circumstance in which the "direct purchaser is owned or controlled by its customer," "market

forces have been superseded and the pass-on defense might be permitted." *Illinois Brick,* 431 U.S. at 760 n.16.  In compliance with the Supreme Court's *UtiliCorp* admonition, the control exception has been very narrowly applied, typically only where the direct seller was owned by the alleged price-fixer.  *See, e.g., Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323, 326-28 (9th Cir. 1980) (according the plaintiff standing as to its purchases from the defendants' wholesale division and wholesaler subsidiary, but denying standing as to its purchases from wholesalers that were not manufacturer-owned); *In re Sugar Industry Antitrust Litig.*, 579 F.2d 13, 18 (3d Cir. 1978) (holding that the plaintiff had standing only with respect to purchases it made directly from the price-fixing defendants and their corporate subsidiaries).

As the Third Circuit has recently noted, even courts that have extended the control exception beyond a parent-subsidiary relationship still require "relationships involving such functional economic or other unity between the direct purchaser and either the defendant or the indirect purchaser that there effectively has been only one sale." *Howard Hess Dental Labs., Inc. v. Dentsply International, Inc.*, Nos. 04-1979 & 04-1980, 2005 WL 2291967, at *6 (3d Cir. Sept. 21, 2005) (quoting *Jewish Hosp. Ass'n of Louisville, Ky., Inc. v. Stewart Mech. Enters., Inc.*, 628 F.2d 971, 975 (6th Cir. 1980)).  In the absence of a parent-subsidiary relationship, Judge Posner suggests that alternative modes of structural control needed to establish the control exception include "interlocking directorates, minority stock ownership, loan agreements that subject the wholesalers to the manufacturers' operating control [or] trust agreements." *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 605 (7th Cir. 1997).

This standard constitutes an extremely formidable hurdle for plaintiffs seeking to invoke the control exception, demanding that the plaintiff plead facts that, if true, would demonstrate that the direct purchasers were owned or otherwise constituted a single economic unit with the

alleged violator.  For example, in *Jewish Hospital Association*, a hospital owner, which contracted with one of several competing general contractors for construction of a hospital addition, brought suit against mechanical subcontractors for allegedly conspiring to fix the price they uniformly bid to each of the competing generals for the mechanical work portion of the project.  628 F.2d at 972.  In opposing the subcontractors' summary judgment motion for lack of antitrust standing, the hospital argued that the "various general contractors were mere conduits for the illegal overcharge," and that this brought its claim "within the rationale of the 'control' exception" to the rule of *Illinois Brick*.  *Id*. at 975.

In affirming dismissal for lack of standing, the Sixth Circuit affirmed the broad application of the *Illinois Brick* bar and the corresponding narrowness of the control exception.  In reviewing *Illinois Brick*'s control exception dictum, the court noted that as an example "of situations where an ownership or control relationship" might provide an exception, the Supreme Court cited two prior decisions in which the conduct at issue was conducted through downstream corporations in which the defendant either owned stock or otherwise exercised financial control.  *Id*.  The court next pointed to the Supreme Court's "emphasis upon the narrow scope of exemptions to the indirect-purchaser rule . . ."  *Id*.  On the basis of that review, the court concluded that the control exception required such "unity" between the seller and the direct purchaser so as to "convert the two-step transaction" by which the hospital purchased "into the equivalent of a single sale."  *Id*. at 975.  *See also Fischer v. Wattles*, 639 F. Supp. 7, 9 (M.D. Pa. 1985) (plaintiff did not fall within the exception where he failed to allege a basis for actual corporate control, such as majority stock ownership, between the alleged violator and the intermediary seller).  As *Jewish Hospital Association* and the other cases reflect, the degree of

unity and control necessary to satisfy this challenging "single sale" requirement is generally found only in the case of common ownership.

The requirement is *not* satisfied merely by allegations that the defendant, because of its market position, was able to assert economic influence — even dominating economic influence — over the direct purchasers.  Indeed, even in the circumstance of an adjudicated monopolist with market power sufficient to *dictate* downstream economic terms, courts have ruled that such allegations fail as a matter of law to satisfy the control exception to *Illinois Brick*.  In *In re Microsoft Antitrust Litig.*, 127 F. Supp. 2d 702 (D. Md. 2001), the end-users of computer software alleged that defendant Microsoft forced its intermediary computer-manufacturer-direct-customers ("OEMs") "to act as [its] agents in offering end-user licenses for acceptance or rejection by customers under terms strictly and exclusively dictated by Microsoft."  *Id.* at 713.  That assertion was joined with allegations of the OEMs' economic dependence on Microsoft and that Microsoft thereby "controlled" the OEMs in their transaction with the plaintiffs.  *Id*.  In granting Microsoft's motion to dismiss the complaint for lack of antitrust standing, the court emphasized that while upstream economic considerations may motivate and guide the intermediary in its downstream dealings with the plaintiffs, they do not create the "functional unity" between the intermediary and the defendant that is essential to invocation of the control exception:  "Whatever incentives OEMs and independent retail dealers may have to cooperate with Microsoft (or disincentives to sue it), they clearly are separate and independent entities capable of making their own decisions."  *Id.*

The Third Circuit recently reached the same conclusion in *Howard Hess*.  In that case, the plaintiffs were dental laboratories who bought artificial teeth manufactured by defendant Dentsply, but that were sold to plaintiffs through Dentsply's exclusive dealers.  The plaintiffs

argued that Dentsply, which controlled 75-80% of the relevant product market, exercised such substantial economic power over its dealers through its exclusive-dealing requirements and resale price setting as to "control" them for purposes of *Illinois Brick*.  The court disagreed, holding as a matter of law that even in these circumstances the control exception did not apply. The court stated:  "[E]ven assuming that Dentsply does exert some degree of control over its dealers, *Illinois Brick*'s policy reasons for denying standing remain. . . . Plaintiffs do not come within the control exception because Dentsply does not own any interest in its dealers and no functional unity exists among them and Dentsply.  Notwithstanding whatever lesser degree of control Dentsply may exert over its dealers, *Illinois Brick*'s policy reasons for denying standing apply."  2005 WL 2291967, at *7.

### 2.      The Facts Pleaded by Plaintiffs Provide No Basis for Applying the Control Exception

Measured against this demanding standard, plaintiffs do not come close to alleging a basis for application of the control exception.  They do not, and cannot, claim that that the lenders are owned by defendants.  Instead, their claim of control is based solely upon the parroting of legal conclusions and buzzwords like "agency" and "economic unity."  (*See, e.g.*, Compl. ¶ 14 ("lenders with whom Defendants frequently meet serve as *agents* of the Defendants with respect to the violations alleged herein"), ¶ 41 ("there is *functional economic unity* between the lenders and Fannie Mae or Freddie Mac") (emphasis added)).  These allegations are not supported by any facts but rather are based solely upon assertions that Fannie Mae and Freddie Mac exercise some degree of economic influence over lenders by virtue of their special position as GSEs — a claim which, as we have shown above, is legally insufficient to invoke the control exception.

- 15 -

The law is clear that plaintiffs' bald conclusions regarding functional unity or legal agency are entitled to no weight and are useless to them in attempting to avoid a Fed. R. Civ. P. 12(b)(6) dismissal.  In the D.C. Circuit, as elsewhere, courts ruling on motions to dismiss are not bound to accept plaintiffs' conclusions as facts, nor are they required to accept factual allegations contradicted by other allegations.  *See Papasan v. Allain*, 487 U.S. 265, 286 (1986) ("Although for the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation."); *Kowal v. MCI Communications Corp.*, 16 F.3d at 1276 ("[T]he court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint.  Nor must the court accept legal conclusions cast in the form of factual allegations."); *Senior Res. v. Martinez*, No. Civ. A. 01-0983, 2003 WL 24147442 (D.D.C. Oct. 20, 2003) (holding that plaintiff's equal protection claim failed because a necessary factual allegation in the complaint was contradicted by other factual allegations).

