IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                               )
IN RE:                         )
                               )
G-FEES ANTITRUST LITIGATION    )
                               )
_____)
                               )
This Document Relates To:      )    Civil Action No. 05-114 (RWR)
                               )
All Actions                    )
_____)
```

<u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs, putative representatives of a nationwide class, have sued defendants Federal National Mortgage Home Loan Association ("Fannie Mae") and Federal National Home Loan Mortgage Corporation ("Freddie Mac"), alleging federal antitrust violations and violations of selected state antitrust and consumer protection laws.  Defendants have moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss all claims asserted in plaintiffs' consolidated class action complaint for failure to state a claim upon which relief may be granted.  Plaintiffs have opposed the motion.  Because plaintiffs have failed to state a claim upon which relief may be granted except as to federal treble damage claims and certain groups of plaintiffs arising under certain state laws, the motion to dismiss will be granted in part and denied in part.  Specifically, the motion will be denied as to plaintiffs' damages claims arising under (1) § 4 of the Clayton Act, 15 U.S.C. § 15, because plaintiffs have pled

sufficient facts to establish antitrust standing; (2) Arizona's
Antitrust Act, Ariz. Rev. Stat. §§ 44-1401 et seq., because
plaintiffs have pled sufficient facts to establish a cognizable
antitrust claim; (3) Minnesota's Antitrust Act, Minn. Stat.
§§ 325D.52 et seq., because plaintiffs have pled sufficient facts
to establish a cognizable antitrust claim; (4) Florida's
Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann.
§§ 501.201 et seq., because plaintiffs have sufficiently alleged
that they suffered a loss as a result of a violation of the
statute; (5) West Virginia's antitrust statutes, §§ 47-18-1 et
seq., because plaintiffs have sufficiently alleged that they
suffered an antitrust injury under the private damages provision
of the statute; (6) Wisconsin's antitrust statute, Wis. Stat.
Ann. §§ 122.01 et seq., because plaintiffs have sufficiently
alleged an antitrust injury under Wisconsin law; and (7) the
common law of Arizona, Colorado, Connecticut, Florida, Idaho,
Minnesota, New Jersey, New York, Pennsylvania, West Virginia,
Wisconsin and Texas, because plaintiffs have alleged facts
sufficient to support an inference of unjust enrichment under the
common law of those jurisdictions.  Defendants' motion to dismiss
will be granted as to all other claims because plaintiffs have
failed to allege a future injury justifying injunctive relief
under federal or state laws, plaintiffs have not alleged an
antitrust injury cognizable under the New Jersey or New York

antitrust statutes, plaintiffs have not alleged an injury
cognizable under the consumer protection statutes of the District
of Columbia, New York, or Virginia, and plaintiffs have failed to
establish standing to bring suit under the laws of states where
no plaintiff is alleged to have purchased a mortgage.

BACKGROUND

Defendants Fannie Mae and Freddie Mac are federally
chartered corporations with shares that are traded publicly on
the New York Stock Exchange.  Fannie Mae was established by
Congress to "provide stability in" and "ongoing assistance to the
secondary market for residential mortgages . . . by increasing
the liquidity of mortgage investments and improving the
distribution of investment capital available for residential
mortgage financing[.]"  12 U.S.C. § 1716(3).  It was authorized
to "manage and liquidate federally owned mortgage portfolios," 12
U.S.C. § 1716, and to "purchase, service, sell" certain
residential mortgages.  12 U.S.C. § 1717(b).  For similar
reasons, Freddie Mac was "authorized to purchase . . .
residential mortgages" within statutorily prescribed limits.  12
U.S.C. § 1454.

According to plaintiffs, Fannie Mae and Freddie Mac operate
exclusively in the secondary mortgage market and are expressly
prohibited by their charters from lending directly to consumers.
("Consolidated Class Action Compl. ("Compl.") ¶ 28.)  Fannie Mae

-4-

and Freddie Mac purchase portfolios of residential mortgages
originated by commercial lenders in the primary mortgage market
and package the portfolios to create mortgage-backed securities
as liquid instruments that trade in capital markets.  (Id. ¶¶ 23,
29, 30.)  The payment stream from the pooled mortgages underlying
a mortgage-backed security flows through to the certificate
holder of the security and constitutes its core value.  (Id.
¶¶ 29, 30.)  When Fannie Mae and Freddie Mac package mortgages as
securities, they guarantee to the certificate holders the timely
payment of the mortgages' principal and interest.  (Id. ¶¶ 30,
45.)

        Fannie Mae and Freddie Mac insure this guarantee against the
possibility of defaults in the underlying portfolio by collecting
a guarantee fee ("G-fee").  (Id. ¶ 30.)  Any lender hoping to
sell its residential mortgages to Fannie Mae or Freddie Mac must
negotiate to become an approved seller/servicer, and then must
originate mortgages that conform to Fannie Mae's or Freddie Mac's
specifications, which include the G-fee.  (Id. ¶¶ 38-42.)  The
amount of the G-fee is generally paid by the mortgage holder on a
monthly basis from a portion of the interest payment received on
the underlying mortgage loans.  (Id. ¶ 47.)  Plaintiffs allege
that lenders pass on to the borrowers all of the G-fee cost.
(Id. ¶ 42.)  In most cases, the borrower is unaware of the G-fee,
which is incorporated into the pricing of the mortgage loan (id.

-5-

¶ 46) and paid by the borrower "in the form of higher monthly payments (i.e., higher interest rates)."  (Id. ¶ 39; see also id. ¶ 47.)

To the extent that the borrowers in the underlying mortgage portfolios do not default, the G-fees become profit for the defendants.  (Id. ¶ 32.)  Alternatively, to the extent that borrowers default, the collected G-fees must be tapped to make good on the guarantees to the certificate holders.  (Id.)  On average, G-fees amount to nearly two-tenths of one percent, or 0.0019, of the loan (id. ¶¶ 2, 44), but may vary across originating lenders.   The exact amount collected by each lender is negotiated in secret between that lender and Fannie Mae or Freddie Mac and is, at Fannie Mae's or Freddie Mac's insistence, maintained in secret.  (Id. ¶ 46.)

Plaintiffs are individuals or entities, residents and presumed citizens of Arizona, Colorado, Connecticut, Florida, Idaho, Minnesota, New Jersey, New York, Pennsylvania, Texas, West Virginia, and Wisconsin, who have obtained, after January 1, 2001, from a commercial lender operating in the primary mortgage market in the United States a conforming mortgage loan that contains a G-fee set by one of the defendants.[1]  (Id. ¶¶ 1, 10,

---

[1] Plaintiffs define conforming mortgages as "loans that conform to the guidelines of Fannie Mae and Freddie Mac." (Compl. ¶ 25.)  Those guidelines "establish uniform features for the loan, such as the maximum loan amount, the down payment amount, the minimum credit worthiness for the borrower, the

-6-

15, 28.)  Plaintiffs allege that Fannie Mae and Freddie Mac conspired with each other to fix the price of the G-fee when instead they should have been competing with each other in G-fee pricing.  As a result, plaintiffs say, they have suffered damages to the extent that the alleged conspiracy produced higher G-fees than competitive pricing would have produced.  (Id. ¶¶ 47-48, 52-58, 63, 65-66, 73-75, 76.)  Specifically, plaintiffs allege that defendants have violated the federal antitrust law, 15 U.S.C. § 1, by engaging in a horizontal contract, combination or conspiracy in unreasonable restraint of trade, and seek both treble damages and declaratory and injunctive relief for defendants' alleged federal violations.  Plaintiffs also seek damages and injunctive relief for alleged violations of the antitrust laws of twenty-two states and the District of Columbia, for alleged violations of Florida's Deceptive Trade Practices Act, for Fannie Mae's alleged violation of the District of Columbia's consumer protection law, and for Freddie Mac's alleged violation of Virginia's consumer protection statute.  Finally, plaintiffs seek the equitable remedies of restitution,

---

borrower's income requirements, and suitable properties."  (Id.) Plaintiffs allege that if "a loan does not conform to the GSE guidelines, the Defendants are unlikely to purchase the loan except in unusual circumstances."  (Id.)  See also Anchor Savings Bank F.S.B. v. United States, 81 Fed. Cl. 1, 17 (2008) ("Fannie Mae and Freddie Mac . . . issue securities comprised primarily of conventional mortgages, but those mortgages must conform to certain underwriting standards to qualify for the Fannie Mae or Freddie Mac guarantee.")