Here, the claim of control is not only conclusory, it is nonsensical and contradicted by the operative facts that are pled.  It defies common sense to suggest that major national finance companies such as Citigroup and GMAC are "controlled" by or "agents" of defendants.  In point of fact, courts that have considered the issue of whether loan originators are controlled through an agency relationship with Fannie Mae or Freddie Mac have uniformly found that no such relationship exists.  Thus, in *Greene v. Ellis (In re Ellis)*, 152 B.R. 211 (Bankr. E.D. Tenn. 1993), the plaintiff argued that the Master Commitment (a loan purchasing contract between Freddie Mac and a mortgage lender) together with Freddie's Sellers' & Servicers' Guide (which sets forth guidelines that must be met before a particular loan will be accepted for purchase by Freddie Mac) established an agency relationship because those documents purportedly controlled

the manner in which the mortgage lender made loans.  The court held to the contrary, finding

that:

> A requirement that work be performed according to standards and
> specifications imposed by an employer under a contract is not
> sufficient to establish the degree of control necessary to make a
> presumably independent contractor the agent of the
> employer….Freddie Mac did not authorize [the mortgage lender]
> to act on its behalf; it merely entered into a contractual relationship
> with the [mortgage lender] wherein the [mortgage lender]
> committed to sell $1 billion worth of qualifying loans to Freddie
> Mac in exchange for payment and the right to be paid service fees
> for loans serviced.

*Id.* at 218.  *See also Mendrala v. Crown Mortgage Co.*, 955 F.2d 1132, 1141 (7th Cir. 1992)

(finding that a seller of loans to Freddie Mac was an independent contractor, not Freddie's agent

or assignee).

Indeed, far from supporting the claim of control, the allegations instead describe an

independent commercial relationship that is arms-length — with no element of unitary identity

or legal control by either party over the other.  Plaintiffs' allegations show that the relationship

between defendants and plaintiffs' lenders is that of contractual sellers and buyers of mortgage

pools, not that of a parent-subsidiary or unified economic entities.  As plaintiffs' Complaint

determinatively alleges:

- "Fannie Mae and Freddie Mac…*buy* mortgages from lenders . . . ." (Compl. ¶ 27)
  (emphasis added);

- "Lenders that make mortgage loans to borrowers conforming to the GSE guidelines *may
  sell those loans* to Defendants." (Compl. ¶ 25) (emphasis added);

- "If a loan does not conform to the GSE guidelines, the Defendants are *unlikely to
  purchase the loan* . . . ."  (Compl. ¶ 25) (emphasis added);

- "Fannie Mae and Freddie Mac use *contractual agreements* with approved seller/
  servicers . . . ." (Compl. ¶ 40) (emphasis added);

- "The GSEs…*negotiat[e]* the pricing of [their purchase of] those mortgages." (Compl. ¶
  40) (emphasis added); and

- 17 -

- "the fees charged by Fannie and Freddie differ from lender to lender, are *heavily negotiated* and are not disclosed." (Compl. ¶ 59) (emphasis added).

Entities that are part of a "single economic unit" obviously do not negotiate with one another.  Whether or not defendants are able within that commercial relationship to exercise economic influence over the lenders is irrelevant for the purpose of the control exception.  The pleadings in their entirety clearly establish that whatever may be lenders' economic incentives to deal with defendants, they remain, in the words of the court in *In re Microsoft Corp.*, "separate and independent entities capable of making their own decisions."  127 F. Supp. 2d at 713.

Plaintiffs accordingly do not, and cannot, plead facts that would place them within the narrow constraints of the control exception to *Illinois Brick*.  Their federal antitrust damages claim in Count I should accordingly be dismissed.

## II.     PLAINTIFFS LACK STANDING TO PURSUE THEIR CLAIMS UNDER STATE REPEALER LAWS (COUNTS III & IV)

As shown above, because plaintiffs are not direct purchasers, their Clayton Act damages claim fails under the rule of *Illinois Brick*.  Anticipating this result, plaintiffs also plead antitrust claims under what they characterize as "Repealer State Laws" — *i.e.*, states that have repealed the direct purchaser limitation of *Illinois Brick*.  In Count III, plaintiffs assert a claim under the antitrust law of the District of Columbia on behalf of the entire alleged class; in Count IV, plaintiffs assert, in the alternative, claims under the laws of twenty-four states, including D.C., on behalf of putative subclasses of persons who obtained loans in those states.  None of these state-law claims, however, provides plaintiffs a refuge.  For the reasons explained below, Counts III and IV should be dismissed in their entirety.

*First*, in D.C. and several of the other so-called "*Illinois Brick* repealer states," the state laws still require that the plaintiff be a "purchaser" of the price-fixed good or service. Here, because plaintiffs concede that they bought only a mortgage loan — not the securitization and guarantee services sold to lenders that were the subject of the alleged price fixing — they are not permitted to make a claim under these statutes.

*Second*, even those states whose antitrust laws do not contain, or have not been construed to contain, an explicit "purchaser" limitation impose minimum standing requirements which, as a matter of law, are not satisfied under the circumstances here. Plaintiffs allege only that they paid more for a product (a mortgage) because of purported price fixing (i) of a wholly different product (securitization and guarantee services) (ii) that plaintiffs did not purchase and (iii) that was sold in a market in which they did not participate. Such a theory of injury is simply too remote to confer antitrust standing *under any of the state laws* being pled.

*Finally*, many of the state-law claims fail for additional reasons, including that (a) some of the statutes cited in Count IV as "repealer state" laws in fact maintain the *Illinois Brick* direct-purchaser requirement; (b) some of the state claims are deficient for various state-specific reasons; and (c) many of the state claims are precluded for the reason that no named plaintiff resides or was injured in that state.

> **A. Because Plaintiffs Are Not "Purchasers" of the Allegedly Price-Fixed Services, They Lack Standing To Assert a Claim Under the D.C. Antitrust Act and Several Other State Laws**

Count III asserts that the alleged conspiracy to fix the price of guarantee fees violates the District of Columbia Antitrust Act ("DCAA"), D.C. Code § 28-4501 (2005), *et seq*. (Compl. ¶¶ 89-95.) Plaintiffs also assert the DCAA in Count IV among a list of state laws under which

plaintiffs claim relief for different resident subclasses. (*Id.* ¶ 97.) Two provisions of the DCAA grant standing to private parties to sue for violations:  Section 28-4508 grants standing to direct purchasers, and section 28-4509 extends the same right to "indirect purchasers."  As explained in Part I, plaintiffs are not direct purchasers and therefore lack standing under section 28-4508.[3] Equally apparent is that plaintiffs are not indirect purchasers — indeed, plaintiffs are not "purchasers" at all of the services that were allegedly price fixed — and thus lack standing under section 28-4509.