disgorgement or a constructive trust for the alleged unjust

enrichment resulting from the conspiracy in restraint of trade.

Defendants argue that each of plaintiffs' claims should be

dismissed for failure to state a claim upon which relief may be

granted.

## DISCUSSION

Federal Rule of Civil Procedure 12(b)(6) authorizes

dismissal of a complaint for failure to state a claim upon which

relief can be granted.  See Fed. R. Civ. P. 12(b)(6).  A court

considering a Rule 12(b)(6) motion to dismiss assumes all factual

allegations in the complaint to be true, even if they are

doubtful.  Bell Atl. Corp. v. Twombly, 127 S. Ct. 1995, 1964

(2007); Kowal v. MCI Communc'ns Corp., 16 F.3d 1271, 1276 (D.C.

Cir. 1994) (noting that a court must construe the complaint

"liberally in the plaintiffs' favor" and "grant plaintiffs the

benefit of all inferences that can be derived from the facts

alleged").  A court need not, however, "accept inferences drawn

by plaintiffs if such inferences are unsupported by the facts set

out in the complaint.  Nor must [a] court accept legal

conclusions cast in the form of factual allegations."  Kowal, 16

F.3d at 1276.  "While a complaint attacked by a Rule 12(b)(6)

motion to dismiss does not need detailed factual allegations,

. . . a plaintiff's obligation to provide the grounds of his

entitle[ment] to relief requires more than labels and

-8-

conclusions[.]" Twombly, 127 S. Ct. at 1964-65 (internal

citations and quotations omitted) (alteration in original).

"Factual allegations must be enough to raise a right to relief

above the speculative level, . . . on the assumption that all the

allegations in the complaint are true . . . ." Id. at 1965

(citations and footnote omitted).

I.   FEDERAL ANTITRUST CLAIMS

     A.   Claim for damages

     In Count I of the complaint, plaintiffs allege injury under

§ 4 of the Clayton Act, codified at 15 U.S.C. § 15, which

provides in relevant part that

> [a]ny person who shall be injured in his business or
> property by reason of anything forbidden in the
> antitrust laws may sue therefor in any district court
> of the United States . . . and shall recover threefold
> the damages by him sustained . . . .

15 U.S.C. § 15.  The Supreme Court has acknowledged that "[a]

literal reading of the statute is broad enough to encompass every

harm that can be attributed directly or indirectly to the

consequences of an antitrust violation[,]" Associated Gen.

Contractors v. California State Council of Carpenters, 459 U.S.

519, 529 (1983) ("AGC"), and that "[a]n antitrust violation may

be expected to cause ripples of harm to flow through the Nation's

economy." Blue Shield of Va. v. McCready, 457 U.S. 465, 476-77

(1982).  Nonetheless, the Court has concluded that "[i]t is

reasonable to assume that Congress did not intend to allow every

person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property." Id. at 477.  Therefore, despite the fact that "neither the statutory language nor the legislative history of § 4 offers any focused guidance on the question of which injuries are too remote from the violation and the purposes of the antitrust laws to form the predicate for a suit under § 4[,]" id., the Court has identified certain limits upon what constitutes a § 4 injury.  One of these limits excludes from § 4 a "pass-on" injury suffered by plaintiffs who absorbed the cost of a price-fixed product passed on through intermediate purchasers.  Illinois Brick Co. v. Illinois, 431 U.S. 720, 736 (1977).  In Illinois Brick, the Supreme Court affirmed the dismissal of a suit by plaintiffs who purchased buildings containing price-fixed bricks, which had been sold first to masonry contractors for use in building masonry structures and sold second to general contractors for incorporating the structures into buildings and sold only third to plaintiffs.  Id. at 726-27.  Often referred to as the "direct purchaser" rule, the decision in Illinois Brick is widely understood to mean that in such a situation, "[t]he right to sue for damages rests with the direct purchasers, who participate in the antecedent transaction with the monopolist."  Campos v. Ticketmaster Corp., 140 F.3d 1166, 1170 (8th Cir. 1998).

-10-

Defendants argue that Count I should be dismissed under Rule 12(b)(6) because plaintiffs were not direct purchasers of defendants' products, and therefore do not state an antitrust injury.  Here, the complaint establishes that plaintiffs are not direct purchasers.  Rather, it is the lenders, not the plaintiffs, who participate in the antecedent transaction with the alleged monopolist, and who then allegedly pass on the G-fee in the form of higher interest rates to plaintiffs.  It is the lenders, not the plaintiffs, who desire and negotiate for the product that incurs the G-fee -- the conforming mortgage that can be pooled and sold as a mortgage-backed security on the secondary market.  It is the lenders who can sell their mortgages and recoup their capital, and the investors who enjoy the guarantee on their investments -- but not the plaintiffs -- who are affected directly and immediately from the product that generates the need for the G-fees.  Because plaintiffs are injured "only by virtue of an antecedent transaction between the [alleged] monopolist and another, independent purchaser[,]" Campos, 140 F.3d at 1169, the rule of Illinois Brick bars plaintiffs' claim for damages under the federal antitrust laws, unless plaintiffs qualify for an exception to the rule.

Indeed, plaintiffs argue that their action falls within the "control" exception to Illinois Brick's direct purchaser rule. See 431 U.S. at 736 n.16 (noting that one situation "in which

-11-

market forces have been superseded and the pass-on defense might be permitted is where the direct purchaser is owned or controlled by its customer"). The control exception applies where there exists a "functional economic or other unity between the direct purchaser and either the defendant or the indirect purchaser [such that] there effectively has been only one sale." Jewish Hosp. Ass'n of Louisville, Ky., Inc. v. Stewart Mech. Enters., 628 F.2d 971, 975 (6th Cir. 1980). The control exception is construed narrowly, and functional economic unity requires a showing of ownership or control through interlocking directorates, minority stock ownership, agreements ceding operating control, a contractual agency relationship, or other modes of control separate from ownership of a majority of the intermediary's common stock. See In re Brand Name Prescription Drugs Antitrust Litig., 123 F.3d 599, 605-06 (7th Cir. 1997); In re Mercedes-Benz Antitrust Litig., 157 F. Supp. 2d 355, 366 (D.N.J. 2001).

Plaintiffs assert that lenders serve as agents for defendants with respect to the G-fees (Compl. ¶ 14), act as "mere conduits" between borrowers and defendants for purposes of collecting G-fees (id. ¶ 43), and that "there is functional economic unity between the lenders and Fannie Mae or Freddie Mac." (Compl. ¶ 41; see also id. ¶¶ 42, 43.) In support of their legal conclusion, plaintiffs allege that in 2003, the two

-12-

defendants "held seventy percent (70%) of the . . . business of
pooling and selling mortgages as mortgage-backed securities,
[and] . . . are the source of liquidity for more than 75% of the
conforming home mortgages originated in the United States" (id.
¶ 27); that "[a] lender must negotiate with Fannie Mae and
Freddie Mac in order to become an approved seller/servicer" (id.