Section 28-4509 permits "indirect purchasers in the chain of manufacture, production, or distribution" to pursue claims relating to "such goods and services" that were subject to an illegal overcharge.  This provision was adopted in response to the Supreme Court's *Illinois Brick* bar, and was intended to supplement section 28-4508 by extending standing beyond that available under federal law.  *See Peterson v. Visa U.S.A., Inc.*, No. Civ. A. 03-8080, 2005 WL 1403761, at *3 (D.C. Super. Ct. Apr. 22, 2005).  But, as the wording of section 28-4509 makes clear, the statute provides relief only to indirect *purchasers* of the goods or services that were subject to the alleged overcharge.  Because plaintiffs are not indirect purchasers of Fannie Mae's or Freddie Mac's securitization and guarantee services, they lack standing under section 28-4509.

---

[3]      Section 28-4508, which permits a private action by "[a]ny person who is injured in that person's business or property by reason of anything forbidden [under the DCAA]," is modeled on section 4 of the Clayton Act, 15 U.S.C. § 12 (2000), *et seq*.  The courts have construed section 28-4508 consistent with federal precedent.  *See* D.C. Code § 28-4515 (2005) ("in construing [the DCAA] a court . . . may use as a guide interpretations given by federal courts to comparable antitrust statutes"); *Wesley v. Howard Univ.*, 3 F. Supp. 2d 1, 4 n.6 (D.D.C. 1998) (dismissing a claim under section 28-4508 because "[w]here a complaint fails to state a claim under the Sherman Act (for any reason other than lack of an effect on interstate commerce), it also fails as a matter of law under the [DCAA]."); *Dial A Car, Inc. v. Transp., Inc.*, 884 F. Supp. 584, 588 n.2 (D.D.C. 1995) (complaint that failed to state a federal antitrust claim also fails to state a claim under DCAA § 28-4508).  Accordingly, because plaintiffs lack standing under federal law, they also lack standing under section 28-4508.

The D.C. Superior Court relied upon this "purchaser" requirement to deny standing in *Peterson*. The plaintiff there alleged that defendants' antitrust violation had caused merchants to pay higher fees for debit card services provided by the defendants, Visa and MasterCard. 2005 WL 1403761, at *1. The plaintiff claimed that merchants passed on a part of this overcharge to him and other consumers in the form of higher prices on purchased consumer goods. The court ruled, however, that the plaintiff lacked standing under section 28-4509, finding that his claim did "not fit into the indirect purchaser category" for the simple reason that the plaintiff "did not purchase the debit card services from the merchants." *Id.* at *3. The fact that some overcharge may ultimately have been borne by the plaintiff did not make the plaintiff an indirect purchaser of services provided to the merchants, and thus was irrelevant. *Id.*

The same outcome is compelled here. As the Complaint acknowledges, "G-fees are the price that Defendants charge for a credit risk guarantee which assures timely payment of principal and interest of the underlying loan." (Compl. ¶ 2.) The fee is charged when a seller in the secondary mortgage market — either the original lender or a consolidator who purchased the mortgage loans from the originators — swaps a pool of mortgages with Fannie Mae or Freddie Mac in exchange for an MBS.[4] As part of that transaction, Fannie Mae or Freddie Mac provides their securitization services and a guarantee. The exchange of the MBS for the mortgages in the secondary market permits the seller to reallocate its capital and make new loans in the primary mortgage market. In no sense, however, are borrowers purchasers of defendants' securitization and guarantee services; to the contrary, they neither buy the security nor consume the credit

---

[4]     The entity that funds the loan may not be the same entity that originates the loan with the borrower; mortgage brokers frequently originate loans and then sell them to investors before they are sold to Fannie Mae or Freddie Mac. *See, e.g., In re Ellis,* 152 B.R. 211.

guarantee, and their own obligations to make full payment of principal and interest under the mortgages is unaffected.[5]  Thus, like the plaintiff in *Peterson*, the instant plaintiffs are not "purchasers" at all of the services at issue.  Hence, standing is unavailable under section 28-4509 as well as section 28-4508.  Count III should be dismissed and Count IV should be dismissed as to the claim under the DCAA.

In addition to D.C., several other states included in Count IV explicitly limit antitrust standing — by statute or judicial interpretation — to direct and indirect *purchasers*.  Since it is manifest that plaintiffs are not "purchasers," it follows that Count IV should be dismissed as to these other states as well, namely Arizona, Florida, Michigan, Nebraska and North Dakota.[6]

## B.     As to All of the State Law Claims, Plaintiffs' Remote and Attenuated Theory of Harm Is Legally Insufficient To Satisfy Basic Requirements for Antitrust Standing

As just shown, D.C. and five other states impose an explicit "purchaser" requirement that bars plaintiffs' claims.  In addition, though, *all* the states identified in Count IV — whether or not they explicitly require that a plaintiff be a "purchaser" — impose certain basic standing requirements that the instant plaintiffs fail to meet.  As non-purchasers who base their theory of

---

[5]      There is nothing in the mortgage loan documents to which plaintiffs are parties that even references defendants' services.  (Compl. ¶ 43.)  That is because these services are not offered to or consumed by borrowers.

[6]      *See Consiglio -Tseffos v. Visa U.S.A., Inc.*,  No. CV 2003-020170, 2004 WL 3030043, at *1 (Ariz. Super. Ct. Dec. 8, 2004) (interpreting Arizona's judicially-created *Illinois Brick* repealer as requiring that plaintiff be an indirect purchaser of services sold by the defendant); *Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100, 109 (Fla. Dist. Ct. App. 1996) (holding that "consumers (that is, indirect purchasers)" may bring actions under the Florida Deceptive and Unfair Trade Practices Act for price-fixing conduct); *Stark v. U.S.A.*, No. 03-055030-CZ, 2004 WL 1879003, at *4 (Mich. Cir. Ct. July 23, 2004) (holding the Michigan Antitrust Reform Act to be inapplicable to a claim by a non-purchaser); *Tackitt v. Visa U.S.A.*, No. CI03-740, 2004 WL 2475281, at *3 (Neb. Dist. Ct. Oct. 19, 2004) (holding that plaintiff could not rely on Nebraska's *Illinois Brick* repealer because she was not an indirect purchaser); *Beckler v. Visa U.S.A.*, No. 09-04-C-00030, 2004 WL 2475100, at *4 (N.D. Dist. Ct. Sept. 21, 2004) (plaintiffs lacked standing as non-purchasers of defendants' services).

harm solely upon the allegation that their seller's cost of doing business was increased in a distinct market, their alleged injuries are too remote to qualify for relief.

When the Supreme Court in *Illinois Brick* established a virtual per se rule barring indirect purchaser suits, the Court recognized that its holding was analytically separate from the question of whether the plaintiff's injury was too remote from the market of the alleged violation to establish standing. *See* 431 U.S. at 728, n.7 ("[T]he question of which persons have been injured by an illegal overcharge for purposes of § 4 [of the Clayton Act] is analytically distinct from the question of which persons have sustained injuries too remote to give them standing to sue for damages under § 4."). Similarly, multiple state courts have held that, even where a state has an *Illinois Brick* repealer, whether a given plaintiff should be accorded standing requires an analysis of the claimed injury and its relationship to the alleged antitrust violation. And, in assessing this question of the remoteness of injury from the violation, state courts have typically relied upon the Supreme Court's general antitrust standing analysis set out in *AGC*.

*AGC* held that, even assuming a plaintiff suffers some injury traceable to an antitrust violation, the question of whether the plaintiff has standing requires a court "to evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." 459 U.S. at 535. To that end, the Court identified five factors for determining whether the relationship between the plaintiff's harm and the defendant's conduct was sufficiently close to confer standing: (1) whether the plaintiff is a consumer or competitor in the allegedly restrained market; (2) whether the injury alleged is a direct, first-hand impact of the restraint alleged; (3) whether there are more directly injured potential plaintiffs with motivation to sue; (4) whether the damages claimed are speculative; and (5) whether the plaintiff's claim risks duplicative recoveries and would require a complex apportionment of damages. *Id.* at 535-45.