¶ 39); that defendants use "contractual agreements with approved
[lenders] . . . to assure that lenders originate and sell" to the
two defendants only those mortgages that conform to the
defendants' specifications (id. ¶ 40); that for a fee, defendants
provide to approved lenders software known as the automated
underwriting system (AUS) to qualify mortgages according to
defendants' specifications (id. ¶ 41); that defendants "exercise
detailed and broad control over the activities of the lenders" in
dictating the specific terms of a conforming mortgage (id.); and
that defendants each "have secretly met with lenders (approved
seller/servicers) to discuss the terms, conditions, and costs
under which they will buy the lender's loans [and] . . . require
[that] lenders . . . keep the terms confidential and they are
forbidden to reveal the negotiated G-Fee rates."  (Id. ¶ 46.)

While the defendants argue that the facts plaintiffs allege
fall short of offering a reasonable basis for an inference that
there is functional economic unity between either of the
defendants and the numerous banks and other commercial lenders

-13-

nationwide identified or implied in the complaint, plaintiffs
allege sufficient facts to justify an inference of control.
Plaintiffs allege that defendants are able to control the
intermediary banks by being the source of 75% of the intermediary
banks' liquidity that was necessary for conforming home
mortgages, and plaintiffs allege the methods of control by
alleging the existence of agreements between defendants and
lenders setting forth defendants' requirements for lenders to
pass G-fees on to plaintiffs and to prevent the intermediary
banks from divulging the cost of the G-fees.  In the context of a
motion to dismiss, these asserted facts could give rise to the
inference that, with respect to G-Fees, the defendants controlled
the intermediary banks such that there was effectively only one
transaction.  See In re Mushroom Direct Purchaser Litig., No. 06-
cv-0620, 2008 WL 583906, at *3 (E.D. Pa. Mar. 3, 2008) (denying
defendants' motion to dismiss on standing grounds because
"plaintiffs' amended complaint sufficiently alleges that [the
intermediary] acted as Giant Eagle's agent in purchasing
mushrooms from defendants and that there existed economic unity
among [the intermediary] and its 'owner-members'"); City of
Moundridge v. Exxon Mobil Corp., 471 F. Supp. 2d 20, 32
(D.D.C. 2007) ("At this stage of the lawsuit, the [plaintiffs]
have sufficiently pled control even though they have failed to
specify the nature of the alleged control."); In re Mercedes-Benz

-14-

Anti-trust Litig., 157 F. Supp. 2d at 365-67 (declining to grant defendants motion to dismiss where it was unclear what role the intermediary played in the transactions).  Therefore, defendants' motion to dismiss plaintiffs' claims under §4 of the Clayton Act for failure to amply plead antitrust standing will be denied.

      B.   Claim for injunctive relief

In Count II, plaintiffs seek injunctive relief under § 16 of the Clayton Act, codified at 15 U.S.C. § 26, which provides that "[a]ny person . . . shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws . . . ."  Defendants argue that plaintiffs may not seek injunctive relief since they fail to allege any conduct posing a risk of future harm to them.  "[I]f a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date."  Zenith Radio Corp. v. Hazeltine Research Inc., 401 U.S. 321, 339 (1971).  "In the context of injunctive relief, however, lingering monetary injury, without any ongoing threat of recurrent violations [to the plaintiffs], is not sufficient to confer standing to seek an injunction."  In re Nifedipine Antitrust Litig., 335 F. Supp. 2d 6, 19 (D.D.C. 2004).

-15-

The complaint identifies as plaintiffs only those who have "obtained residential real estate loans from commercial lenders and make monthly mortgages that include G-Fees at artificially inflated levels set by the Defendants." (Compl. ¶ 10.) The complaint does not allege that any of the plaintiffs are prospective mortgagees of conforming mortgages that have not already been originated. Plaintiffs allege that the cost of the G-fee each borrower pays as part of his or her monthly interest rate on the mortgage "throughout the life of the loan is 'baked into' the loan transaction at the outset, and continues throughout the life of the loan on an unchanged basis" and that the "G-Fees set at the time of the loans by approved seller/servicers and at all times thereafter throughout the life of the mortgage loans effectively constitute only one G-Fee transaction." (Id. ¶43; see also id. ¶¶ 39, 47.) According to the allegations, the G-fee associated with a conforming mortgage is set when the mortgage loan is made, is apportioned over the life of the loan, remains unchanged after the loan is originated, and is collected through monthly interest payments. The fact that they will "continue to pay" (id. ¶ 5) the G-fees that are incorporated into the cost of the loan at its origination is what plaintiffs identify as threatened future harm. Stated otherwise, the allegations establish not that plaintiffs expect to incur future injury, but that plaintiffs will continue to absorb the

effects of past injuries into the future, courtesy of the installment plan.

Plaintiffs have conflated damages from a past injury that will be realized in the future, sometimes referred to as future damages, with the threat of a future injury.  Plaintiffs seek injunctive relief to prevent defendants from "colluding with regard to G-Fees and requiring of lenders that G-Fees be kept secret and confidential."  (Compl. §§ 37, 88.)  However, even if this alleged collusion were to be enjoined, plaintiffs would not feel relief because none claims to be a future mortgagee, and as current mortgagees, the G-Fees are already "baked in" to their mortgages as current mortgagees.  An order enjoining defendants from specific future conduct would have no remedial effect whatsoever on the continuing future damages plaintiffs expect to experience due to the past injury they allege was inflicted at the time when their loans were originated.  Plaintiffs' allegations do not identify any future conduct by defendants that threatens to injure plaintiffs' business or property.  Any injury that occurred to the plaintiffs occurred when they obtained their mortgages, and plaintiffs' predicament is one of future damages, not future injury.

Because plaintiffs have pled that they are threatened with future damages, but not with future injury, their federal claim

for injunctive relief (Count II) will be dismissed for failure to
state a claim upon which relief may be granted.

II.  STATE STATUTORY CLAIMS

    Counts III through VI assert state statutory claims.  In
Count IV, the complaint states that

> [d]efendants have entered into agreements in restraint
> of trade in violation of numerous other state laws
> identified below [listing 24 jurisdictions and
> referring to 26 sets of statutes].  To the extent these
> other state laws apply to Plaintiffs' claims,
> Plaintiffs seek injunctive relief and, where available,
> compensatory and multiple damages under the following
> state laws as to claims of class members who obtained
> loans in those states.

(Compl. ¶ 97.)  For the same reason that plaintiffs are not
entitled to federal antitrust injunctive relief -- because
plaintiffs identify a past, not a future, injury -- they are not
entitled to any state antitrust injunctive relief.  In addition,
the plaintiffs lack standing to allege antitrust violations under
the laws of states where no named plaintiffs have been personally
injured.  Accordingly, defendants' motion to dismiss will be
granted as to all claims for injunctive relief under the state
antitrust laws identified in Counts III and IV.

    A.   State claims without a proper plaintiff

    In Counts III and IV of the complaint, plaintiffs allege
either consumer protection or antitrust violations arising under
the statutes of California, the District of Columbia, Iowa,
Kansas, Louisiana, Maine, Massachusetts, Michigan, Mississippi,

Nebraska, Nevada, New Mexico, North Carolina, North Dakota, South
Dakota, Tennessee, and Vermont, but have identified no plaintiff
who is entitled to seek relief under any of those statutes.  The
Constitution limits a federal court to hearing a case or
controversy, and a case or controversy requires a specific,
identified plaintiff who can establish a personal injury under
the claim asserted.  Warth v. Seldin, 422 U.S. 490, 502 (1975).