As in *AGC* itself, these factors are frequently addressed as matters of law in the context of a

motion to dismiss under Fed. R. Civ. P. 12(b)(6).  *See* p. 7, *supra.*

Although *AGC* interpreted federal standing requirements, the analysis is equally

applicable to state law standing — as demonstrated by the fact that courts in more than a

dozen Count IV states have recently applied *AGC* to deny standing to antitrust plaintiffs

in circumstances analogous to those here. The Supreme Court's *AGC* analysis drew

heavily on common-law concepts shared by all the states such as proximate cause, 459

U.S. at 531-33, and many of the relevant state statutes specifically provide, or have been

interpreted by the courts as requiring, that they should be construed in harmony with

federal antitrust precedents.[7] Thus, even for those states that do not explicitly impose a

direct or indirect *purchaser* requirement, plaintiffs' claims fail because they do not satisfy

the *AGC* requirements.

---

[7]     *See, e.g.*, Ariz. Rev. Stat. § 44-1412 (2004); D.C. Code Ann. § 28-4515 (2005); Iowa Code §
553.2 (2004); Mich. Comp. Laws Ann. § 445.784 (2005) (law to be construed with due deference to
interpretations by federal courts of comparable antitrust statutes); *Howard v. Minn. Timberwolves
Basketball Ltd. P'ship*, 636 N.W.2d 551, 556 (Minn. App. Ct. 2001) ("Minnesota antitrust law should be
interpreted consistently with federal court interpretations of federal antitrust law unless Minnesota law
clearly conflicts."); Neb. Rev. Stat. § 59-829 (2005); Nev. Rev. Stat. Ann. § 598A.050 (2004); N.J. Stat.
Ann. § 56:9-18 (2005); N.M. Stat. Ann. § 57-1-15 (2005); *Crouch v. Crompton Corp.*, No. 02 CVS 4375,
2004 WL 2414027, at *18 (N.C. Super. Ct. Oct. 28, 2004) ("The General Assembly has directed the state
courts to follow federal guidelines in determining standing."); S.D. Codified Laws § 37-1-22 (2005); W.
Va. Code § 47-18-16 (2005); *Lerma v. Univision Communications, Inc.*, 52 F. Supp. 2d 1011, 1016 (E.D.
Wis. 1999) ("Wisconsin courts have held that the state [law] is generally controlled by federal court
decisions regarding the Sherman Act.").

     The Massachusetts statute cited in Count IV is actually a repealed law concerning the
Massachusetts Sewerage District.  Mass. Ann. Laws ch. 92 § 1 (2005), *et seq.*  The Massachusetts
Antitrust Act, however, contains a federal harmonization provision.  Mass. Ann. Laws ch. 93 § 1 (2005).

### 1.   The *Visa/MasterCard* cases illustrate application of the *AGC* standing analysis to derivatively injured non-purchasers.

We have already described the Visa/MasterCard case filed in the District of Columbia, where the D.C. Superior Court held as a matter of law that a non-purchaser did not qualify as an "indirect purchaser" under DCAA § 28-4509.  *Peterson*, 2005 WL 1403761.  The *Peterson* court also found that the plaintiff lacked standing under § 28-4508 because he failed to satisfy *AGC*'s five-factor test.  In addition, courts in twelve other states have applied the *AGC* analysis to dismiss similar *Visa/MasterCard* complaints for lack of standing.[8]  Indeed, *no* court has reached an opposite conclusion.  The *Visa* cases thus present compelling authority for dismissal of plaintiffs' claims here.

Again, in the *Visa* cases plaintiffs alleged that Visa and MasterCard forced merchants that accepted their credit cards also to accept their debit cards and to pay excess fees for use of those cards.  *See*, *e.g.*, *Gutzwiller*, 2004 WL 2114991, at *1-2.  Further, plaintiffs alleged that the merchants passed on the purported overcharges to consumers by increasing the prices of consumer goods they purchased.  *Id.*  Plaintiffs accordingly claimed to have been injured to the extent of the overcharges traceable to an upstream antitrust violation.  *Id.* at 2.

---

[8]      *See Credit/Debit Card Tying Cases*, No. J.C.C.P. No. 4335, 2004 WL 2475287 (Cal. Super. Ct. Oct. 14, 2004); *Peterson v. Visa U.S.A., Inc.*, 2005 WL 15403761; *Southard v. Visa U.S.A., Inc.*, No. LACV 031729, 94491, 2004 WL 3030028 (Iowa Dist. Ct. Nov. 17, 2004); *Knowles v. Visa U.S.A., Inc.*, No. Civ.A. CV-03-707, 2004 WL 2475284 (Me. Super. Ct. Oct. 20, 2004); *Stark*, 2004 WL 1879003; *Gutzwiller v. Visa U.S.A., Inc.*, No. C4-04-58, 2004 WL 2114991 (Minn. Dist. Ct. Sept. 15, 2004); *Tackitt*, 2004 WL 2475281; *Kanne v. Visa, U.S.A., Inc.*, No. 1033, 469, 2005 WL 1403764 (Neb. Dist. Ct. Feb. 4, 2005); *Ho v. Visa U.S.A., Inc.*, No. 112316/00, 2004 WL 1118534 (N.Y. Sup. Ct. Apr. 21, 2004), *aff'd*, 2005 WL 646343 (N.Y. App. Div.); *Crouch*, 2004 WL 2414027; *Beckler*, 2004 WL 2475100; *Cornelison v. Visa U.S.A., Inc.*, No. CIV03-1350 (S.D. Cir. Ct. Oct. 22, 2004) (motion hearing) (copy attached in Appendix, Item 1); *Fucile v. Visa U.S.A., Inc.*, No. S1560-03 CNC, 2004 WL 3030037 (Vt. Super. Ct. Dec. 27, 2004); *Strang v. Visa U.S.A., Inc.*, No. 03 CV 011323, 2005 WL 1403769 (Wis. Cir. Ct. Feb. 8, 2005).

In each of thirteen state courts that analyzed these complaints under the *AGC* factors (note 8 *supra*), the court concluded that the injuries claimed by the plaintiffs were too remote to confer standing.[9]   Although the analysis, and sometimes the categorization of the factors, differs somewhat from state to state, the consistent theme of these opinions is that because plaintiffs were non-purchasers of the services provided by defendants, did not participate in the relevant market that was the subject of the restraint, and were consequently asserting only derivative harms suffered by more directly injured parties, they did not have standing to assert a claim even under a "repealer" state law.  As the New York Supreme Court observed:

> Here, the plaintiffs' claims, as general consumers at stores which accept Visa and Mastercard, are clearly derivative of the stores' claims against those companies, and their alleged injuries are indirect.  They have had no direct dealings with either of the defendants; they do not claim to use defendants' credit or debit card services in any way.  Rather, they claim that stores where they shop raise their prices on all products in order to absorb the extra fees charged by Visa and Mastercard, and that they pay higher prices as a result.

*Ho*, 2004 WL 1118534, at *2.   *See also, e.g.*, *Gutzwiller*, 2004 WL 2114991, at *6 (dismissing the complaint after observing that "[the Eighth Circuit] has repeatedly applied [*AGC*] factor (1) in rejecting the antitrust claims of plaintiffs who are neither consumers nor competitors in the allegedly restrained market."); *Crouch*, 2004 WL 2414027, at *24 ("In this case the customers in the relevant market would be the retailers who purchase debit and credit card services, not all consumers of retail products.  This factor alone would strongly support a finding of no standing . . .").