To have Article III standing, a plaintiff must establish: "(1)
[he or she] suffered an 'injury in fact' that is (a) concrete and
particularized and (b) actual or imminent, not conjectural or
hypothetical; (2) the injury is fairly traceable to the
challenged action of the defendant[s]; and (3) it is likely, as
opposed to merely speculative, that the injury will be redressed
by a favorable decision."  Friends of the Earth, Inc. v. Laidlaw
Envtl. Servs., 528 U.S. 167, 180-81 (2000) (citing Lujan v.
Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).  "[T]he
possibility that other members of the class might have had
standing had they brought suit does not thereby confer standing
on the named representatives; the actual plaintiffs must show
that they have personally suffered an injury redressable by the
courts."  Am. Jewish Congress v. Vance, 575 F.2d 939, 944 (D.C.
Cir. 1978) (citing Warth, 422 U.S. at 502).  Accordingly, named
plaintiffs in a class action

> must allege and show that they personally have been
> injured, not that injury has been suffered by other,

-19-

> unidentified members of the class to which they belong
> and which they purport to represent.  Unless these
> [plaintiffs] can thus demonstrate the requisite case or
> controversy between themselves personally and
> [defendants], none may seek relief on behalf of himself
> or any other member of the class.

<u>Warth</u>, 422 U.S. at 502 (internal quotation marks and citation

omitted).  Because the allegations do not support an inference

that any of the named plaintiffs have been personally injured

such as to provide them with the causes of action asserted in

Counts III and IV under the laws of California, the District of

Columbia, Iowa, Kansas, Louisiana, Maine, Massachusetts,

Michigan, Mississippi, Nebraska, Nevada, New Mexico, North

Carolina, North Dakota, South Dakota, Tennessee and Vermont,

plaintiffs lack standing to bring those claims, and the claims

asserted in Counts III and IV as to those jurisdictions will be

dismissed.[2]

B.    <u>Antitrust injury under state antitrust claims</u>

States may, but need not, follow the rule of <u>Illinois Brick</u>

in enforcing their own state antitrust laws.  <u>California v. ARC</u>

<u>America Corp.</u>, 490 U.S. 93, 105-06 (1989) (holding that <u>Illinois</u>

<u>Brick</u> did not preempt state laws that permit suits by plaintiffs

with passed-on injuries).  Several states expressly do not adhere

to the rule announced in <u>Illinois Brick</u>.  Yet, that does not

---

[2]  Whether other reasons would cause plaintiffs' claims
under these state laws to be dismissed if there were an
appropriate plaintiff is not reached here.

-20-

necessarily answer the question of whether injuries such as plaintiffs' are cognizable under state antitrust statutes. Several states, either by statute or case law, expressly require their courts to follow the guidance of federal case law in interpreting the state's antitrust statutes, and some Supreme Court decisions offer just such guidance.

Recognizing that "the infinite variety of claims that may arise make it virtually impossible to announce a black-letter rule that will dictate the result in every case[,]" the Supreme Court has identified several considerations appropriate to determining whether certain injuries are countenanced within § 4 of the Clayton Act.  AGC, 459 U.S. at 536; see also McCready, 457 U.S. 465.  Taken together, McCready and AGC teach that a court making such a determination should consider three categories of factors:  (1) the nature of the injury, AGC, 459 U.S. at 538; McCready, 457 U.S. at 478; (2) the causal connection linking the defendant, injury and plaintiff, McCready, 457 U.S. at 477; and (3) the risk of duplicative recovery or complex apportionment of damages between plaintiffs at multiple levels of the chain of production.[3]  AGC, 459 U.S. at 544-545.

---

[3] For example, the AGC Court in describing the risk of complex apportionment of damages in that case said the District Court would have to identify damages and apportion "them among directly victimized contractors and subcontractors and indirectly affected employees and union entities.  It would be necessary to determine to what extent the coerced firms diverted business away from union subcontractors, and then to what extent those

As to the first category, the nature of the injury, the
Supreme Court's decisions "have emphasized the central interest
in protecting economic freedom of participants in the relevant
market." <u>AGC</u>, 459 U.S. at 538.  As a threshold matter, antitrust
plaintiffs "must prove more than injury causally linked to an
illegal presence in the market.  Plaintiffs must prove an
antitrust injury, which is to say [an] injury of the type the
antitrust laws were intended to prevent and that flows from that
which makes defendants' acts unlawful."  <u>Brunswick Corp. v.
Pueblo Bowl-o-Mat, Inc.</u>, 429 U.S. 477, 489 (1977).  A court
should consider the alleged injury in light of "those forms of
injury about which Congress was likely to have been concerned in
making defendant's conduct unlawful and in providing a private
remedy under § 4."  <u>McCready</u>, 457 U.S. at 478.  In this respect,
whether the plaintiff was "a consumer [or] a competitor in the
market in which trade was restrained," may be a factor of central
importance.  <u>AGC</u>, 459 U.S. at 539.  As to the second factor, "the
physical and economic nexus between the alleged violation and the
harm to plaintiff," <u>McCready</u>, 457 U.S. at 478, a court should
apply an analysis akin to "that employed traditionally by courts
at common law with respect to the matter of proximate cause."
<u>Id.</u> at 477 (internal quotation marks and citation omitted).

---

subcontractors absorbed the damage to their businesses or passed
it on to employees by reducing the work force or cutting hours or
wages."  <u>AGC</u>, 439 U.S. at 545.

-22-

Logically, this category includes factors such as "the directness or indirectness of the asserted injury[,]" ACG, 459 U.S. at 540, and whether there are other persons more appropriately positioned to sue for the injuries alleged.  Id. at 544.  As to the third category, the type of recovery, a court should take account of "the risk of duplicate recoveries[,]" "the danger of complex apportionment of damages[,]" id., and whether the damages are speculative.  Id. at 542.  In addition to these three major categories of factors, it is proper to consider any evidence of specific intent to harm, although intent to harm is neither a necessary nor a sufficient condition to maintain a suit under § 4.  McCready, 457 U.S. at 479 (stating that the availability of a § 4 suit "is not a question of the specific intent of the conspirators"); AGC, 459 U.S. at 537 (stating that intent "is not a panacea that will enable any complaint to withstand a motion to dismiss").  Where state law mandates conformity with federal decisional law, these considerations are to be applied to the state statutory provision that parallels § 4 of the Clayton Act.

     1.   Arizona antitrust claims

Plaintiffs assert a state antitrust claim under Arizona's laws, codified at Ariz. Rev. Stat. §§ 44-1401 et seq.  Arizona's statute permits, but does not require, a court enforcing Arizona's antitrust statute to apply federal case law interpreting comparable federal antitrust provisions.  Ariz. Rev.

-23-

Stat. § 44-1412.  By its decision in <u>Bunker's Glass Co. v.</u>
<u>Pilkington, PLC</u>, 75 P.3d 99 (Ariz. 2003), the Arizona Supreme
Court expressly declined to apply <u>Illinois Brick</u> to bar suits by
plaintiffs who alleged they had suffered passed-on injuries, and
held that the "plain language of [Ariz. Rev. Stat.] § 44-1408
[the provision of the Arizona antitrust statute comparable to
§ 4 of the Clayton Act], would allow an indirect purchaser suit."
<u>Bunker's Glass</u>, 75 P.3d at 103.

       The Arizona court implicitly declined to apply the factors
further defining and limiting antitrust injury under § 4 of the
Clayton Act that were identified by the Supreme Court in <u>AGC</u>, a
decision mentioned only by the dissent, not the majority, in
<u>Bunker's Glass</u>.  75 P.3d at 113 (McGregor, J., dissenting).  The
majority expressed the view that some of the <u>AGC</u> factors --
problems of complex apportionment of damages and the risk of
multiple recoveries -- were matters that the Arizona courts were
competent to handle.  <u>Id.</u> at 108.  Given the opinion in <u>Bunker's</u>
<u>Glass</u>, it appears that if presented squarely with the question,
the Arizona court would reject the use of the <u>AGC</u> factors to bar
suit by plaintiffs with the passed-on injuries plaintiffs
describe in this case.  Accordingly, defendants' motion to
dismiss will be denied as to the Arizona plaintiffs' claims
arising under the Arizona antitrust statutes.