---

[9]     In addition, other courts have dismissed *Visa* complaints for lack of standing on remoteness or other similar grounds without expressly invoking *AGC*.  *See Moore v. Visa U.S.A., Inc.*, No. 03 CV 4086, 2004 WL 3030032 (Kan. Dist. Ct. Nov. 15, 2004); *Bennett v. Visa U.S.A., Inc.*, No. Civ. A. 35126, 2004 WL 2115353 (Tenn. Ch. Aug. 27, 2004); *Consiglio-Tseffos*, 2004 WL 3030043.

2.      **Application of the *AGC* factors to plaintiffs' claims requires
        dismissal of all the Count IV claims.**

The *Visa/MasterCard* decisions establish that non-purchasers suffering derivative injuries

simply do not have standing to seek relief for antitrust violations pled under state law.  Like the

plaintiffs there, the instant plaintiffs have not purchased the services offered by defendants and

seek relief only for harms derivative of alleged injuries to sellers in a secondary  market.  The

Court should accordingly dismiss Count IV in its entirety.

First, as in *Visa/MasterCard*, the instant plaintiffs are not consumers or competitors in the

allegedly restrained market.  *See AGC*, 459 U.S. at 539.  The Complaint acknowledges that

"[d]efendants are expressly prohibited by their charters from lending directly to consumers" and

"operate exclusively in . . . the secondary mortgage market."  (Compl. ¶ 28.)  The secondary

mortgage market is where mortgages are pooled and securitized and where Freddie Mac and

Fannie Mae offer, as part of their securitization services, to guarantee MBS holders against the

risk of defaults on the underlying mortgages.  The secondary mortgage market is accordingly the

market allegedly restrained by the supposed conspiracy, and plaintiffs are neither consumers nor

competitors in that market.  Nor do they consume any securitization and guarantee services in the

primary mortgage market in which they are participants.  For these reasons, the plaintiffs'

mortgage documents do not even reference securitization and guarantee services.  (*Id.* ¶ 43.)

Second, plaintiffs plainly did not suffer any "direct, first-hand impact" from the purported

price-fixing conspiracy.  *See AGC*, 459 U.S. at 540.  Because defendants operate exclusively in

the secondary mortgage market (Compl. ¶ 28), the effect of any conspiracy would be to raise the

cost of doing business in *that* market — in which no plaintiff participates.   At best, plaintiffs

allege only that they were harmed when mortgage lenders passed on to them, in the form of

increased interest rates, some or all of the increase in their costs of doing business in the secondary market.  Such injury is the antithesis of "direct" or "first-hand."

The third factor — whether there are more directly injured parties with the motivation to sue — also cuts against standing.  Here, the direct purchasers of defendants' securitization and guarantee services are the entities that sold mortgages to Fannie Mae and Freddie Mac.  It is these sellers, not the borrowers, who negotiated g-fees with defendants and incorporated those fees into contracts by which they sold the mortgages.  (*Id.*  ¶¶ 40, 43, 46.)  Moreover, the sellers are sophisticated banks and consumer lending enterprises; as such, they clearly have the capability and motivation to sue, especially if one accepts as true — as must be done on a motion to dismiss — plaintiffs' allegation that lenders are concerned about the impact of artificially inflated g-fees on their ability to compete and on profit levels.  (*Id.* ¶ 59.)  "[T]he existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party . . . to perform the office of a private attorney general."  *AGC*, 459 U.S. at 542.

Fourth, plaintiffs' damages claims are necessarily speculative.  *See id*. at 542-44.  This is not a case involving an overcharge on product resold to the plaintiff/consumer in a secondary market, or even a case where a component used as an ingredient in a downstream product was subsequently purchased by the plaintiff.  Instead, plaintiffs are asking the Court to award damages based on the *possibility* that an overcharge on one of a lender's many costs of doing business was passed on as part of an entirely separate transaction in which that lender set the interest rate for a home mortgage loan.  Determining the existence and amount of any such pass-through from a secondary market guarantee fee to a primary market interest rate could never be established with reasonable certainty and would, at best, be a matter of considerable speculation.

- 28 -

Finally, plaintiffs' claims risk duplicative recovery and would require a complex apportionment of damages.  *See id.* at 543-44.  Should the Court award damages to plaintiffs in this case, there would be nothing to prevent the more directly injured sellers from asserting similar claims against Freddie Mac and Fannie Mae.  Any damages awarded to sellers would be entirely duplicative of the recovery by the current plaintiffs.  Furthermore, the apportionment of damages would be complex in the extreme.   Frequently, the entity that originated the loan with the borrower is one or more steps removed from the entity that sells the mortgage to Fannie Mae or Freddie Mac subject to a previously negotiated guarantee fee.[10]  For each class member it would therefore be necessary to establish the path by which a mortgage reached Freddie Mac or Fannie Mae and, for each stage in the process, to determine the extent to which any g-fee overcharge was passed on and ultimately reached the borrower — a hopelessly complex and, as noted above, necessarily speculative task.

In short, every factor in the AGC analysis weighs decidedly against granting plaintiffs standing to bring this suit.  As with the unbroken line of court decisions dismissing similarly remote claims in the *Visa/MasterCard* litigation, so too should this Court dismiss all of the state law claims in Count IV.

### C.     Additional Independent Grounds Mandate the Dismissal of the Majority of the Count IV Claims

In addition to the universal absence of standing for the Count IV state claims discussed above, most of those claims are subject to dismissal on other, independent grounds.  First, some of the statutes cited in Count IV are not, in fact, "repealer" state laws, but rather maintain the

---

[10]       *See* note 4, *supra.*

*Illinois Brick* direct-purchaser rule; second, some of the claims are deficient on various state-specific grounds; and, third, many of the claims are precluded because no plaintiff resides or was injured in the particular state and thus none is an appropriate class representative for the proposed Count IV state-by-state subclasses.

### 1.      Count IV must be dismissed as to states that follow *Illinois Brick.*

We have already established that plaintiffs are not direct purchasers of the services provided by Fannie Mae and Freddie Mac.  At least four of the Count IV states — Louisiana, Massachusetts, New Jersey and West Virginia — continue to apply the *Illinois Brick* direct-purchaser requirement.[11]  Thus, dismissal as to those states is plainly warranted.

### 2.      Various state-specific reasons require dismissal of other Count IV state claims.

There are other independent state-specific reasons for dismissing three of the Count IV claims:

- Massachusetts:  The state antitrust act does not apply to "any course of conduct, pattern of activity, or activities unless they occur and have their competitive impact primarily and predominantly within the commonwealth and at most, only incidentally outside New England . . ." Mass. Ann. Laws ch. 93 § 3 (2005).  The Complaint alleges a price-fixing conspiracy affecting borrowers nationwide and with no special nexus to Massachusetts or New England.