-24-

2.   Minnesota antitrust claims

Plaintiffs assert an antitrust claim under Minn. Stat.
§§ 325D.52 <u>et seq.</u>  Minnesota does not follow the rule of
<u>Illinois Brick</u>.  <u>State by Humphrey v. Philip Morris Inc.</u>, 551
N.W.2d 490, 497 (Minn. 1996).  Absent a clear statutory directive
to the contrary, a Minnesota court is otherwise required to apply
federal case law to the Minnesota parallels of the federal
antitrust statutes.  <u>Howard v. Minn. Timberwolves B'ball Ltd.
P'ship</u>, 636 N.W.2d 551, 556 (Minn. App. 2001) (concluding that
Minnesota antitrust law must be interpreted consistently with
federal court interpretations of federal antitrust law, unless
Minnesota law clearly conflicts).  However, Minnesota is not
required to abide by federal antitrust standing limitations.
<u>Snyder's Drug Stores v. Minnesota State Bd. Of Pharmacy et al.</u>,
221 N.W.2d 162, 165 (Minn. 1974).

The Minnesota Supreme Court has determined that the <u>AGC</u>
factors "do not provide the benchmark for antitrust standing in
Minnesota," that an antitrust plaintiff does not have to be a
consumer or competitor in the market restrained by the alleged
antitrust violation, and that application of the <u>AGC</u> factors to
claims arising under Minnesota antitrust law would "contravene
the plain language of the {Minnesota antitrust] statute and . . .
thwart the intent of the legislature by barring indirect
purchaser suits for the reasons articulated in <u>Illinois Brick</u>.

-25-

Lorix v. Crompton Corp., 736 N.W.2d 619, 627, 629 (Minn. 2007).
In Lorix, the Court stated that application of the first AGC
factor - - whether the plaintiff is a consumer or competitor in
the allegedly restrained market - - was "not harmonious with
[Minnesota] antitrust law." Id. at 627.  Lorix did not define
the outer limits of standing under the Minnesota antitrust
statute.  However, the Court found that the plaintiff - - a
consumer who alleged that she paid more for tires as a result of
the defendant chemical companies' conspiracy to fix the price of
rubber-processing chemicals - - had standing because the
plaintiff "allege[d] that she is an end user of a consumer good
whose price was inflated by anticompetitive conduct" on behalf of
the defendants.  Id. at 631.  Similarly, the plaintiffs in this
case have alleged that they suffered damages by paying higher G-
Fees than a competitive market would have established because of
the defendants' anticompetitive conduct.  Therefore, defendants'
motion to dismiss will be denied as to the Minnesota plaintiffs'
claims arising under the Minnesota antitrust statutes.

　　　　3.   New Jersey antitrust claims

　　Plaintiffs assert a claim under New Jersey's antitrust
statutes, codified at N.J. Stat. Ann. §§ 56:9-1 et seq.  After
plaintiffs initiated this action, the New Jersey appellate court
issued an opinion leaving no doubt that New Jersey follows the
rule of Illinois Brick, and that indirect purchasers lack

-26-

standing under the New Jersey Antitrust Act.  See Sickles v. Cabot Corp., 877 A.2d 267, 271 (N.J. App. 2005).  For this reason, plaintiffs here are barred from suing under New Jersey's antitrust statute, a conclusion they concede.  (See Pls.' Opp'n to Mot. to Dismiss at 27 n.12.)  Accordingly, the claim under New Jersey's antitrust statute will be dismissed.

        4.   New York antitrust claims

      Plaintiffs assert a claim under New York's antitrust statute, the Donnelly Act, codified at N.Y. Gen. Bus. Law §§ 340 et seq.  New York's law limits class actions by private persons. Specifically,

> [u]nless a statute creating or imposing a penalty, or a
> minimum measure of recovery specifically authorizes the
> recovery thereof in a class action, an action to
> recover a penalty, or minimum measure of recovery
> created or imposed by statute may not be maintained as
> a class action.

N.Y. Civ. Prac. Law & R. § 901(b).  This limitation applies to claims brought under the Donnelly Act, and New York courts have held that a class of private persons cannot maintain a Donnelly Act action.  "Private persons are precluded from bringing a class action under the Donnelly Act (General Business Law § 340) because the treble damages remedy provided for in subsection 5 constitutes a 'penalty' within the meaning of CPLR 901(b)."  Cox v. Microsoft Corp., 290 A.D.2d 206 (N.Y. App. Div. 2002).  See also Paltre v. Gen. Motors Corp., 26 A.D.3d 481, 483 (N.Y. App. Div. 2006) ("The treble damages provision [in New York's Donnelly

-27-

Act] is a penalty within the meaning of § 901(b).  The
plaintiffs' Donnelly Act class action may not be maintained
because the Donnelly Act does not specifically authorize the
recovery of this penalty in a class action[.]") (citations
omitted); <u>Sperry v. Crompton Corp.</u>, 26 A.D.3d 488, 489 (N.Y. App.
Div. 2006), <u>aff'd</u>, No. 4, 2007 WL 527726 (N.Y. Feb. 22, 2007)
(holding that the court below had properly dismissed the
plaintiffs' Donnelly Act class action as barred by
CPLR § 901(b)).

     As was discussed in <u>Erie Railroad Co. v. Tompkins</u>, 304 U.S.
64 (1938), where a state law abridges a state cause of action, a
federal court exercising diversity jurisdiction is bound to
observe the state law that abridges the claim.  <u>See</u> <u>Ragan v.</u>
<u>Merchants Transfer and Warehouse Co.</u>, 337 U.S. 530, 533 (1949);
<u>accord</u> <u>Hanna v. Plumer</u>, 380 U.S. 460, 470 n.12 (1965); <u>Leider v.</u>
<u>Ralfe</u>, 387 F. Supp. 2d 283, 291 (S.D.N.Y. 2005) (finding that §
901(b) is substantive, not procedural, law for the purposes of
the <u>Erie</u> doctrine, and must be applied by a federal court sitting
in diversity).  Because New York's antitrust statute does not
specifically authorize class actions by private persons,
plaintiffs' claim for antitrust damages under New York law will
be dismissed.

-28-

5.   West Virginia antitrust claims

Plaintiffs assert a West Virginia antitrust claim under West Virginia Code §§ 47-18-1 et seq.  In 1990, the West Virginia legislature approved a legislative rule, now codified at 142 Code of State Rules § 9, which had been proposed by the state's attorney general under W. Va. Code § 47-18-20.  The legislative rule, which carries the force of law,[4] expressly provides that "[a]ny person who is injured directly or indirectly by reason of a violation of the West Virginia Antitrust Act, . . . may bring an action for damages under W. Va. Code § 47-18-9[,]" which is West Virginia's statutory equivalent of § 4 of the Sherman Act. 142 C.S.R. § 9.  Under this rule, plaintiffs' injuries fall within the scope of § 47-18-9, and the rule of Illinois Brick is inapplicable.

In light of West Virginia's statute expressly requiring "harmony with judicial interpretations of the comparable federal antitrust statutes," W. Va. Code § 47-18-16, a West Virginia court is bound to consider other U.S. Supreme Court decisions in determining whether plaintiffs' injuries are cognizable as

---

[4]   In West Virginia, "[l]egislative rules are proposed by an agency subject to the Administrative Procedures Act (APA), but must be approved by the Legislature before they go into effect . . . .  A legislative rule is the only form of rule under the APA which: carries the force of law, or supplies a basis of civil or criminal liability, grants or denies a specific benefit." West Virginia Secretary of State at http://www.wvsos.com/adlaw/rulemaking/ruletypes.htm.