---

[11]      *See Free v. Abbott Labs.*, 176 F.3d 298, 299 (5th Cir. 1999) (holding that Louisiana courts would follow the federal rule and deny standing to indirect purchasers), *aff'd by an equally divided court*, 529 U.S. 333 (2000); *Ciardi v. F. Hoffmann La-Roche, Ltd.*, 762 N.E.2d 303, 308 (Mass. 2002) (interpreting the Massachusetts Antitrust Act as barring indirect purchaser suits); *Sickles v. Cabot Corp.*, 877 A.2d 267, 274-75 (N.J. Super. Ct. App. Div. 2005) (holding that indirect purchasers cannot sue for antitrust violations under the New Jersey Antitrust Act) (citing *Island Mortgages v. 3M*, 860 A.2d 1013 (N.J. Super. Ct. Law Div. 2004); *Gray v. Marshall County Bd. of Educ.*, 367 S.E.2d 751, 755 (W. Va. 1988) (noting that the court was directed by the legislature to apply  federal decisional law interpreting the Sherman Act to  parallel West Virginia antitrust statute).

- New York:  This claim should be dismissed because New York prohibits class actions "to recover a penalty or minimum measure of recovery created or imposed by statute" unless the statute "specifically authorizes the recovery thereof in a class action . . ." N.Y. C.P.L.R. § 901(b) (2005).  Sections 340 and 349 provide for a penalty in the form of treble damages and do not specifically authorize recovery in a class action, and hence the New York claim should be dismissed.  *See, e.g.*, *Leider v. Ralfe*, No. 01 Civ.3137 HB FM, 2005 WL 152025, at *2 (S.D.N.Y. Jan. 25, 2005); *Cox v. Microsoft Corp.*, 290 A.D.2d 206, 206 (N.Y. App. Div. 2002).  In addition, the conduct alleged in the Complaint is not "consumer-oriented," as required by Section 349.  *See Stutman v. Chem. Bank*, 731 N.E.2d 608, 611 (N.Y. 2000); *Sperry v. Crompton Corp.*, Index No. 17872/02, slip op. at 3-4 (N.Y. Sup. Ct. Nov. 20, 2003) (copy attached in Appendix, Item 2).  Defendants' securitization and guarantee services were sold in the secondary mortgage market and were not consumer-oriented services sold in the primary mortgage market.

- Tennessee:  The statute cited in Count IV is limited in scope to agreements affecting the price of "products and articles."  The securitization and guarantee services provided by Fannie Mae and Freddie Mac are not products or articles.   *See Beaudreau v. Larry Hill Pontiac/Oldsmobile/GMC, Inc.*, 160 S.W.3d 874, 881-82 (Tenn. Ct. App. 2004); *Bennett*, 2004 WL 2115353, at *4.

In addition, one of the statutes relied upon for the California claim does not support a

damages recovery:

- California:  Plaintiffs cannot sue under California Business & Professions Code § 17200 because that statute provides for restitution rather than damages.  The California Supreme Court permits restitution only where a plaintiff is seeking "money or property that defendants *took directly* from plaintiff."  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149 (2003) (emphasis added).  As shown above, defendants here took nothing directly from plaintiffs.

### 3.      Count IV should be dismissed as to sixteen states in which no named plaintiff suffered injury.

The Court should dismiss Count IV as to sixteen states in which no named plaintiff is

alleged to have obtained a mortgage,[12] and under the law of which, therefore, no named plaintiff

can show the injury needed to establish individual standing.  By these claims, plaintiffs seek to

---

[12]      These sixteen states are California, Iowa, Kansas, Louisiana, Maine, Massachusetts, Michigan, Mississippi, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, South Dakota, Tennessee, and Vermont.

recover not for themselves but for "[other] class members who obtained loans in these states."

(Compl. ¶ 97.)   For each of these claims to survive dismissal, there must be a named plaintiff

able to establish standing under the state law in question.   As the D.C. Circuit has observed:

> [T]he members of the class purportedly represented by the plaintiffs, even
> if they have suffered injury in fact, may not seek relief in the federal
> courts through a class action unless the named plaintiffs can establish their
> own standing.   Likewise, the possibility that other members of the class
> might have had standing had they brought suit does not thereby confer
> standing on the named representatives; the actual plaintiffs must show that
> they have personally suffered an injury redressable by the courts.

*Am. Jewish Congress v. Vance*, 575 F.2d 939, 944 (D.C. Cir. 1978) (citation omitted).  *See also*

*Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("[N]amed plaintiffs who represent a class 'must

allege and show that they personally have been injured, not that injury has been suffered by

other, unidentified members of the class to which they belong and which they purport to

represent'"); *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) ("[I]f none of the named plaintiffs

purporting to represent a class establishes the requisite of a case or controversy with the

defendants, none may seek relief on behalf of himself or any other member of the class.")

In *In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365 (S.D. Fla. 2001),

the named plaintiffs asserted indirect purchaser claims under multiple state laws and they

established to the court's satisfaction standing under the laws of certain states where they had

purchased products that where the subject of the alleged antitrust violation.  *Id.* at 1370-72.

Nonetheless, the court dismissed the claims under the laws of ten other states because it was

"clear that no named plaintiff suffered an injury giving rise to an antitrust claim" under those

state laws.  *Id.* at 1371.  The court quoted *Griffin v. Dugger*, 823 F.2d 1476 (11th Cir. 1987),

which reads:

> "[I]t is not enough that a named plaintiff can establish a case or controversy between himself and the defendant by virtue of having standing as to just one of many claims he wishes to assert. Rather, *each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim.*"

*Id.* at 1463 (emphasis added; citation omitted). So too here, the Court should dismiss the sixteen claims in Count IV asserted under state laws where no named plaintiff claims to have suffered injury.

In sum, the Count III claim under D.C. law and *each* of the state claims under Count IV are subject to dismissal, many of them for multiple reasons. All should be dismissed under the universally applicable standing principles of the *AGC* analysis. In addition, dismissal for some follows directly from *Illinois Brick*; for others (including D.C.) because of the lack of an indirect purchaser; for others because of the absence of an appropriate representative for a state-specific subclass; and for others because of still additional reasons. In Exhibit A, we chart each of the Court IV states and identify the applicable grounds. But the bottom line is clear: *none* of the D.C. and state antitrust claims can survive dismissal under Rule 12(b)(6).

## III.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE D.C. AND VIRGINIA CONSUMER PROTECTION LAWS (COUNTS V & VI)

Plaintiffs' claims against Fannie Mae in Count V under the D.C. Consumer Protection Procedures, D.C. Code §§ 28-3901 (2005), *et seq.* ("DCCPP") and against Freddie Mac in Count VI under Virginia's Consumer Protection Act, Va. Code Ann., §§ 59.1-196 (2005), *et seq.* ("VCPA") should be dismissed because the g-fee transactions at issue do not involve *consumer* services subject to those statutes. In addition, the DCCPP and VCPA do not apply here because

no named plaintiff resides or was injured in the District of Columbia or Virginia, nor do plaintiffs claim they have been misled or deceived within those jurisdictions.

**A.    Plaintiffs Fail To State a Claim Because None Purchased Any Consumer Good or Service from Freddie Mac or Fannie Mae**

As discussed in Parts I and II, plaintiffs lack standing to assert antitrust claims because they did not purchase, directly or indirectly, the services that were the subject of the alleged price-fixing.  Plaintiffs' claims under the DCCPP and VCPA fail for a similar reason.  The DCCPP applies only to transactions involving "consumer" goods and services, defined as "anything . . . which is *primarily for personal, household, or family use*."  D.C. Code § 28-3901(a)(2) (emphasis added).  Likewise, the VCPA applies only to practices involving "consumer transactions," defined as "[t]he advertisement, sale, lease, license or offering for sale, lease or license, of goods or services to be used primarily for *personal, family or household purposes*."  Va. Code Ann. § 59.1-198 (emphasis added).  Plaintiffs have no claim under either statute because the guarantee and securitization services offered by defendants in the secondary mortgage market were *commercial* rather than *consumer* services, and thus outside the scope of those statutes.