antitrust injuries under § 47-18-9.  No published decision of a
West Virginia court has considered whether or to what extent the
Supreme Court's decisions, and in particular the factors
identified in McCready and AGC, apply to § 47-18-9.  A ruling
here will be one of first impression.

      Applying the various factors a court should consider in
determining whether a plaintiff has alleged an antitrust injury,
but leaving aside -- as required by West Virginia law -- the fact
that the injury was passed-on by the lenders to plaintiffs, the
only close question involves the nature of the injury alleged.
On the one hand, plaintiffs here are not participants in the
allegedly restrained market of collusively priced G-fees.  On the
other hand, the injury alleged is of the type that flows from the
alleged antitrust violation - - price-fixing.  Furthermore,
although the margin of the overcharge of the G-fee that is due to
the illegal collusion would necessarily be an estimate based on
unverifiable assumptions, each plaintiff's damages would be based
on the amount of the loan, and it cannot be said that the damages
sought are speculative or that apportionment would be complex.
There is only a slight chance of duplicative recoveries in this
case.  Although the lenders could sue, they have not yet done so.
The allegations establish that lenders have few incentives to sue
and have mitigated their damages in any case.  Defendants' intent
to harm the victims is clearly alleged in the complaint and also

-30-

weighs decidedly in favor of determining that plaintiffs have
alleged an antitrust injury.  On balance, the factors the Supreme
Court has identified as appropriate for consideration lead to a
conclusion that plaintiffs here have alleged an antitrust injury
under the private damages provision of West Virginia's antitrust
statute.  For this reason, and because the rule of <u>Illinois Brick</u>
does not apply in West Virginia, defendants' motion to dismiss
will be denied as to the West Virginia plaintiffs' claims arising
under the West Virginia antitrust statute.

     6.   Wisconsin antitrust claims

     Plaintiffs assert a claim under Wisconsin's antitrust
statute, codified at Wis. Stat. Ann. §§ 122.01 <u>et seq.</u>  After the
decision in <u>Illinois Brick</u> was announced, the Wisconsin
legislature effectively repealed the rule barring suit by
indirect purchasers by amending its antitrust statute to allow a
suit for treble damages by "any person injured, directly or
indirectly, by anything prohibited" under the state antitrust
statute.  Wis. Stat. Ann. § 133.18(1)(a).

     Wisconsin's antitrust statutes do not include a provision
requiring Wisconsin's courts to harmonize their findings with
federal decisional law.  However, "[w]hile federal cases
construing federal law are not controlling on Wisconsin courts'
interpretations of state statutes, over the years [Wisconsin]
courts have looked to federal antitrust decisions for guidance

-31-

when the language and policy of the federal and state antitrust
statutes are substantially similar and when Wisconsin case law on
an issue is 'scarce.'"   Carlson & Erickson Builders v. Lampert
Yards, 529 N.W.2d 905, 908 (Wis. 1995).   In addition, in a case
of first impression, a Wisconsin court of general jurisdiction
concluded that if faced with the question, Wisconsin's appellate
courts would "look to the[] factors" identified in AGC "for
guidance" in assessing whether a plaintiff's antitrust injuries
were cognizable under the Wisconsin antitrust statute.   Strang v.
Visa U.S.A., Inc., No. 3 CV 11323, 2005 WL 1403769, *3 (Wis. Cir.
Feb. 8, 2005).   In Strang, the plaintiff had sued for injury from
increased retail prices on goods sold by merchants who had
sustained monopolistic overcharges from providers of debit card
services.   Id. at *1.   The court identified the following five
categories of AGC factors as those a Wisconsin court should
consider in determining whether a plaintiff's injury is
cognizable as an antitrust injury under § 133.18(a) of the
Wisconsin Statutes:

> 1. Is there a causal connection between the antitrust
> violation and the harm to the plaintiff?
>
> 2. Did the defendant intend to cause the particular
> harm?
>
> 3. The nature of the claimant's injuries, most
> specifically the directness or indirectness of those
> injuries.   Included in this consideration is whether
> there is another class of affected individuals who are
> more directly injured.

-32-

4. Is the injury claimed highly speculative in nature? At bottom, does the claimed injury rest on an abstract conception or speculative measure of harm.

5. The risk of duplicative recovery as well as the danger and judicial manageability of complex apportionment of damages.

Id. at *3.  The court also noted that "[t]he AGC court also directed attention to whether a claimant was a consumer or competitor in the restrained market[,]" a concern logically interrelated with other "nature of the injury" concerns.  Id. at 4.  Finding that the plaintiff in Strang was neither a consumer nor a competitor in the restrained market, that the damages sought were speculative, that apportionment of any damages would be exceedingly complex, and –– in light of the fact that the retail merchants had already brought an antitrust suit against the defendants for the same conduct –– the "risk of duplicative recoveries could not be more acute[,]" the court concluded that "the analysis of the AGC factors overwhelmingly supports the conclusion that [plaintiff] lacks [antitrust injury] standing to maintain [her] action."  Id. at *4-5.

Applying a similar analysis to these facts suggests that plaintiffs here have alleged facts that support the following inferences:  (1) plaintiffs' injuries are causally connected to defendants' conduct; and (2) defendants knew that plaintiffs would be injured by their conduct; but (3) plaintiffs do not participate in the allegedly restrained market, their injury is

-33-

indirect, and there are other more directly injured persons.

Further, the damages plaintiffs seek are not exceptionally

speculative, there is only a slight risk of duplicative

recoveries, and the apportionment of damages would not present

exceptionally complex issues for judicial management.  On

balance, then, as applied to this case, the factors a Wisconsin

court would consider lead to the conclusion that plaintiffs have

stated an antitrust injury under Wisconsin law.  The allegations

here disclose a restraint of the type outlawed by the antitrust

act that is alleged to have produced increased prices that

injured these plaintiffs.  Although the Wisconsin court treated

as important the fact that the <u>Strang</u> plaintiff was neither a

consumer nor a competitor in the restrained market, it did not

indicate that the factor was critical or necessary, <u>id.</u> at *4,

and the Supreme Court has stated that a plaintiff need not be a

consumer, purchaser, competitor or seller in order to allege an

antitrust injury.  <u>Mandeville Island Farms, Inc. v. Am. Crystal</u>

<u>Sugar Co.</u>, 334 U.S. 219, 236 (1948).  Accordingly, defendants'

motion to dismiss will be denied as to the Wisconsin plaintiffs'

claims arising under Wisconsin's antitrust statute.

     C.   <u>State consumer protection claims</u>

          1.   D.C. Consumer Protection Procedures Act

In Count V, plaintiffs assert a claim against Fannie Mae

under the District of Columbia's Consumer Protection Procedures

-34-

Act ("CPPA").  D.C. Code §§ 28-3901 et seq.   The CPPA was
enacted "to police trade practices arising only out of
consumer-merchant relationships."  Howard v. Riggs Nat'l Bank,
432 A.2d 701, 709 (D.C. 1981).  "Transactions along the
distribution chain that do not involve the ultimate retail
customer are not 'consumer transactions' that the Act seeks to
reach.  Rather, it is the ultimate retail transaction between the
final distributor and the individual member of the consuming
public that the Act covers."  Adam A. Weschler & Son, Inc. v.