In *Siradas v. Chase Lincoln First Bank, N.A.*,  No. 98 Civ. 4028, 1999 U.S. Dist. LEXIS 15593 (S.D.N.Y. Sept. 30, 1999), the court squarely decided that Freddie Mac is neither a "supplier" nor engaged in "consumer transactions" under the VCPA with respect to its participation in the home mortgage business.  *Id.* at *28-29.  There, the plaintiffs alleged that Freddie Mac and the lending institutions that provided the plaintiffs' mortgages deceptively overcharged them for interest payable on their home mortgages in violation of the VCPA.  The court, however, dismissed the claim finding that Freddie Mac, which had purchased the

- 34 -

plaintiffs' loans, was not a "supplier" that may be sued under the VCPA because it "clearly . . .

has not sold goods or services to [p]laintiffs." *Id.* at *29. Moreover, the court could find no

"consumer transaction" in which Freddie Mac engaged with the plaintiffs as required by the

VCPA. *Id. See also Murray v. Dryvit Systems, Inc.*, No. 01-04-7383, 2002 WL 32072493 (Va.

Cir. Ct. July 15, 2002) (same result under analogous facts).[13]   The same reasoning compels

dismissal of plaintiffs' VCPA and DCCPP claims here because neither Freddie Mac nor Fannie

Mae sold any consumer goods or services to plaintiffs.[14]   Plaintiffs' purchases — home mortgage

loans — did not include securitization and guarantee services, even as a component.

Plaintiffs' allegation that their mortgage interest payments were higher as a result of the

alleged conspiracy is irrelevant. The DCCPP and VCPA simply do not give consumers the right

---

[13]     *See also Sperry v. Crompton Corp.*, Index No. 17872/02, slip op. at 4 (N.Y. Sup. Ct. Nov. 20, 2003) (dismissing claim under an analogous consumer protection statute against sellers of rubber-processing chemical used by tire manufacturers because plaintiffs, who were consumers of tires, had no dealings with the chemical producers; "[t]he conduct complained of by the plaintiff concerned private business transactions between corporations that cannot be construed as 'consumer oriented'").

[14]     The VCPA regulates only "suppliers," defined as "a seller or lessor who advertises, solicits or engages in consumer transactions, or a manufacturer or distributor who advertises and sells or leases goods or services to be resold or leased by other persons *in consumer transactions*." Va. Code §59.1-198 (2005) (emphasis added). Similarly, the DCCPP regulates "merchants," which are defined as any "person who does or would sell, lease (to), or transfer, either directly or indirectly, *consumer goods or services*, or a person who does or would supply the goods or services which are or would be the subject matter of a trade practice." D.C. Code § 28-3901(3) (2005) (emphasis added). Neither Fannie Mae nor Freddie Mac sell, directly or indirectly, any consumer services.

The *Siradas* court also dismissed the plaintiffs' VCPA claim because real estate transactions, being governed by the Federal Consumer Credit Act, 15 U.S.C. § 1601 (2000), *et seq.*, are expressly excluded from the VCPA under Va. Code § 59.1-199(C). *Siradas*, 1999 U.S. Dist. LEXIS 15593, at *27 (citing *Smith v. U.S. Credit Corp.*, 626 F. Supp. 102 (E.D. Va. 1985) (consumer real estate transactions are within the purview of the FCCA and thus are excluded under the VCPA)). Further, the VCPA also expressly exempts mortgage lenders from the Act's coverage. Va. Code Ann. § 59.1-199(D) (2005). It is difficult to imagine that the Virginia legislature intended the VCPA to cover the secondary market transactions while excluding home mortgages at the consumer level.

While the D.C. statute does include consumer home mortgage loans within its scope (*see* D.C. Code § 28-3901(a)(7) (2005)), neither Fannie Mae nor Freddie Mac makes consumer home loans.

to sue based upon conduct involving upstream commercial transactions, even if they allege that it somehow affected them.  As the *Siradas* court recognized, even though a plaintiff alleges that Freddie Mac engaged in deceptive practices that directly inflated the plaintiff's interest payments, Freddie Mac was not a "supplier" of goods or services to plaintiffs.

In short, Fannie Mae and Freddie Mac did not participate in the consumer market, and their securitization and guarantee services were not sold by them or anyone else in the consumer market.  Accordingly, these consumer protection statutes are inapplicable.

### B.     The DCCPP and VCPA Do Not Apply to Transactions Occurring Outside of Their Jurisdictions

Plaintiffs' DCCPP and VCPA claims also should be dismissed because the named plaintiffs do not reside and have not suffered injury within D.C. or Virginia.  Nor do plaintiffs claim they were misled or deceived in D.C. or Virginia, as they dealt only with out-of-state lenders in out-of-state jurisdictions.  It is a fundamental principle of statutory construction that unless the statute clearly expresses the legislature's intent for the statute to have extraterritorial effect, it shall not be so construed.  *See, e.g., Matthews v. Automated Bus. Sys. & Servs., Inc.*, 558 A.2d 1175, 1180 n.8 (D.C. 1989) (observing that whether a D.C. statute has extraterritorial application is ultimately a question of legislative intent); 73 Am. Jur. 2d Statutes § 250.[15]  There is no indication that either the Virginia or D.C. legislatures intended these statutes to apply to wholly out-of-state transactions, and indeed the DCCPP was written so as to "promote . . . fair

---

[15]     Section 250 explains:

"Unless the intention to have a statute operate beyond the limits of the state or country is clearly expressed or indicated by its language, purpose, subject matter, or history, no legislation is presumed to be intended to operate outside the territorial jurisdiction of the state or country enacting it. . . . Thus an extraterritorial effect is not to be given statutes by implication."

business practices throughout *the community*." D.C. Code § 28-3901(b)(2) (emphasis added).

Courts in other states have construed their consumer protection laws as inapplicable to foreign

plaintiffs for alleged injuries occurring elsewhere. *See, e.g.*, *Avery v. State Farm*, No. 91494,

2005 Ill. LEXIS 959, at *132 (Ill. Aug. 18, 2005) (declining to extend the Illinois consumer

protection statute to out-of-state plaintiffs where '[t]he overwhelming majority of circumstances

relating to the disputed transactions in this case . . . occurred outside of Illinois" for out-of-state

plaintiffs). The same limited scope should be accorded the DCCPP and VCPA.[16]

## IV.   PLAINTIFFS LACK STANDING TO SEEK INJUNCTIVE RELIEF BECAUSE THE CONDUCT THEY SEEK TO ENJOIN DOES NOT THREATEN THEM (COUNT II)

To be entitled to injunctive relief, plaintiffs must show that they are "'immediately in

danger of sustaining some direct injury as [a] result' of the challenged conduct." *McConnell v.*

*FEC*, 540 U.S. 93, 226 (2003) (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983))

(quotations omitted; alteration in original). Plaintiffs lack standing to seek injunctive relief

because they do not allege that *the conduct they seek to enjoin* poses any risk of *future* harm to

*them*. The only harm plaintiffs claim to have suffered relates to the amounts of their monthly

---

[16]      Indeed, a broad extraterritorial application of the D.C. or Virginia statute could raise
constitutional questions. In holding that the DCCPP did not apply to a claim by a D.C. resident
respecting a loan negotiated primarily in Virginia, this Court said in dictum:

> In fact, the statutory language [of the DCCPP] does not even restrict the class of potential
> plaintiffs to residents of the District of Columbia. Thus, if the Court were to give the
> statute extraterritorial effect, not only could the law be construed to reach all out-of-state
> transactions involving District of Columbia residents, but it could be construed to reach
> all consumer transactions involving parties over which this Court could exercise personal
> jurisdiction. Such a construction would raise serious constitutional questions that, in light
> of the Court's more narrow interpretation of the statute, need not be considered here.