Klank, 561 A.2d 1003, 1005 (D.C. 1989); cf. Williams v. The
Purdue Pharma Co., 297 F. Supp. 2d 171, 175 (D.D.C. 2003)
(finding that where allegations showed that defendant
pharmaceutical manufacturers had touted their products directly
to plaintiff-consumers through brochures and videotapes,
plaintiffs had alleged facts supporting an inference of a
consumer-merchant relationship even though retail pharmacies were
the final distributors to plaintiff, but dismissing on other
grounds).

     Plaintiffs allege that Fannie Mae violated the CPPA by
failing "to state a material fact," contrary to Section 28-
3904(f) of the CPPA.  (Compl. §§ 101-102.)  Plaintiffs specify
that the defendants prevented lenders from revealing material
facts in mortgage transactions, by alleging that Fannie Mae
required lenders not to disclose "the existence and amount of the

G-Fees . . . 'baked into' loans to borrowers."  (Compl. ¶ 102.)
Plaintiffs do not allege that Fannie Mae had any direct dealings
or communications with plaintiffs.  Plaintiffs' factual
allegations do not afford either an inference that Fannie Mae was
the final distributor of a good or service to the plaintiffs, or
an inference that plaintiffs and Fannie Mae had a consumer-
merchant relationship.  Fannie Mae sells nothing to the
plaintiffs and plaintiffs obtain nothing from Fannie Mae.
Plaintiffs and Fannie Mae never entered into a sales agreement,
and there is no real estate transaction between plaintiffs and
Fannie Mae.  (Compl. ¶ 28 ("The Defendants are expressly
prohibited by their charters from lending directly to consumers.
They operate exclusively in what is known as the secondary
mortgage market purchasing mortgages from primary mortgage market
institutions.").)  Plaintiffs do not consume any good or service
provided either directly or indirectly by Fannie Mae.  Rather,
according to the allegations, Fannie Mae announces to lenders the
terms of any mortgages made that Fannie Mae might later purchase
(id. at ¶ 40 ("Fannie Mae and Freddie Mac use contractual
agreements with approved [lenders] . . . to assure that lenders
originate and sell to the two [defendants] only those mortgages
that comply with [defendants'] requirements.")), and Fannie Mae
sells to investors a guarantee on the mortgage-backed securities.
(Id. at ¶ 30 ("Fannie Mae and Freddie Mac have guaranteed that if

the underlying mortgages that form the mortgage backed securities [sold to investors] default, they will step in and cover the absent cash flow."); see also id. at 28-30.)  Because plaintiffs are unable to allege that they are consumers of anything Fannie Mae provides, they cannot state a claim under the CPPA, and defendants' motion to dismiss the claim under the D.C. Consumer Protection Procedures Act, Count V, will be granted.

      2.  Virginia Consumer Protection Act

      In Count VI, plaintiffs assert a claim against Freddie Mac under the Virginia Consumer Protection Act ("VCPA").  Va. Code Ann. §§ 59.1-196 et seq.  The VCPA provides that it is unlawful to use any "deception, false pretense, false promise, or misrepresentation in connection with a consumer transaction."  Va. Code Ann. Sec. § 59.1-200.  Just as Fannie Mae had not provided any plaintiff with any goods or services, neither has Freddie Mac provided any plaintiff with any goods or services, either directly or indirectly.  For this reason alone, plaintiffs cannot state a claim against Freddie Mac under the VCPA.  See Siradas v. Chase Lincoln First Bank, Civil Action No. 98-4028, 1999 WL 787658, *9 (S.D.N.Y. Sept. 30, 1999) (concluding that Freddie Mac was not subject to the VCPA because it was not a "supplier" to plaintiffs and did not engage in "consumer transactions" within the meaning of the VCPA); see also Murray v. Dryvit Systems, Inc., Civ. No. 01-04-7383, 2002 WL 32072493, *4-5

-37-

(Va. Cir. Ct. July 15, 2002) (holding that homeowner plaintiff could not state a claim under the VCPA against manufacturer of the synthetic stucco sold to contractor who built and sold home to plaintiff). In addition, other courts have concluded that consumer real estate transactions are not governed by the VCPA. Smith v. United States Credit Corp., 626 F. Supp. 102 (E.D. Va. 1985); Siradas, 1999 WL 787658, at *9. Accordingly, defendants' motion to dismiss the claim asserted under the VCPA, Count VI, will be granted.

      3.   New York Consumer Protection Act

      Plaintiffs assert in Count IV a claim under the New York Consumer Protection Act ("CPA"). N.Y. Gen. Bus. Law §§ 349 et seq. The Consumer Protection Act provides for actual damages or treble damages where the violation is knowing or willful. While plaintiffs here have alleged facts that support an inference that defendants' conduct was knowing and willful, New York's Civil Practice Law and Rules § 901(b) disallows class actions to recover a penalty or minimum measure of recovery unless the statute specifically authorizes a class action. New York's CPA does not expressly provide for class actions. Accordingly, the claim is barred and defendants' motion to dismiss this claim will be granted.

-38-

4.   Florida Deceptive and Unfair Trade Practices Act

Plaintiffs assert in Count IV a claim under the Florida
Deceptive and Unfair Trade Practices Act ("DUTPA").  Fla. Stat.
Ann.  §§ 501.201 et seq.  The DUTPA prohibits "[u]nfair methods
of competition, unconscionable acts or practices, and unfair or
deceptive acts or practices in the conduct of any trade or
commerce . . . ."  Fla. Stat. Ann. § 501.204(1).  While the DUTPA
at one time had been interpreted to apply only to parties to a
consumer transaction, the Florida legislature amended the statute
in 2001 to allow a damages action by any "person who has suffered
a loss as a result of a violation of this part," dropping the
requirement that an action for damages under the DUTPA had to be
brought by a consumer.  Fla. Stat. Ann. § 501.211(2); Niles Audio
Corp. v. OEM Systems Co., Inc., 174 F. Supp. 2d 1315, 1319-20
(S.D. Fla. 2001) (applying the amended statute to permit damages
action by competitor); Gritzke v. M.R.A. Holding, LLC,
No. 4:01CV495-RH, 2002 WL 32107540, *4 (N.D. Fla. Mar. 15, 2002)
(applying the amended statute to permit damages action by person
who was unwillingly depicted on the cover of material for sale in
consumer transactions).

Here, plaintiffs allege they have suffered a loss due to
defendants' price-fixing, an unfair method of competition.
Because the DUTPA does not require that plaintiffs be consumers
of anything sold by Fannie Mae or Freddie Mac in order to have a

claim for damages, the Florida plaintiffs have stated a claim under DUTPA.  Accordingly, defendants' motion to dismiss will be denied as to the Florida plaintiffs' claims arising under Florida's DUTPA.

III. STATE COMMON LAW UNJUST ENRICHMENT CLAIMS

Defendants argue that plaintiffs' unjust enrichment claims, found in Count VII, should be dismissed because plaintiffs lack antitrust standing to seek damages.  In Count VII, plaintiffs assert an unjust enrichment claim against defendants, but do not identify any particular jurisdiction's laws they mean to implicate.  Plaintiffs allege facts sufficient to support an inference of unjust enrichment under the common law of many jurisdictions -- that plaintiffs conferred, and were impoverished by, overpayments that defendants benefitted from and did not deserve, and that plaintiffs have no adequate remedy at law.[5] See, e.g., Carter v. Safeway Stores, 744 P.2d 458, 462 (Ariz. Ct. App. 1987) ("The five elements of a claim for unjust enrichment are: "(1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) absence of justification for the enrichment and the impoverishment and (5) an absence of a remedy provided by law."); Fla. Power Co. v. City

---

[5]  Plaintiffs ask for restitution and a constructive trust (and mention disgorgement in a section heading), but the parties do not address the proper measure of relief for unjust enrichment under the laws of any of the states.