*Nelson v. Nationwide Mortgage Corp.*, 659 F. Supp. 611, 617 (D.D.C. 1987).

mortgage payments that are supposedly attributable to guarantee fees — which are fixed by *past* conduct.  As plaintiffs acknowledge, the interest charges payable over the life of a residential real estate loan are "set at the time of the loans."  (Compl. ¶ 43.)

The injunction plaintiffs seek, however, is to prevent defendants from "colluding with one another with regard to G-Fees and requiring of lenders that G-Fees be kept secret and confidential."  (Compl. ¶ 37, Prayer for Relief; *see also id.* ¶ 88 (seeking to enjoin defendants' "unlawful contract, combination or conspiracy"); *id.* ¶ 94 (same)).  Such an injunction would not redress any threatened harm to *plaintiffs*, because none of them alleges that he has taken steps or has concrete plans to obtain another residential real estate loan.  Because plaintiffs fail to allege "a real and immediate threat of future injury" to them from the conduct they seek to enjoin, they lack standing to seek injunctive relief.  *In re Nifedipine Antitrust Litig.*, 335 F. Supp. 2d 6, 16-17 (D.D.C. 2004).[17]

---

[17]     In addition, whether an antitrust plaintiff is entitled to injunctive relief depends on "traditional principles of equity," *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 130 (1969), including the principle that an injunction is not available where the alleged harm is purely monetary.  *See Lucas v. Bechtel Corp.*, 800 F.2d 839, 847 (9th Cir. 1986) (plaintiffs "lack[ed] standing under section 16" of the Clayton Act where their alleged injury "involve[d] only monetary harm").  Plaintiffs' allegations of harm involve purely monetary injuries – *viz.*, that they "have paid artificially high G-Fees."  (Compl. ¶ 87.) They thus lack standing to seek injunctive relief for this reason as well.

Moreover, for jurisdiction-specific reasons, some of the statutes under which plaintiffs seek injunctive relief do not allow their claims to survive dismissal.  *First*, under D.C. law, because plaintiffs lack standing to seek damages under D.C. Code § 28-4508(a), they also lack standing to seek injunctive relief under that provision.  *See Peterson*, 2005 WL 1403761, at *4-6 & n.5 ("D.C. plaintiff lacks standing to pursue his claim for injunctive relief for the same reasons he lacks standing for his damages claim.").  *Second*, like D.C. Code § 28-4508(a), the relevant statutes of Arizona and New York authorize private actions for damages and injunctive relief in the same sentence.  Ariz. Rev. Stat. 44-1408(B) (2004); N.Y. Gen. Bus. Law § 349(h) (2005).  As explained above, plaintiffs lack standing to seek damages under these statutes.  Plaintiffs therefore also lack standing to seek injunctive relief under these same statutes, because the statutes impose the same standing requirements for injunctive relief as for damages.  *Third*, and finally, the West Virginia statute cited in Count IV authorizes private causes of action only for damages, not for injunctive relief.  *See* W. Va. Code § 47-18-9 (2005).

**V.     PLAINTIFFS' UNJUST ENRICHMENT CLAIM SHOULD BE
          DISMISSED BECAUSE IT IS BASED ON THE SAME DEFECTIVE
          ANTITRUST CLAIMS (COUNT VII)**

Courts consistently hold that private plaintiffs who lack standing to seek damages under federal and state antitrust statutes cannot make an "end run around" these statutes by asserting restitution claims based on the same allegations.  *See In re New Motor Vehicles Can. Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 211 (D. Me. 2004); *In re Relafen Antitrust Litig.*, 225 F.R.D. 14, 20 (D. Mass. 2004); *In re Microsoft Corp. Antitrust Litig.*, 241 F. Supp. 2d 563, 565 (D. Md. 2003); *In re Terazosin Hydrochloride*, 160 F. Supp. 2d at 1380.  Relying on the identical allegations underlying their antitrust claims, Count VII asserts a freestanding claim for "restitution."  (Compl. ¶ 115.)  Because plaintiffs lack antitrust standing to seek damages, allowing them to seek restitution based on the same allegations "would subvert the statutory scheme[s]" under which they lack antitrust standing.  *In re New Motor Vehicles*, 350 F. Supp. 2d at 211.

## CONCLUSION

For the reasons stated, plaintiffs' Complaint should be dismissed in its entirety.

Respectfully submitted,

_____/s/ John E. Hall_____

| | |
|---|---|
| Henry C. Thumann (D.C. Bar # 474499) | James R. Atwood (D.C. Bar # 079996) |
| Richard G. Parker (D.C. Bar # 418605) | John E. Hall (D.C. Bar # 415364) |
| Rebecca H. Farrington (D.C. Bar # 460592) | Jonathan J. Gimblett (D.C. Bar # 489257) |
| O'MELVENY & MYERS | COVINGTON & BURLING |
| 1625 Eye Street, N.W. | 1201 Pennsylvania Avenue, N.W. |
| Washington, DC 20006 | Washington, DC 20004 |
| Tel: 202 383 5300 | Tel: 202 662 6000 |

*Attorneys for the Federal National Mortgage Association*

Graciela M. Rodriguez (D.C. Bar # 438955)
KING & SPALDING
1700 Pennsylvania Avenue, N.W.
Washington, DC 20006
Tel: 202 737 0500

Of Counsel
Jodie L Kelley (D.C. Bar # 447477)
Jonathan Griffith (D.C. Bar # 456080)
FEDERAL NATIONAL MORTGAGE CORPORATION
3900 Wisconsin Avenue, N.W.
Washington, DC 20016
Tel: 202 752 3900

Jeffrey Q. Smith
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
Tel: 212 556 2100

*Attorneys for Federal Home Loan Mortgage Corporation*

Of Counsel
Hyacinth G. Kucik (D.C. Bar # 398736)
Lance Wolf (D.C. Bar # 476388)
FEDERAL HOME LOAN MORTGAGE CORPORATION
8200 Jones Branch Drive
McLean, VA 22102
Tel: 703 903 2000

October 11, 2005

**EXHIBIT A**
**Grounds for Dismissal of State Antitrust Claims**

|     | *Illinois Brick* direct-purchaser requirement | Purchaser requirement | *AGC* analysis | No repre-sentative for state subclass | Misc. state-specific reason |
| --- | --- | --- | --- | --- | --- |
| AZ |   | X | X |   |   |
| CA |   |   | X | X | X |
| DC |   | X | X | X |   |
| FL |   | X | X |   |   |
| IA |   |   | X | X |   |
| KS |   |   | X | X |   |
| LO | X |   | X | X |   |
| ME |   |   | X | X |   |
| MA | X |   | X | X | X |
| MI |   | X | X | X |   |
| MN |   |   | X |   |   |
| MS |   |   | X | X |   |
| NE |   | X | X | x |   |
| NV |   |   | X | X |   |
| NJ | X |   | X |   |   |
| NM |   |   | X |   |   |
| NY |   |   | X | X | X |
| NC |   |   | X | X |   |
| ND |   | X | X | X |   |
| SD |   |   | X | X |   |
| TN |   |   | X | X | X |
| VT |   |   | X | X |   |
| WV | X |   | X |   |   |
| WI |   |   | X |   |   |