-40-

of Winter Park, 887 So.2d 1237, 1243 (Fla. 2004) (elements of
unjust enrichment claim are "a benefit conferred upon a defendant
by the plaintiff, the defendant's appreciation of the benefit,
and the defendant's acceptance and retention of the benefit under
circumstances that make it inequitable for him to retain it
without paying the value thereof"); Tri-State Mech., Inc. v.
Northland College, 681 N.W.2d 302, 306 (Wis. App. 2004) (listing
the elements to a claim of unjust enrichment as: "(1) a benefit
conferred upon the defendant by the plaintiff; (2) an
appreciation or knowledge by the defendant of the benefit; and
(3) the acceptance or retention by the defendant of the benefit
under circumstances that makes its retention inequitable");
Commerce Bank v. First Union Nat'l Bank, 911 A.2d 133, 143-144
(Pa. Super. 2006) ("The elements of unjust enrichment are
benefits conferred on defendant by plaintiff, appreciation of
such benefits by defendant, and acceptance and retention of such
benefits under such circumstances that it would be inequitable
for defendant to retain the benefit without payment of value.");
Gavenda v. Strata Energy, Inc., 705 S.W.2d 690, 693 (Tex. 1986)
("underpaid royalty owners . . . have a remedy: they can recover
from the overpaid royalty owners. . . .  The basis for recovery
is unjust enrichment; the overpaid royalty owner is not entitled
to the royalties."); VRG Corp. v. GKN Realty Corp., 641 A.2d 519,
554 (N.J. 1994) ("To establish unjust enrichment, a plaintiff

must show both that defendant received a benefit and that
retention of that benefit without payment would be unjust.");
Gagne v. Vaccaro, 766 A.2d 416, 435 (Conn. 2001) (elements of
unjust enrichment are "(1) the defendant was benefitted, (2) the
defendant unjustly failed to pay the plaintiff for the benefits,
and (3) the failure of payment was to the plaintiff's
detriment"); Brewer v. Washington Rsa No. 8 L.P., 184 P.3d 860,
864 (Idaho 2008) (unjust enrichment claims involve "three
elements: (1) there was a benefit conferred upon the defendant by
the plaintiff; (2) appreciation by the defendant of such benefit;
and (3) acceptance of the benefit under circumstances that would
be inequitable for the defendant to retain the benefit without
payment to the plaintiff for the value thereof"); Lewis v. Lewis,
189 P.3d 1134, 1145 (Colo. 2008) (to prevail on claim of unjust
enrichment, "the plaintiff must show that she conferred a benefit
on the defendant under circumstances that would make it unjust
for defendant to retain the benefit without paying"); Beth Israel
Med. Ctr. v. Horizon Blue Cross 7 Clue Shield of N.J., Inc., 448
F.3d 573, 586 (2d Cir. 2006) ("To prevail on a claim for unjust
enrichment in New York, a plaintiff must establish (1) that the
defendant benefitted; (2) at the plaintiff's expense; and (3)
that equity and good conscience require restitution.") (internal
quotation marks and citation omitted); Veolia Es Special Services
Inc. v. Techsol Chem. Co., No. 07-cv-0153, 2007 WL 4255280, at *9

-42-

(S.D. W.Va. Nov. 30, 2007) (a claim of unjust enrichment in West Virginia "entails the establishment of three elements: (1) a benefit conferred upon the plaintiff, (2) an appreciation or knowledge by the defendant of such benefit, and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value"); Southtown Plumbing v. Har-Ned Lumber Co., 493 N.W.2d 137, 140 (Minn. App. 1992) ("To establish an unjust enrichment claim [under Minnesota law] it must be shown that a party has knowingly received something of value, not being entitled to the benefit, and under circumstances that would make it unjust to permit its retention.").

However, for the same reason as that stated above in Section II.A., plaintiffs here have standing to pursue unjust enrichment claims in only those jurisdictions where a plaintiff has alleged that he personally has sustained an injury giving him a cause of action arising under the law of that jurisdiction.  Accordingly, defendants' motion to dismiss will be granted as to claims for unjust enrichment arising under the law of any jurisdiction other than the states of Arizona, Colorado, Connecticut, Florida, Idaho, Minnesota, New Jersey, New York, Pennsylvania, West Virginia, Wisconsin, and Texas, the states in which plaintiffs reside.

-43-

Unjust enrichment is a common law equitable claim, available only where there is no adequate remedy at law.  Rule 8, however, expressly permits pleading in the alternative of the sort employed by plaintiffs here, even where they appear to have an adequate remedy at law.

> A party may set forth two or more statements of a claim . . . alternatively or hypothetically . . . .  A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds.

Fed. R. Civ. P. 8(e)(2).  "It is not generally a ground for dismissal of a complaint asserting equitable claims that the plaintiff has an adequate remedy at law."  1 Moore's Fed. Prac. § 2.03[2] (Matthew Bender 3d ed.).  Accordingly, defendants' motion to dismiss plaintiffs' claims for common law unjust enrichment in the four jurisdictions -- Arizona, Florida, West Virginia and Wisconsin -- where plaintiffs' antitrust or consumer protection claims survive, will be denied.

Defendants argue that the unjust enrichment claims should be dismissed for lack of antitrust standing where plaintiffs are barred either under Illinois Brick or AGC from pursuing antitrust damages.  They argue that plaintiffs should not be permitted to make an "end run" around the indirect purchaser bar by asserting unjust enrichment claims in the alternative.  Although defendants cite decisions in support of their position, not all courts agree, and for sound reasons.  See In re Cardizem CD Antitrust

-44-

Litig., MDL No. 1278, Order No. 79 at 28-32, May 23, 2003 (Mem.
Op. and Order Granting in Part and Den. in Part Defs.' Mot to
Dismiss) ("Cardizem").  As an initial matter, "federal statutes
should not be construed to displace a court's traditional
equitable jurisdiction absent 'the clearest command or an
inescapable inference to the contrary.'"  Id. at 30 (quoting
Miller v. French, 530 U.S. 327, 336 (2001) (internal quotations
and citation omitted)).  In addition, the justification for
Illinois Brick's indirect purchaser bar was the difficulty of a
fair measurement and apportionment of damages -- a problem not
posed by this case.  See Cardizem at 31-32.  No reason or logic
supports a conclusion that a state's adherence to the rule of
Illinois Brick dispossesses a person not only of a statutory
legal remedy for an antitrust violation, but also dispossesses
the same person of his right to pursue a common law equitable
remedy.  Such a conclusion will not be adopted here, and
defendants' motion to dismiss the Arizona, Colorado, Connecticut,
Florida, Idaho, Minnesota, New Jersey, New York, Pennsylvania,
West Virginia, Wisconsin, and Texas, plaintiffs' claims for
unjust enrichment will be denied.

## CONCLUSION AND ORDER

For the reasons stated above, it is hereby

ORDERED that defendants' motion [14] to dismiss be, and
hereby is, GRANTED in part and DENIED in part.  The motion to

-45-

dismiss is GRANTED as to Counts II, III, V, and VI, DENIED as to
Count I, and is GRANTED in part and DENIED in part as to Counts
IV and VII.  With respect to Count IV, the motion to dismiss is
denied as to the antitrust damages claims brought under the
statutes of Arizona, Minnesota, West Virginia, and Wisconsin, and
the consumer protection claims brought under Florida's Deceptive
and Unfair Trade Practices Act, and granted as to the remaining
claims.  With respect to Count VII, the motion to dismiss is
denied as to unjust enrichment claims brought under the common
law of Arizona, Colorado, Connecticut, Florida, Idaho, Minnesota,
New Jersey, New York, Pennsylvania, West Virginia, Wisconsin, and
Texas, and it is granted as to unjust enrichment claims asserted
under the laws of any other jurisdiction.

SIGNED this 29 day of October, 2008.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge